UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------

SHEILA A. GARD,

                 Plaintiff,

COMMON GROUND HEALTHCARE COOPERATIVE,
MOLINA HEALTHCARE OF WI, INC.,
FOUNDERS INSURANCE COMPANY,

               Involuntary Plaintiffs,

   -vs-                  Case No. 2:20-CV-256

UNITED STATES OF AMERICA,
UNITED STATES POSTAL SERVICE,
MARK CZECHOLINSKI,

               Defendants.

----------------------------------------------------

       Video Examination of SHEKHAR DAGAM, M.D.,

taken at the instance of the Plaintiff, under and

pursuant to the Federal Rules of Civil Procedure,

before Sarah M. Gilkay, a Certified Realtime

Reporter, Registered Merit Reporter, and Notary

Public in and for the State of Wisconsin, at 4600 W.

Loomis Road, Suite 101, Greenfield, Wisconsin, on

February 23rd, 2022, commencing at 3:34 p.m. and

concluding at 5:15 p.m.

EXHIBIT
14

Page 2

```
 1            A P P E A R A N C E S
 2
      GRUBER LAW OFFICES, LLC, by
 3    Mr. Eric M. Knobloch
      100 East Wisconsin Avenue - Suite 2800
 4    Milwaukee, Wisconsin  53202
      Appeared on behalf of the Plaintiff.
 5
 6    UNITED STATES ATTORNEY - EASTERN DISTRICT, by
      Mr. Brian E. Pawlak
 7    517 East Wisconsin Avenue
      Milwaukee, Wisconsin  53202
 8    Appeared on behalf of the Defendants.
 9
                  * * * * *
10
            A L S O   P R E S E N T
11
      Mr. Keke M. Lewandowski, paralegal
12
      Mr. Jay Church, videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              * * * * *
 2            I N D E X
 3
 4        E X A M I N A T I O N
 5   BY MR. KNOBLOCH                     5
     BY MR. PAWLAK              41
 6   BY MR. KNOBLOCH                84
 7
 8         E X H I B I T S
 9
10   EXHIBIT NO.          PAGE IDENTIFIED
11   Exhibit 3  Medical records excerpt      9
12   Exhibit 4  Medical record, 4/30/2018     11
13   Exhibit 5  Aurora physical therapy      35
               records
14   Exhibit 6  Medical bill breakdown       36
15   Exhibit 7  CV of Shekhar Acharya Dagam   6
16   Exhibit 8  Report, Dr. Dagam, January    8
               14, 2020
17   Exhibit 9  Patient History - Detail     50
18   Exhibit 10 MedPriceMonkey.com printout   67
19             related to code 63082
20   Exhibit 11 MedPriceMonkey.com printout   69
               related to code 63081
21
22   Exhibit 12 MedPriceMonkey.com printout   70
               related to code 22551
23
24   Disposition of Original Exhibits:
25   Attached to Original Transcript.
```

Page 4

```
 1        TRANSCRIPT OF PROCEEDINGS
 2        THE VIDEOGRAPHER:  Good afternoon.
 3   We're going on the record.  The time is
 4   3:34 p.m.  Today is Wednesday, February 23rd,
 5   2022.  Please silence phones and other devices
 6   not being used for the deposition, as they can
 7   interfere with the recorded audio.  The
 8   deposition will continue to be recorded until
 9   all parties agree to go off the record.
10        This is media unit number one of the
11   recorded deposition of Dr. Shekhar Dagam.  This
12   is taken in the matter of Sheila A. Gard, et
13   al., versus United States of America, et al.
14   This case is filed in the U.S. District Court
15   for the Eastern District of Wisconsin, Case No.
16   2:20-CV-256.
17        Our deposition is being held at 4600
18   West Loomis Road, Suite 101, Greenfield,
19   Wisconsin, 53220.
20        I'm not authorized to administer an
21   oath, I'm not related to any party in the
22   action, nor am I financially interested in the
23   outcome.
24        If we can have counsel state their
25   appearances and affiliation for the record,
```

Page 5

```
 1   beginning with the noticing attorney, and then
 2   the court reporter will swear in the witness.
 3        MR. KNOBLOCH:  Eric Knobloch from
 4   Gruber Law Offices here on behalf of the
 5   plaintiff, Sheila Gard.
 6        MR. PAWLAK:  The defendant appears by
 7   Assistant United States Attorney Brian Pawlak.
 8   Also present is a paralegal from our office,
 9   Keke Lewandowski, common and casual spelling.
10        SHEKHAR DAGAM, M.D., called as a
11   witness herein, having been first duly sworn on
12   oath, was examined and testified as follows:
13        EXAMINATION
14   BY MR. KNOBLOCH:
15   Q   Hello, Dr. Dagam.  We're here today to talk
16   about the care and treatment of Ms. Sheila Gard,
17   including the treatment that you provided, with
18   respect to an auto accident that occurred on
19   March 24th of 2017.  We're going to get into
20   that treatment, but before we do so I would like
21   to provide you an opportunity to introduce
22   yourself to the Court.
23        What is your occupation and your
24   specialty, please?
25   A   Yeah.  My name is Shekhar Dagam.  I'm a
```

1     neurosurgeon, and my occupation is surgery of

2     different aspects of the central nervous system.

3   Q   How long have you been a neurosurgeon?

4   A   I've been in practice for over 20 years.

5   Q   What I have marked in front of you, Exhibit

6     No. 7, appears to be your CV.

7        Would you agree with that?

8   A   Yes.

9   Q   Did you have a chance to look over that in the

10    few minutes before today's deposition?

11   A   I did.

12   Q   And it appears to me that the board

13    certification area, this version that we're

14    looking at ends in 2018.

15        Have you maintained your board

16    certification from 2018 to the present, and are

17    you currently board-certified?

18   A   Yeah. Unfortunately the CV I think is an older

19    version, and so I'm board-certified currently.

20    It actually even has the business address as a

21    different address.

22   Q   Where did you do your undergrad and your medical

23    training and residency, please?

24   A   I did my undergrad at University of

25    California-Berkeley. I did my medical school at

1     George Washington University. And then I did my

2     neurosurgery training at the Mayo Clinic, and

3     then I did some time for an intra-residency

4     fellowship at the University of Pittsburgh

5     Department of Neurosurgery.

6   Q   I may have already asked you this. How long

7    have you been employed as a neurosurgeon?

8   A   I've been practicing neurosurgery since I

9     graduated from my residency program in 2001.

10   Q   Give us some perspective as to your average week

11    or your average month, how often are you -- do

12    you have surgery days versus clinic days, and

13    how many surgeries would you say you perform on

14    an average week?

15   A   Yeah. So my practice is approximately

16     50 percent surgery, 50 percent clinic. So I

17     will spend between two to three days in the OR

18     per week, and then alternate weeks I would be

19     two to three days in the clinic. The average

20     number of surgeries I do varies from

21     year-to-year. There were years where I was

22     doing 10 to 12 surgeries a week. Now it's

23     closer to 6 to 8 per week.

24   Q   Do you maintain privileges at any hospitals and,

25    if so, where?

1   A   I currently have privileges at Columbia

2     St. Mary's Ascension in Downtown Milwaukee. I'm

3     also -- I have privileges at the sister

4     hospital, which is in Ozaukee, Columbia

5     St. Mary's Ozaukee. I have privileges at

6     Watertown Memorial Hospital in the city -- in

7     the town of Watertown. And then there is an

8     outpatient surgery center called Milwaukee

9     Surgical Suites where I have privileges as well.

10   Q   We're here today to talk about treatment that

11    was received by Ms. Gard due to that March 24 of

12    '17 accident. Throughout the course of this

13    time period from that accident forward, have you

14    had an opportunity to draft a report, and is

15    that your report in front of you as Exhibit 8?

16   A   Yes, it is.

17   Q   Based on your report or your other knowledge,

18    what is your understanding of the accident that

19    Ms. Gard was in?

20   A   Well, she was in an accident which caused her to

21    have neck pain.

22   Q   Taking a look at your report there, Doctor, I'm

23    going to ask you a very general question, then

24    we're going to get into the specifics of

25    treatment.

1        What are the injuries that Ms. Gard

2    sustained in the accident that ultimately led to

3    the cervical fusion that you performed?

4   A   So she developed neck pain after the car

5     accident, and -- and she ultimately ended up

6     having both non-surgical and surgical treatment

7     for the neck pain.

8   Q   What I've shown you -- or showing you here,

9    Doctor, has been marked as Exhibit 3. What I

10    did was take out some records from what will be

11    Plaintiff's Exhibit No. 1, which is the

12    certified medical records, and I took out

13    records that I think you and I will talk about

14    today. I highlighted some areas that I think

15    may be a topic of discussion, and I also Bates

16    stamped in the lower right-hand corner for the

17    sake of our discussion today, so we don't have

18    to flip around as much.

19        With that being said, I would like for

20    you to take a look at the first Bates stamped

21    page number 1.

22        Do you have that in front of you?

23   A   I do.

24   Q   All right. And this appears to be an urgent

25    care clinic from the date of the accident,

Page 10

1    March 27th of 17.
2        Can you tell from this document,
3   Doctor, what pain complaints Ms. Gard was
4   reporting at that time?
5 **A   Yeah. She said that she was having bilateral**
6    **shoulder pain, as well as pain on the left side**
7    **of her head, and then she said additionally pain**
8    **included neck pain.**
9 **Q**   If you can flip the page to Bates stamp number 2
10   there, this appears to be dated March 30th of
11   '17. The note is with a Dr. Amy Swift-Johnson.
12       Do you know her?
13 **A   Not personally.**
14 **Q**   All right. Can you explain the symptoms that
15   she appeared she was having at that visit,
16   please.
17 **A   The doctor reports in here that she was having**
18    **continued bilateral neck pain, which is neck**
19    **pain on both sides. It was worse on the right**
20    **side. She was having pain also going into the**
21    **shoulder blades and going down the back.**
22 **Q**   Okay. Would it be reasonable at that point
23   based on what you know, Doctor, for Ms. Gard to
24   undergo a series of physical therapy?
25 **A   Yes. It would be very reasonable.**

Page 11

1 **Q**   All right. What I would like to do is show you
2   Exhibit No. 4. We're going to go back to 3, but
3   let's just switch to 4. All right.
4       Do you see that note, Doctor?
5 **A   Yes.**
6 **Q**   And what's the date on that note?
7 **A   April 30th, 2018.**
8 **Q**   All right. I think I went out of order just a
9   bit. In any event, we're going to get to --
10   well, no. Let's stick on Exhibit No. 4.
11       What is the referral at that point
12   from the -- from the physician, based on
13   Exhibit 4?
14 **A   Yeah. So in this note she recommends or says**
15    **that she can follow up with pain management.**
16 **Q**   This is missing some pages. That's okay.
17       You're aware of Dr. Ong?
18 **A   Yes.**
19 **Q**   Who is Dr. Ong, and how do you know him?
20 **A   So Dr. Ong is a physician who practices in pain**
21    **management. He works out of Aurora Lakeland**
22    **Hospital.**
23 **Q**   Do you have a referral relationship with
24   Dr. Ong?
25 **A   Yes. Yes, we do.**

Page 12

1 **Q**   Okay. What I would like to draw your attention
2   to now is number 10 on Exhibit 3. This appears
3   to be date of service from June of 2018.
4       Do you see that?
5 **A   I do.**
6 **Q**   And under the operative procedure it says
7   "medial branch nerves."
8       Can you tell from this what procedure
9   it is that Dr. Ong is performing here?
10 **A   Yeah. He's doing a block of the pain nerve**
11    **endings or fibers that go to the facet joints at**
12    **C4-5, C5-6, and so he calls it a medial branch**
13    **block.**
14 **Q**   In your opinion what is the objective of such a
15   procedure?
16 **A   The objective is to identify the location of the**
17    **neck pain. He makes a determination of where**
18    **the neck pain is based on exam, history, imaging**
19    **review, and then with that he'll decide where he**
20    **thinks the neck pain is coming from. He'll want**
21    **to have some sort of objective evidence to say**
22    **that that is where the pain is coming from, so**
23    **he'll do a block under X-ray to make sure that,**
24    **in fact, her pain is coming from that area.**
25 **Q**   Flip to Bates stamp number 11 there. I have

Page 13

1   highlighted that Dr. Ong appears to be an
2   interventional pain management doctor.
3       Is that your understanding?
4 **A   That is correct.**
5 **Q**   Is it common in your experience, Doctor, for
6   someone who has neck pain who undergoes a series
7   of physical therapy and does not get relief to
8   then be referred to a pain management
9   specialist?
10 **A   It's very common.**
11 **Q**   What I would like to do now, at this point I
12   think we're starting to get into some of your
13   notes. Bates stamp number 12 there, Doctor, if
14   you could. The date on that is July 12 of 2018.
15       Do you see that?
16 **A   I do.**
17 **Q**   Do you believe this to be the first office visit
18   that you had with Ms. Gard?
19 **A   I believe so.**
20 **Q**   And what were some of the problems, if any, that
21   she was explaining to you at that point?
22 **A   The main issue is she was having chronic neck**
23    **pain.**
24 **Q**   If you flip the page to Bates stamp 13 there,
25   does this discuss some of the facet joint

Case 2:20-cv-00256-NJ    Filed 03/01/24    Page 4 of 36    Document 37-11

Page 14

1   injections that she was having and talk about
2   the relief that she was receiving, and, if so,
3   can you explain that, please?
4   A   Yeah.  So she had the medial branch block, and
5       she reported she had at least 50 percent pain
6       relief.
7   Q   Can you explain in your experience, Doctor,
8       the -- how typical is that, for someone to get
9       50 percent relief?  Is that typical?  Atypical?
10      Can you talk about that?
11  A   I mean, if they're able to identify the proper
12      location and if the person is a reasonably
13      responding individual -- because some people
14      just don't respond to injections -- they should
15      at least get 50 percent, and it's very
16      reasonable to expect that.
17  Q   If you could now flip to page 17, which I think
18      is the last or second-to-last page, maybe, of
19      your visit.
20          What was the plan or course of action
21      that you establish with Ms. Gard at your first
22      visit?
23  A   So on our first visit we wanted her to maximize
24      her therapy with Dr. Ong, her treatments with
25      Dr. Ong.  She had gotten relief with the facet

Page 15

1       injections.  Certainly it would have been
2       reasonable for her to go back again.  Because I
3       think Dr. Ong and her had talked about a second
4       round.
5           I know that this was potentially
6       leading toward a more permanent solution called
7       radiofrequency ablation, which is the permanent
8       version of the medial branch block, which is a
9       more temporary version, and I had steered her in
10      that direction.  I felt that that was more than
11      appropriate for her to try to find the least
12      invasive method for pain relief.
13  Q   It also talks on number two here for the plan is
14      to continue with Aleve.
15          Would that be a -- something that --
16      well, is that something you recommended at that
17      time that she continue?
18  A   Yeah.  I mean, she was taking that, and then we
19      said, "You know what, that sounds great.  You
20      know, if you're getting relief from that, let's
21      continue that."  And I also said, you know, she
22      could try other therapies like Lidoderm patches
23      and so forth.
24  Q   If you could now turn to the next page, which is
25      Bates stamped 18, Doctor.  This appears to be a

Page 16

1   date of service from August 9th of 2018, and it
2   looks like another operative note of sorts from
3   Dr. Ong.
4           Would you agree with that?
5   A   Yes.
6   Q   And from this document could you tell what
7       procedure we're talking about here?
8   A   He says he's doing medial branch blocks.
9   Q   Is it common to -- for a patient to undergo
10      multiple medial branch blocks?
11  A   In fact, it is, because you want to be able to
12      have reproducibility to finding the location of
13      pain gene- -- to find the pain generator.  It is
14      possible if you do it only once that you may
15      have just mistakenly thought that that's the
16      level, because sometimes the medication could
17      spread, sometimes you could be off.  I mean,
18      there is so many different variables.  So by
19      repeating it and getting the same result, it
20      increases the confidence of your original
21      findings.
22  Q   Okay.  If you now flip to Bates stamp 20, and
23      this appears to be another office visit from you
24      dated August 22nd of 2018.
25          Would you agree with that?

Page 17

1   A   Yes.
2   Q   Flip the page to Bates stamp 21 there.  I take
3       this to be part of the history and discussion
4       that you're having with Ms. Gard at this visit.
5           Is that a fair statement?
6   A   Yes, it is.
7   Q   And what was your advice or what was the plan or
8       course of action that you establish with
9       Ms. Gard at that time?
10  A   Yeah.  So at that time she says her pain is a
11      little bit more tolerable.  She said she didn't
12      have neck pain before the accident.  She wanted
13      to know what would be a long-term option down
14      the road, and I think we had talked about
15      surgery.  She wasn't interested in surgery at
16      that moment, and she thought that she could
17      continue to manage her pain without open
18      surgery.  And we certainly were fine with that.
19      We, in fact, always support that whenever
20      possible.
21  Q   And perhaps my question would have been better
22      served after we looked at page 25, so I'm going
23      to have you briefly read the bottom highlighted
24      part there, and can you let us know when you've
25      had a chance to read that.

Case 2:20-cv-00256-NJ    Filed 03/01/22    Page 5 of 36    Document 37-11

1  A   Okay.  So in this paragraph we had a discussion
2      about the possibility of future surgery.  And
3      even though she was managing -- and certainly,
4      again, we are supportive of that.  It seemed
5      like she was always having breakthrough pain,
6      and I felt that at some point surgery may be
7      indicated.
8  Q   But at this time in August of 2018, it was not
9      yet recommended by you, is that a fair
10     statement?
11 A   I think at that point I didn't feel that she had
12     to have surgery.  In her mind she wanted to
13     maximize everything nonsurgical, and I think
14     that there is so many factors that come into
15     making a surgical recommendation.  When it's for
16     pain specifically, the patient has to be in that
17     mindset as well, and I think she wasn't.
18         And so we really knew that it was not
19     critical that she have surgery that day.  It
20     wasn't like she was, you know, in the midst of
21     being paralyzed.  We felt that since this would
22     be for pain that most likely she will need
23     surgery down the road, but that -- the timing of
24     that would have to be based on what she felt
25     comfortable with.

1  Q   At that point in your opinion was it reasonable
2      for her to push off the surgery and try other
3      conservative --
4  A   Absolutely.
5  Q   -- remedies?
6  A   Absolutely.  Yes.  Absolutely.
7  Q   It appears here under the plan that you
8      recommend that she continue with Dr. Ong.
9          Is that a fair statement?
10 A   Yes.
11 Q   And then also order -- in plan three there it
12     looks like order another CT of the cervical
13     spine.
14         Is that to see if there is any
15     progression of her problem?
16 A   Yeah.  So one of the things that we can see in
17     CAT scans that we can't always see on MRI is we
18     can see damage that MRI won't show.  So if there
19     is facet damage, which is the area that
20     Dr. Ong was injecting, we can sometimes see
21     black streaks in the facet joints, and that's
22     what I was looking for.
23 Q   Gotcha.  If we could then turn to page Bates
24     stamp 33, please.  This appears to be an
25     operative note of Dr. Ong again dated

1      November 15 of 2018.
2          Do you see that?
3  A   Yes.
4  Q   It appears that at least per this document that
5      it says "The patient has underlying facet joint
6      arthropathy."
7          Can you explain what that means?
8  A   Yeah.  So it just means there is disease or some
9      damage to the facet joint.
10 Q   What is the procedure that is indicated here on
11     Bates stamp 33?
12 A   Yeah.  So this procedure he's describing is
13     radiofrequency ablation of the nerve endings
14     around the -- at or around the facet joints to
15     alleviate pain.
16 Q   I've heard radiofrequency ablation is a nerve
17     burning procedure.  Is there some correlation
18     there, or am I making that up?
19 A   No.  So, unfortunately, it's called nerve
20     burning.  You're technically not burning any
21     nerves.  You're destroying nerve endings, which
22     are pain receptors which are connected through
23     tiny filaments to the actual large nerve bundle.
24     So the large nerve bundle itself is not damaged.
25 Q   Gotcha.  If you could then flip to Bates stamp

1      37, please.  This is a date of service from
2      November 29 of 2018.  It looks like another
3      radiofrequency ablation, although this one
4      targets the left side of C4, C5, and C6, whereas
5      the prior one was the right side.
6          Is that common for there to be two of
7      those procedures within a two-week time span,
8      one targeting each side?
9  A   Yeah.  And this is probably based on Dr. Ong's
10     experience.  He probably felt that he wanted to
11     try one side, see how effective it was, and then
12     go to the other side.
13 Q   Are we still within the realm of what you would
14     call a reasonable course of care for Ms. Gard,
15     based on the injuries that you observed?
16 A   Absolutely.
17 Q   If we could now turn to Bates stamp number 39,
18     please.  This appears to be another office visit
19     from your office dated December 5 of 2018.
20         Would you agree with that?
21 A   I agree.
22 Q   And then the stuff I want to talk about is on
23     Bates stamp 43, if you could flip to that, and
24     there is some stuff I highlighted on page 43 and
25     44.

Page 22

1      Can you explain the recommendations
2 that you made to Ms. Gard at that time, please.
3      Well, let me back up. Let me withdraw
4 the question.
5      The first question I want to ask you
6 is what was the discussion you were having with
7 Ms. Gard at that time based on the feedback you
8 were getting from her with the conservative
9 treatment she had received up to that point?
10 A   I mean, she was -- she was responding to the
11    injections and the radiofrequency. I mean, she
12    was getting better.
13 Q   Is it common for someone to have temporary
14    relief from those radiofrequency ablations?
15 A   Yeah. Absolutely. We can't promise how long
16    those will last. You know, sometimes they last
17    weeks, sometimes they last months, and anywhere
18    in between. So that's very much variable on the
19    person.
20 Q   The next page there I have one sentence
21    highlighted. It appears now that the topic of a
22    surgical procedure is starting to pop up.
23      Is there any correlation between the
24    timing of this, meaning you're now talking to
25    her about surgery after she's done the

Page 23

1 conservative measures? Is that typical or
2 atypical?
3 A   It's very typical when the patient asks or if
4    the patient is concerned about long-term
5    management. And there was several issues that
6    came up. You know, she wanted to know what --
7    would she have to do radiofrequency over and
8    over, and I said certainly that would be
9    possible. She was concerned about, you know,
10    would surgery give her that permanency, and I
11    said yes. She wanted to know if there were any
12    risks, and I said absolutely.
13      And so we kind of had all the
14    different things, and it took multiple
15    conversations to just finally sort of come to
16    the conclusion that surgery was the thing that
17    she wanted to pursue.
18 Q   Gotcha. If you can flip the page to page 45.
19    This is an office visit from December 19 of 2018
20    with Dr. Ong.
21      Would you agree with that?
22 A   I agree.
23 Q   It appears here that -- per this record that
24    Ms. Gard obtained initially 50 percent pain
25    relief from the procedure. Now she was down to

Page 24

1 30 percent.
2      I think we talked about it a little
3 bit, but is that a common phenomenon you see in
4 your patients that have these types of
5 procedures?
6 A   Yeah. I mean, there is certainly a temporary
7    nature to all these needle procedures and the
8    radiofrequency. I mean, it's possible that it
9    could have lasted longer. I mean, it's not
10    unheard of for it to last several months to a
11    year, and it's certainly possible that it only
12    lasts a few weeks.
13 Q   The last sentence that I highlighted, it says
14    "Continues to have neck pain radiating to both
15    shoulders."
16      I understand that for you to evaluate
17    what that really means you would want to see
18    some imaging, but from a clinical standpoint
19    with that comment there with her neck pain
20    radiating to both shoulders, what does -- what
21    does that indicate to you, if anything?
22 A   It tells me that the area that was hurting from
23    the very beginning is still continuing to hurt
24    her at this point.
25 Q   The next document is -- that I would like to

Page 25

1 draw your attention to, Doctor, is Bates stamp
2 number 48, please. This appears to be an office
3 visit from February 27 of 2019.
4      Would you agree with that?
5 A   I agree.
6 Q   And then if you turn to Bates stamp number 53 on
7    that, I highlighted some things, and it appears
8    that from my recording of this page here that
9    the option of surgery or the recommendation of
10    surgery, you're getting closer to that.
11      Can you comment on that?
12 A   Yeah. I mean, I think at this point, you know,
13    she says she still has persistent symptoms.
14 Q   And I may interrupt. What were the symptoms per
15    this note that she was reporting at that time?
16 A   Well, pain in the neck going into the shoulder,
17    into the trapezius muscles, which is just
18    muscles between the shoulder and the neck, and
19    then pain going into the shoulder blade. She
20    feels that it just feels uncomfortable with just
21    normal daily activities. So those were the main
22    symptoms.
23 Q   I note here from my reading that the MRI appears
24    that she has significant disease at C5 and C6.
25      What do you mean by that?

Page 26

1  A  I mean there is -- there is an -- there is --
2     the disc at C5-6 is abnormal, and based on where
3     the radiofrequency was, based on what the MRI
4     was, we felt that C5-6 was our target.
5  Q  Okay.  The next note is page 54, if you can turn
6     to that.  It appears that office visit is
7     October 30th of 2019.
8        Do you see that?
9  A  Yes.
10 Q  Flip the page here to page 56.  It appears
11    now -- we're in October of 2019 -- that you are
12    now making the official recommendation of a
13    surgery.
14       Can you please confirm that's true,
15    and, if so, what surgery were you recommending
16    and why?
17 A  Yeah.  We're recommending -- so we were
18    recommending a fusion surgery at the C5-6.  We
19    recommended it from the front.
20 Q  Why?
21 A  The -- the disc at C5-6 appeared abnormal.  We
22    can do a fusion at 5-6 from the front and get
23    the most stabilization of the C5-6 segment.  We
24    could certainly approach it from the back of the
25    spine, which is the direction Dr. Ong went in

Page 27

1     with the needles.  However, you have to disrupt
2     more muscle tissue, and the recovery is longer.
3        So often when a fusion needs to be
4     done and a choice -- you have a choice between
5     the front or the back, most surgeons opt for the
6     front because the recovery is faster and you
7     seem -- you can get a little bit stronger
8     stabilization.
9  Q  It appears from page 56 here that prior to
10    making that recommendation, you obtained some
11    more diagnostic imaging in the form of an MRI.
12       Is that true, and why did you do that
13    at that time?
14 A  I don't remember when her prior MRI was, but
15    typically we like to have a repeat MRI, if it's
16    been many, many months from the prior imaging,
17    just to see if there is any changes.
18 Q  And it appears that from page 56 here that this
19    was a situation where Ms. Gard didn't right away
20    say she wanted to have the surgery.  To the
21    contrary, it looked like she wanted to just
22    think about it for a little bit.
23       Is that true, and is that a common
24    phenomenon you see?
25 A  Absolutely.  It's super common.  In fact,

Page 28

1     we're -- we encourage every patient when we
2     discuss surgery to -- you know, just to take
3     some time out of the -- away from the doctor's
4     office and think it through.  We, in fact, tell
5     every patient to do that.
6  Q  Okay.  That brings us to page 58, if you can
7     flip to 58, please.  That appears to be a visit
8     from you of November 20th of 2019.
9        Would you agree with that?
10 A  I agree.
11 Q  If you flip to the page 60 of that, it appears
12    now the plan is to actually go through with the
13    surgery.
14       Am I reading this correctly?
15 A  That is correct.
16 Q  And my guess is that this indicates Ms. Gard
17    thought about it for a period of time and
18    decided to call back and wanted to schedule the
19    surgery.
20       Do I have that right?
21 A  That is correct.
22 Q  All right.  And then the next one that I would
23    like for you to turn your attention to is Bates
24    stamp number 66.  That appears to be your
25    operative note of December 24th of 2019.

Page 29

1        Am I seeing that correctly?
2  A  That is correct.
3  Q  And using these documents and your memory and
4     your expertise, can you explain with as much
5     detail as you can the surgery that you performed
6     on Ms. Gard.
7  A  Yeah.  So the procedure is called an anterior
8     cervical discectomy and fusion.  What we do is,
9     after the patient is asleep on the table, we
10    make an incision in the front of the neck.
11    Using X-ray we identify the C5-6 level.  We'll
12    put small distraction pins into the body.  It's
13    just to open up the space a little bit to have
14    room to work in.  We'll bring in a microscope so
15    we're able to magnify everything that we see.
16       And using instruments -- they're
17    called curettes -- we just curette out all the
18    disc space.  We'll go to the back of the disc,
19    we'll identify any nerves that are there and
20    just check to see if the nerves are being
21    pinched, and we'll free them.
22       Once that's done, the bone where the
23    disc came from, we'll rough it up until we just
24    get tiny bits of bleeding so that it will be
25    likely to fuse.

Page 30

1    We'll put a spacer in there, and the
2    spacer can be anything the surgeon chooses,
3    whatever works and whatever the patient prefers.
4    Often we'll fill it either with the patient's
5    own bone or something called allograft, which is
6    cadaver bone.
7        What I typically do is I do a mixture.
8    I'll take bone from the surgery and then bone
9    from a cadaver that's commercially available.
10   We'll put it into the spacer, put it in there,
11   and then we'll put a small plate that anchors
12   everything together, and the plate is screwed
13   into the bones.
14 Q   So this was at C5 and C6, and I want to see if I
15   have that correctly.  This involves an incision
16   into the front of the neck.
17       Can you use your finger there, kind
18   of --
19 A   Yeah.
20 Q   -- you point to where the incision is.
21 A   So most surgeons will make an incision on the
22   right side, so we'll find the midline midpoint
23   at the neck -- in men, 5-6 is not far from the
24   Adam's apple -- and -- and we'll just go to the
25   right of that, and so we'll make a linear

Page 31

1    incision, like, right here.
2 Q   And am I correct in hearing you that one of the
3    first things you do -- I'm not going to say it's
4    the first, but -- is you identify the damaged
5    disc, and you remove that disc?
6 A   Yes.
7 Q   And then you fill that space with either cadaver
8    bone or the patient's actual bone; is that
9    accurate?
10 A   Correct.  And we'll put that inside a structural
11   spacer that's usually like a small little
12   cylinder or small little box.
13 Q   And correct me if I'm wrong, but I'm going to
14   assume the idea behind this is once you remove
15   that damaged disc and replace it with bone, the
16   idea is the body is going to naturally fuse
17   together, those bones will fuse together
18   naturally; is that right?
19 A   That is correct.
20 Q   Are there any plates and screws involved in
21   this, or no?
22 A   Yes.  So --
23 Q   Can you describe that, please.
24 A   Yeah.  So what we'll do is after we put the
25   interbody -- which is a box or a little

Page 32

1    cylinder -- on top of the C5 and C6 bones, we'll
2    put a small plate.  And the plate is made of
3    titanium metal, and then there will be little
4    holes in the plate for screws to go in and
5    anchor the plate to the bone.
6        And typically these screws are -- we
7    always use millimeter measurements, so they're,
8    like, between 12 to 15 millimeters in length.
9    And 25 millimeters is an inch, just to give you
10   reference.
11       And so we'll put these screws in.
12   They'll go into the bone, they'll screw in,
13   they'll lock the plate down, and that will
14   provide a bracing.  It will internally brace the
15   bones together.  Similar to someone who is
16   wearing an external collar or brace, this is an
17   internal brace that will hold it all together.
18 Q   Am I correct in assuming that that bracing
19   promotes the idea of lack of -- or non-movement
20   so that the bones can naturally fuse together
21   better?
22 A   Absolutely.  Yeah.  So you want those two
23   bones -- the C5 and C6 bones -- not to move, and
24   then the healing will occur.  Once it fuses, the
25   body will use the fusion of bone to prevent any

Page 33

1    further movement, and then the plate actually
2    just becomes superfluous at some point.
3 Q   Did she tolerate the surgery okay?
4 A   Yes.
5 Q   And then I have the next note here, page 69 --
6    do you see that? -- September 2 of 2020?
7 A   Yes.
8 Q   And this is a post-op visit, and I think on
9    page 71 there is some comment that I would like
10   for you to talk about.  Yeah.  It goes to the
11   improvement noted by the patient at that time.
12       Can you tell the Court here, based on
13   this note and Ms. Gard's perception, what she
14   felt -- how much she felt she improved from the
15   surgery?
16 A   Yeah.  So at this point she says she's about
17   20 percent better.  You know, and we went
18   through the questioning in every different way,
19   and that was the number she came up with.
20 Q   All right.  One thing I skipped over, on page 67
21   you talk about the risks of the surgery.
22       What are the known, verifiable risk
23   factors for the type of surgery Ms. Gard had?
24 A   I mean, the risks are basically neurologic
25   injury, injury to the nerves, to the spinal

Case 2:20-cv-00256-NJ    Filed 03/01/22    Page 9 of 36    Document 37-11

Page 34

1   cord. There can be bleeding. There can be a
2   spinal fluid leak. There can be injury to the
3   soft tissue structures in the neck, that
4   includes the vein, the artery that's there.
5   There is other nerves in that area as well.
6   There is the trachea, the esophagus, the
7   thyroid. I mean, all these structures are right
8   there, and certainly they're at risk for injury.
9       There can be a risk of bleeding after
10  the surgery where you would have to go back in
11  and remove the blood clot. And usually you see
12  that within the first day -- day of the surgery.
13  Infection certainly is a risk. There is a risk
14  that she doesn't fuse, and the metal plate I put
15  in can break. So these are the big risks
16  specific to the surgery.
17      And then there is general risks. You
18  know, she could have a heart attack. She could
19  have a blood clot in the leg that can go to the
20  lung. She can get pneumonia. You know, all
21  these other general risks.
22 Q  Is it also a risk of this surgery that it may
23  not work to the patient's satisfaction, meaning
24  the patient may not get the relief that he or
25  she had hoped for?

Page 35

1  A  That's always a risk. Absolutely. And I think
2   that with every patient we're very clear on that
3   and we just say, you know, we feel that
4   statistically this is what should happen, but I
5   said, you know, I can never guarantee it. And I
6   think with Sheila, you know, as you can see, we
7   took a slow train to surgery. You know, we
8   never ever said to her, "You've got to choose
9   now" or "Let's just jump to surgery." We
10  purposely take a slow train because this is a
11  very thoughtful process.
12 Q  Those risk factors that we just described there
13  in the past couple minutes, are those risk
14  factors that were explained to Ms. Gard?
15 A  Yes.
16 Q  Prior to surgery?
17 A  Yes.
18 Q  All right. A couple things that I want to go
19  over, Doctor. I talked about the physical
20  therapy records, but I didn't give you a chance
21  to go -- to look through those, and nor did I go
22  over those in any great detail. I would like to
23  turn your attention to Exhibit 5.
24      I don't want you to go through these,
25  but if you could just generally breeze through

Page 36

1   these, do these appear to you to be physical
2   therapy records pertaining to Ms. Gard from
3   various Aurora facilities?
4  A  Yes.
5  Q  And, again, I'll represent to you this physical
6   therapy time frame was from roughly April of
7   2017 extending into early 2018.
8       With that representation, would that
9   be a reasonable time period for Ms. Gard to
10  undergo physical therapy?
11 A  Absolutely.
12 Q  The treatment that we have gone over today from
13  the ER -- or excuse me -- the urgent care, the
14  primary doctor, physical therapy, Dr. Ong, and
15  then the visits with you, do you believe all of
16  that treatment to be reasonable and necessary to
17  address the injuries that Ms. Gard sustained in
18  this March 24th of 2017 accident?
19 A  Absolutely. It's -- it's the standard of care.
20 Q  All right. Next I want to draw your attention
21  to Exhibit 6.
22      Have you had a chance to review this
23  document prior to today's deposition?
24 A  Yes.
25 Q  Before we get into that specifically, I want to

Page 37

1   get a little background.
2       You are a medical doctor, you are not
3   necessarily a billing expert, you have people in
4   your office to do that for you; is that correct?
5  A  That is correct.
6  Q  Are you generally aware of the various costs for
7   various procedures that your patients undergo?
8  A  In general, yeah. I mean, never the specific
9   exact amounts, but I have a general idea.
10 Q  All right. What I would like to do, then, is
11  draw your attention to Exhibit 6, and I'll
12  represent to you that this is a graph that my
13  office made based upon the actual certified
14  medical bills that will be part of Exhibit 2 at
15  trial.
16      With that background and that
17  representation, I would like to draw your
18  attention to the left-hand column of this
19  document. How this document works here, it's
20  two pages, and the first column on the left-hand
21  side of page one of Exhibit 6 then goes onto the
22  second page of Exhibit 6, and it runs a total
23  there.
24      Do you understand what I'm getting at
25  Doctor?

Page 38

1  A  I do.  I do.
2  Q   Okay.  And I would like for you to just briefly
3     look through those charges on the left-hand
4     column there, both page one and two.  It
5     includes urgent care, facet joint prices,
6     physical therapy, and some imaging.
7         Do you see that, Doctor?
8  A  I do.
9  Q   And the bottom the total there is $80,878.92.
10        Do you see that?
11  A  I do.
12  Q   Do you agree that those are generally reasonable
13     charges for those procedures, Doctor?
14  A   Yeah.  I mean, I realize that, you know, these
15     are large numbers, but that is in line with what
16     I've seen with -- from other centers, other
17     practices, so that's well within the normal
18     range.
19  Q   All right.  The same questions I'm going to have
20     with respect to a couple different graphs here.
21        Do you see Wisconsin Radiology, do you
22     see that segment there?
23  A  I do.
24  Q   Do you see the Metropolitan Anesthesiologists?
25  A  I do.

Page 39

1  Q   Do you see the Columbia St. Mary's charges
2     there?
3  A  I do.
4  Q   I'm going to assume that Wisconsin Radiology and
5     Metropolitan Anesthesiologists are various
6     anesthesiology or radiology groups.
7         Would you agree with that?
8  A  Yes.
9  Q   And those charges seem to be about -- well,
10     exactly $76 and $10,868.
11        Do you see those numbers?
12  A  I do.
13  Q   Do you agree that those are generally reasonable
14     prices for those services?
15  A  I agree.
16  Q   The Columbia St. Mary's, that indicates it's
17     from the surgery and hospital stay.  Those dates
18     correlate with the dates we just talked about
19     for the fusion surgery, so I'll call these the
20     facility charge, and that facility charge is
21     $34,822.59.
22        Do you see that?
23  A  I do.
24  Q   Do you agree that that is a reasonable charge
25     for the surgery facility charge and the hospital

Page 40

1     stay relative to the surgery you performed?
2  A  I do.
3  Q   And the last topic of discussion with Exhibit 6
4     here are your charges, and that's on the top
5     right of page 1 of Exhibit 6.  It details office
6     visits and then eventually a surgeons' charge
7     and then a couple more office visits.
8         Do you see that?
9  A  Yes, I do.
10  Q   And the total there is $103,127.
11        Do you see that?
12  A  Yes.
13  Q   And do you believe your charges for the services
14     you performed on Ms. Gard are reasonable in
15     nature?
16  A  I do.
17  Q   Okay.  Doctor, you understand that various
18     providers can charge various different price
19     tags for the same surgeries?
20  A  Yes.
21  Q   And is that, in fact, a common phenomenon to
22     your knowledge, that various neurosurgeons in
23     the community may charge different prices for
24     same or similar services?
25  A  Yeah.  I mean, I think the neurosurgeons

Page 41

1     generally don't talk to each other about
2     pricing.  I mean, to some degree we can't
3     because there would be a collusion issue.  But I
4     think that everyone tries to charge what they
5     believe a fair price based on their practice
6     experience and the services they offer.
7         MR. KNOBLOCH:  Okay.  At this point I
8     would like to move into evidence Exhibit 3, 4,
9     5, 6, 7, and 8.
10        Any objection?
11        MR. PAWLAK:  Yeah.  I would like to
12     object until I have an opportunity to
13     cross-examine him about these exhibits, and then
14     we can take that up afterwards.
15        MR. KNOBLOCH:  Okay.
16  BY MR. KNOBLOCH:
17  Q   Doctor, have all of your opinions today been to
18     a reasonable degree of medical certainty?
19  A  Yes.
20        MR. KNOBLOCH:  Subject to moving these
21     into evidence, I have no further questions for
22     this doctor.
23        MR. PAWLAK:  Thank you.
24        EXAMINATION
25

Page 42

1  BY MR. PAWLAK:
2  Q   Let's start with Exhibit 6, where we finished
3      off here.  Can you tell us why under the
4      Metropolitan Anesthesiologists there are two
5      identical itemizations for $5,434?
6  A   I can't tell you that because I didn't generate
7      the bill.
8  Q   Okay.
9  A   Nor I did personally review the bill.  All I
10     have is the number in front of me.
11 Q   So really, although you testified you believe
12     these were reasonable, you really have a
13     complete lack of foundation here to comment
14     whether these are reasonable prices?
15            MR. KNOBLOCH:  Objection to form.
16            THE WITNESS:  I don't have a detailed
17     review of what the charges are.  I know that
18     roughly in the market I think these are
19     approximately reasonable.  If you said to me,
20     you know, "What is an anesthesiologist supposed
21     to charge?" I couldn't tell you, because I'm not
22     an anesthesiologist.
23 BY MR. PAWLAK:
24 Q   Okay.  Exactly.  Well, as you're looking at this
25     from whatever -- whatever basis that you're

Page 43

1      making, you're offering this opinion, when does
2      the anesthesiologist -- at what point does the
3      anesthesiologist fee become unreasonable?
4  A   I think you would have to ask an
5      anesthesiologist.
6  Q   Okay.  So then you would agree with me you
7      really have no basis to comment on whether or
8      not this anesthesiologist fee was reasonable?
9            MR. KNOBLOCH:  Objection to form.
10            THE WITNESS:  I think my basis is on,
11     you know, approximately, it's a physician
12     providing a service for X amount of period of
13     time.  You know, it's an approximate number, I
14     could say that it's reasonable.
15            Because if you said to me, "What are
16     they doing?" you know, I would say, "Yeah,
17     they're keeping the patient alive, they're --
18     they're accepting a risk."  I mean, there is a
19     lot of time investment, and they have to do
20     postoperative care.  I think that if you said to
21     me, you know, given the fact that in medicine
22     what we charge, you know, they're going to
23     change about this number, I would say relative
24     to everyone else, that seems reasonable.
25            Now, we have to also remember, you

Page 44

1      know, a lot of the charged amounts that are
2      submitted to insurance companies, we don't get
3      paid this.  So, you know, there is charged --
4      there is billed amounts, and then there is
5      whatever you get billed.  And so, you know,
6      these numbers are generated by all practices.
7      Everyone has their way of developing their
8      numbers, and I'm telling you, relative to all
9      other charges, I would say this is reasonable.
10 BY MR. PAWLAK:
11 Q   Okay.  So before we get to how you generate your
12     numbers -- that's a great segue -- let me go
13     back to one more point.
14            So, for example, here, the hospital
15     stay is at 34,822.  You've testified that you
16     believe that was reasonable; is that correct?
17 A   Correct.
18 Q   What are you basing that upon?
19 A   Again, based on what I've heard other facilities
20     charge.  You know, I've seen facilities charge
21     more than this, and so to me that seemed a
22     reasonable number.  I mean, I wouldn't have been
23     shocked -- shocked.  I've seen Aurora charge
24     double this.
25 Q   Okay.  So at what point would you be shocked?

Page 45

1      100,000?  150?  A quarter million?  What would
2      be unreasonable in your opinion, based upon your
3      knowledge and experience in this area?
4  A   I mean, I think that, you know, certainly if
5      they got to a number that was significantly
6      higher, so maybe over 100,000.
7  Q   Okay.  So how do you set your fees?
8  A   So our fees were set many, many years ago by my
9      billing manager.  So 20 years ago we started the
10     practice and it was part of a larger group of
11     neurosurgeons and they had their fees, and we
12     really couldn't share fee numbers.  We were
13     told, you know, "You have to set your fees."
14            So I had a billing manager start, and
15     she -- she checked national fee numbers, and
16     then she set my fees.  And then every year --
17     and this was 20 years ago, this is 2001, 2002,
18     2003, roughly in there -- she gradually
19     increased the fees based upon what insurance
20     companies allowed, based upon national trends,
21     based on inflation.
22            And just over the years she has, you
23     know, roughly increased the fees, and she would
24     say, "Hey, you know, Dr. Dagam, you've had the
25     same fees for the last three years.  You know, I

Page 46

1    think it's time we increase the fees a certain
2    percentage," and I said, "Okay."
3         And she goes, "You know, I think, you
4    know, the other neurosurgeons are increasing
5    their fees, I've talked to other doctors," so
6    she has increased the fees over 20 years, and
7    this is kind of where we ended up.
8         I would say if -- you know, my fee
9    numbers are based upon 20 years of practice, 20
10   years of experience, and the complexity of what
11   we do. We do complex spine cases. Spine cases
12   do generally charge more than other surgical
13   cases. Spine cases, they generate -- they have
14   higher RVU numbers. When you add them all up,
15   the RVU numbers are much larger.
16        So if you base it on -- per -- you
17   know, on the number of RV -- total RVUs, you
18   know, we're going to have a larger bill. We've
19   been around for 20 years. We have 20 years of
20   experience. So I think all that kind of comes
21   together. That's how we have generated our
22   charges.
23 Q   Please define what RVU is.
24 A   Relative value unit. Again, I'm not a billing
25   expert, but that's -- that's sort of the

Page 47

1    assigned value for any particular procedure you
2    do. So doing a cervical fusion, each different
3    part of the fusion has a value, a relative
4    value. And so we're doing, like, at least -- if
5    you look at the op. note, we're doing at least
6    three or four different things.
7         And I think -- and I don't know if
8    this fee also includes the assistant fee. I
9    don't know. I don't know if that includes that.
10 Q   Just to give you a preview, I will be addressing
11   that issue, but I'm going to stick with this one
12   for the time being.
13        So what's your billing manager's name,
14   please?
15 A   So my billing manager has changed. We've
16   changed this year because of COVID. So it was
17   originally Heidi Weber, but now it's
18   Rhonda Nessler.
19 Q   So is Heidi no longer working for you?
20 A   No. Because of COVID, our practice reduced, and
21   she wanted a bigger position, so she moved on.
22 Q   So are you aware of where you are charging
23   for spine-type surgeries within the Milwaukee
24   area? Are you high? You're low? You're in
25   between?

Page 48

1  A   I don't know because I don't ask other surgeons
2    what their numbers are.
3  Q   Okay. And have you ever heard, for example, of
4    charging -- so, for example, you know, 110 or
5    120 percent of what Medicare would pay for a
6    similar surgery?
7  A   Could you repeat that.
8  Q   Sure. Sure. You must be aware that Medicare
9    sets prices, reimbursement rates for surgery;
10   correct?
11 A   Correct.
12 Q   And I'm sure you've done similar surgeries here
13   today for Medicare?
14 A   Correct.
15 Q   And they usually -- I know doctors complain
16   about what Medicare pays?
17 A   Yes.
18 Q   All right. So if you were -- have you ever
19   heard in private practice, capitalism rules in
20   this country, we control what we want to charge
21   for ourselves?
22 A   Yes.
23 Q   Have you ever heard of doctors setting -- for
24   example, "I know what Medicare pays for this
25   surgery, I'm going to charge 125 or 150 percent

Page 49

1    of what Medicare pays"? Have you ever done
2    anything like that to your knowledge?
3  A   I think, yes, to some degree I have heard that,
4    where doctors will charge a multiple of what
5    Medicare will pay. So it's not typically 1.2,
6    1.3, but it will typically be 2 to 3 times or
7    even higher than that.
8  Q   Okay.
9  A   And that's what their -- and that would be what
10   their billed amount is. So, again, our billed
11   amounts are very different than what we get
12   paid, you know, because if we submit a bill --
13   we'll submit the same charge to Medicare, but
14   we'll just get Medicare reimbursement numbers,
15   you know, et cetera.
16 Q   Do you know whether you've been paid anything
17   for these surgeries?
18 A   I would have to ask my billers, because I don't
19   know if I've been paid for this or not.
20 Q   Okay. All right. So you don't know if your
21   surgery is -- your prices that you charge are
22   high/low for what you do, it's just based upon
23   20 years of cumulative surgery and your --
24   Heidi Weber adjusting the rates over those --
25 A   Correct.

Page 50

1 Q -- 20 years?
2 A Correct.
3 Q Okay. All right. I'm going to give you what's
4 been marked as Exhibit No. 9. It's described as
5 a Patient History Detail for the neurological
6 surgery that you did in this matter.
7 So Plaintiff's attorney submitted a
8 document, Exhibit 6, which indicates your fees
9 were 103,127. The document which I have in
10 front of you, which is broken down into
11 significant detail, indicates it's 101,527, so
12 relatively close in the grand scheme of things;
13 correct?
14 A Correct.
15 Q All right. So you indicated earlier, you asked
16 whether or not the fees reflected in Exhibit 6
17 actually detailed the work done -- I think you
18 used the word "assistant" in the surgery
19 process?
20 A Yes.
21 Q And who was that assistant, and who is that
22 person?
23 A Oh, yeah. So my physician assistant,
24 Beau Boedecker.
25 Q So on this sheet there is obviously

Page 51

1 abbreviations used, and there is a provider
2 column, it's P-R-O-V.
3 And you would agree that stands for
4 "provider"; right?
5 A Correct.
6 Q And there are names listed. Your name, of
7 course, is in full, D-A-G-A-M, which is your
8 entire last name.
9 And then there is B-E-A-U-B, and whom
10 does that remember to?
11 A That refers to the physician assistant,
12 Beau Boedecker.
13 Q All right. And then we have on the far left
14 side here the codes for the surgical procedures;
15 is that correct?
16 A Correct. Yes.
17 Q And this is -- this is how typically billing
18 works in America today. Every process you
19 perform has to have a code assigned to it, and
20 then you bill out for that?
21 A That is correct.
22 Q So, for example, although we've been referring
23 to this as one surgery, this thing is broken
24 down here into at least 17, 18-plus different
25 components of that surgery that you performed

Page 52

1 that day?
2 A I don't know the exact number, but it is broken
3 down into many components.
4 Q Yeah. I mean -- and if you don't want to trust
5 my counting, feel free to count on your own. I
6 mean, I'm just trying to hit the ballpark here.
7 A Sure. Sure. I know it's a multiple. Yes.
8 Q All right. So -- and each of these codes -- for
9 example, let's look at the first code, 63081.
10 Are you familiar with that?
11 A Yes.
12 Q And what is that, if we can refer to it as one
13 or two words to give it a --
14 A Yeah.
15 Q -- title?
16 A Yeah. It's called a corpectomy code.
17 Q Okay. So I looked through your report, and I
18 never found a mention of a corpectomy.
19 Why is that?
20 A I don't know if the -- are you talking about the
21 operative report?
22 Q Yeah. Yeah.
23 A I don't know where -- do you have a copy of it?
24 Q Well, I'll tell you what. I'm going to pull
25 open -- we're still on the record here. I want

Page 53

1 to just, if you don't mind -- you -- let me do a
2 little segue.
3 You previously testified in a
4 deposition conducted by me; is that correct?
5 A I believe so.
6 Q Yes. And I have here the certified original
7 copy of that, which is still in the plastic, and
8 I'm going to open here today to use again so we
9 don't duplicate this multiple times.
10 A Sorry. I was going through the wrong stack.
11 Q So I'm going to give to you what was previously
12 marked as Exhibit No. 1 -- this might be -- in
13 that deposition which was conducted on
14 October 13, 2021, here at your same office of
15 which we were present today. The -- your
16 operative reports are in that exhibit pages 67
17 through 79.
18 Feel free to go to those pages and
19 tell me if you mention anything called a
20 corpectomy in there.
21 A Yeah. So I actually use the word
22 "vertebrectomy," and that's basically the same
23 thing.
24 Q Okay. Is there any difference between a
25 corpectomy and a vertebrectomy whatsoever?

Case 2:20-cv-00256-NJ    Filed 03/01/22    Page 14 of 36    Document 37-11

Page 54

1  A   In my -- for me, no.
2  Q   Okay.  Would there be some other practitioners
3      who might have a nuance on those meanings?
4  A   There may be, but I don't know what that
5      different would be.
6  Q   Okay.  So you talk about the partial C5
7      vertebrectomy and partial C6 vertebrectomy; is
8      that correct?
9  A   Correct.
10 Q   Now, why was it important to note that the
11     partial C5 was a decompression of the spinal
12     cord of 55 percent and the partial C6
13     vertebrectomy -- vertebrectomy -- excuse me --
14     was a decompression of the spinal cord of
15     60 percent?  What's the relevance and importance
16     of those points?
17 A   Yeah.  So that kind of goes back to my billing
18     manager.  So when we were doing these reports,
19     she has said to me, "Be as detailed and specific
20     as you can."  So it's not necessarily critical
21     in this particular case, and it doesn't have
22     necessarily a critical clinical application.  It
23     was more of a billing person.
24         Because what my billing manager would
25     do is with other insurance companies they would

Page 55

1      often just not want to pay any codes, and then
2      she would go back and say, "Well, Dr. Dagam very
3      clearly specified in this operative report."
4          So she -- she had a long conversation
5      with me one time.  This was many years ago.  She
6      said, "You know, the more detailed you are" --
7      because originally when doctors do operative
8      reports, we're kind of going through them
9      quickly, you know.  I mean, if it was up to me,
10     this operative report would be, like, four
11     sentences.  You know, I just -- I would
12     literally just give a very general description,
13     and then obviously, you know, if anything -- any
14     complication occurred, I would put that in
15     there.
16         But with her, she said, "Look, you
17     know, my job is hard enough, so I need you to be
18     crazy detailed," so that -- that was the reason
19     why we kind of go into that level of detail.
20 Q   Are you aware that, in fact, if the -- if the
21     decompression of the spinal cord is less than
22     50 percent, you can't charge as much?
23 A   I don't know if that's the case, but she told
24     me, "If you're going to do a partial, you know,
25     don't" -- I don't know, she gave me some

Page 56

1      guidelines on it, so I said, "All right, well,"
2      I go, "I'm not going to say anything that
3      obviously I didn't do," and she goes, "Yeah,
4      absolutely not."
5          So when we go in there, we do what's
6      necessary and then we dictate it.  You know, so
7      if we're taking out 50 percent, you know, we're
8      like, all right, well, you know, she says, you
9      know, just make it 51 percent, just go in there,
10     and so I -- I kind of had to do what was
11     necessary and then make this report have enough
12     detail for her to be able to use it as whatever
13     she needed to fight the insurance company on.
14 Q   Is it also true that one of the nuances in the
15     distinction or the definition between corpectomy
16     and vertebrectomy is a corpectomy is over
17     50 percent --
18 A   I don't --
19 Q   -- by definition?
20 A   Yeah, that I don't know.  Yeah.  To me
21     vertebrectomy and corpectomy are very much the
22     same.
23 Q   So 63081 is we'll call it the corpectomy.  And
24     what is your assistant's name again, please?
25 A   Beau Boedecker.

Page 57

1  Q   Beau Boedecker.  His charge amount for that was
2      $7,365; is that accurate?
3  A   Yes.
4  Q   And then we go down to the second cor- -- help
5      me with this, please -- corpectomy?
6  A   Correct.
7  Q   And that was performed by you; correct?
8  A   Correct.
9  Q   And you charged $20,251 for that?
10 A   Correct.
11 Q   Are you three times better than he is?  Three
12     times faster?  What's the difference for the
13     prices?
14 A   Well, we work together.
15 Q   Okay.
16 A   Yeah.  So he -- he's assisting me under the
17     microscope.  I'm working there.  We're both
18     working together.  And so I -- you know, we have
19     to do the corpectomy together.
20 Q   Okay.  So correct me if I'm wrong, but I
21     envision you being the -- since you're the
22     surgeon, I envision you doing all the cutting
23     and the placing, and he's helping you out and
24     assisting you in whatever way, shape, and form
25     that you would deem necessary; correct?

Case 2:20-cv-00256-NJ   Filed 03/01/22   Page 15 of 36   Document 37-11

Page 58

1  A    That's correct.
2  Q    So why do we split up this billing on the sheet?
3       Why is this done?  What's the story behind this?
4  A    Well --
5  Q    It looks as if he performed one set of the stuff
6       and you performed the other?
7  A    I think this is billing convention.  So I don't
8       set billing convention.  I didn't invent it, nor
9       do I enforce it.  This is billing convention.
10      This is the way billing is done.
11           If it was personally up to me, you
12      know, I would say "This is what we did, pay me
13      this amount," but this is how the system is set
14      up, so that's why it's split up into all these
15      different categories and there is charges for
16      him, charges for me.
17  Q   Okay.  Let me get back to that.  So describe to
18      me literally what mechanically goes on.  I know
19      you did it earlier.  But for the corpectomy,
20      what qualifies, what procedure, what did you do
21      to be able -- entitled you folks to bill under
22      63081 for the corpectomy?
23  A   Well, we go in, we identify the disc space,
24      remove the disc material.  We feel underneath
25      the vertebral bone.  We feel that it's a little

Page 59

1  tight, so we want to start taking out bone.  And
2  in order to get that, we sometimes have to shave
3  down from the top down.  We do that.  We take
4  additional bone.
5       We have to even out the surfaces, so
6  you have to remove additional bone for that.  So
7  there is a lot of shaping of the -- of the C5
8  and C6 vertebral bodies, one, to remove
9  ligament, to remove any osteophytes, and to make
10 it all even.  Because if it's not even, then you
11 can't put the fusion device inside it to get it
12 to heal.  So there is a lot of work to be done.
13      There is continuous bleeding, so the
14 assistant is there to help suction any bleeding.
15 He's there to help me hold tissue back.  Because
16 when he has to retract the esophagus and trachea
17 in order for me to work, he's looking through
18 there, he's identifying any additional bleeders
19 that I may not see.  He's suctioning.
20      So it's a symphony of two people
21 working together.  I can't do this case by
22 myself.  It's very difficult.  And so without
23 the -- without a highly skilled assistant --
24 because I can bring in an assistant, and if they
25 don't have knowledge, if they're not skilled, if

Page 60

1  they're not familiar with the surgery, it's --
2  they're useless, you know.
3       So a brand new PA from PA school is no
4  good.  Beau, who has been in with -- who has
5  been with me for, you know, hundreds of cases,
6  hundreds, maybe thousands of cases, that's
7  critical.  His skill is critical.  So, you know,
8  maybe the numbers reflect that, you know, that
9  experience, that information, the nuance.
10      You know, it's kind of like having
11 someone who really has played the violin really
12 well as a first and second violin, and together
13 you have a symphony.  And I'm not a musician, so
14 I'm just -- my metaphor might be horrible, but
15 that's literally what's happening.
16  Q   Okay.  Let's move on to the next one.  63082, do
17      you know what that one is?
18  A   That's the other vertebrectomy code for the
19      other, the C6.
20  Q   And can we assign a brief descriptor to that
21      process?
22  A   Same thing that happens to the C6 side, the
23      other side of the disc space.
24  Q   All right.  Well, for example -- and you can
25      correct me if I'm wrong, but 63081, there is one

Page 61

1  on top, and then there is one below --
2  A   Correct.
3  Q   -- for you, so -- and we said those were the
4      corpectomies, one for the C5 and one for the C6;
5      is that right?
6  A   Well, 63081 is for the C5.
7  Q   Okay.
8  A   And then 63082 is for the C6.
9  Q   All right.  So what's the second 606301 [sic]
10     down below for?
11  A   You're talking about why are there two 63081s
12     and --
13  Q   Correct.
14  A   Well, there is one 63081 for Beau.
15  Q   Yes.
16  A   And one for me.
17  Q   Ah, but they include both C5s?
18  A   Well, remember, I said that we both work
19     together.
20  Q   You both work together.  Fine.
21  A   And convention -- so I, again, did not invent
22     billing convention, you're asking me
23     questions --
24  Q   Yeah.
25  A   -- that really I am not the expert on.

Page 62

1  Q  Yeah.
2  A  The way it works is he and I both do the
3     corpectomy.
4  Q  Correct.  I've got that.  I understand that.
5  A  And because we both work together, there is a
6     bill for him, and there is a bill for me.
7  Q  Okay.  But 63082 is an entirely different code.
8     Why would you use a different code for the same
9     surgery, same -- one is a C5 and one is a C6,
10    doesn't it make more sense that the 63081 down
11    below is for the C6, for example?
12 A  No.  Because the coding -- again, not my policy,
13    but the coding rules require that the other
14    vertebral body get -- gets its own code and it's
15    a different code and it's called the additional
16    corpectomy code.
17 Q  Okay.  But I thought 63082 was for
18    decompression.  No?
19 A  It -- yeah.  It's for the corpectomy.
20    Vertebrectomy and decompression of the cord.
21    Yes.
22 Q  Okay.  So what I'm suggesting to you is that
23    there is a series of numbers at the top of the
24    different codes that were done for C5, and then
25    we start again under your name, for example, for

Page 63

1     C6 with --
2  A  No.
3  Q  You don't see it that way?
4  A  No.
5  Q  Okay.
6  A  And I think that maybe you're misinterpreting,
7     and I don't know.
8  Q  Well, that's what we're here to find out.
9  A  So there is a set of codes for Beau, and so
10    there is a 63081, 82, 22 -- I mean, a bunch of
11    codes for Beau.
12 Q  Yes.
13 A  And then there is a bunch of codes for me.
14 Q  Correct.
15 A  And since he and I are both working together, we
16    are required to bill each code to each provider,
17    so you don't just -- so, I mean, if we're both
18    working on the corpectomy, we have to bill each
19    of us -- each of us separately.
20 Q  Okay.  So there is no breakdown, then, on this
21    sheet for C5 and C6?
22 A  Well, I think there is a breakdown because to
23    me, you know, it doesn't -- it depends on which
24    one you assign to which --
25 Q  Yeah.

Page 64

1  A  -- vertebral body.  It doesn't say that 63081 is
2     C5 --
3  Q  No.
4  A  -- or 63082 is C6.  It doesn't say that.  It
5     just says that that's one corpectomy, and then
6     the other one is the additional.  And it really
7     just depends on how you read the operative
8     report.
9  Q  So this is the question:
10       Are we breaking down this surgical
11    procedure by C5 and C6, or are we breaking it
12    down by provider, in this case by you and your
13    assistant, Beau?
14 A  I think -- I think you have to do both.  I mean,
15    I think that's -- again, that's the convention.
16    We -- we are -- you know, we are not given a
17    choice on how to bill this.  This is the way
18    billing is done.
19 Q  All right.  So what is 2251 [sic], then, what --
20    what -- what part of this entire process is
21    that?
22 A  That is the arthrodesis, which is basically
23    getting the surface of the vertebral bodies
24    prepared for the fusion so that you can put a
25    spacer in there.  So that means evening it out,

Page 65

1     taking -- making sure if there is any excess
2     bleeding, that's taken care of.  I mean, all
3     those little things we have to do.
4  Q  Okay.  And that's commonly referred to as a
5     fusion, perhaps?
6  A  It could be.
7  Q  Arthrodesis?
8  A  It could be.  Yeah.  Arthrodesis is just the
9     medical term.
10 Q  Okay.  And he charged 7,500, and you charged
11    20,625; is that correct?
12 A  That is correct.
13 Q  All right.  And then 22853, do you know what
14    that is?
15 A  That's the -- getting the vertebral spacer
16    ready.
17 Q  Is that also referred to as the cage?
18 A  Yes.
19 Q  Describe that again, please.
20 A  So we get a cage -- well, first we have to
21    measure the size of the cage.  We do trials.  We
22    get the cage.  We fill it with bone from the
23    patient, put cadaver bone in there.  We put it
24    into the -- we put it into the spacer, make sure
25    it's large enough, but not too large.  We tap it

Case 2:20-cv-00256-NJ   Filed 03/01/22   Page 17 of 36   Document 37-11

Page 66

1     in and then make sure it's countersunk
2     appropriately.
3   Q   And his charge for that was 1,770, and your
4     charge was 4,866; is that correct?
5   A   **That is correct.**
6   Q   And then we have 22845, do you remember what
7     that is?
8   A   **Yeah. That's putting in the cervical plate.**
9   Q   And what is the plate, again, please?
10   A   **The plate is a titanium plate that we put on the**
11     **surface of the C5 and C6, put screws in and**
12     **anchor it to the bone.**
13   Q   And he charged $3,826 for that, and you charged
14     $10,519 for that; is that correct?
15   A   **That is correct.**
16   Q   And there is a number of other codes in here,
17     but there is only one of those. For example,
18     61783, do you know what that is for?
19   A   **Let me see here. Yeah. That's for -- so we**
20     **spent time with preoperative planning, so**
21     **that -- we can charge for that. And then we**
22     **used some navigation, so we just took some**
23     **X-rays and then we put it into a navigation**
24     **system just to make sure our screws and our**
25     **plate were as even as possible.**

Page 67

1   Q   Is that the so-called Stealth system?
2   A   **Yes.**
3   Q   And then 77003?
4   A   **That's for taking X-rays and interpreting the**
5     **X-rays and so forth.**
6   Q   That's the fluoroscope?
7   A   **Yes.**
8   Q   And that was a charge of $987?
9   A   **Yes.**
10   Q   And, lastly, 69990?
11   A   **Yes.**
12   Q   That is for the --
13   A   **Use of operating microscope.**
14   Q   All right. And there is one fee for that for
15     $3,420; is that correct?
16   A   **That is correct.**
17   Q   All right. So I'm going to hand you what's been
18     marked as Exhibit No. 10.
19        Have you ever heard of consumer --
20     internet consumer services where you can check
21     out what your doctor is going to charge you for
22     a service?
23   A   **No, I've never heard of that.**
24   Q   So you would be surprised to find out where your
25     price range is for services in the Milwaukee

Page 68

1     area?
2   A   **I don't do that, I haven't looked at it, so I**
3     **wouldn't be shocked or surprised. I -- you**
4     **know, I just don't do that.**
5   Q   Well, I'm going to hand you Exhibit No. 10, and
6     Exhibit No. 10 is for code 63082, which I call
7     the decompression. And it says the average cost
8     for that procedure in the United States is
9     around 1,300, and you charge 9,200 averagely,
10     but -- which is less than what you charged in
11     this case.
12   A   **Okay.**
13   Q   Is that surprising to you?
14   A   **I -- I don't know anything about this service,**
15     **and I don't know how accurate they are, so I --**
16     **I mean, thank you for this piece of paper, but I**
17     **really don't put a lot of faith in it.**
18   Q   Okay. Well, it's pretty accurate to you; isn't
19     it? It lists pretty close to what you charged
20     for this, although it's under, they were
21     conservative here, you charged more than this in
22     this particular procedure?
23   A   **And I don't know how they get their numbers.**
24     **Yeah. All right. And Beau -- Beau Boedecker's**
25     **name is listed here and he's your assistant from**

Page 69

1     this case and he's about a third of what your
2     rate is; is that correct?
3   A   **Again, I don't know how it gets their numbers,**
4     **and I'd have -- and I would have to do my own**
5     **analysis to tell you --**
6   Q   Yeah.
7   A   **-- what our averages are.**
8   Q   Okay.
9   A   **So, I mean, again, thank you for this piece of**
10     **paper, but --**
11   Q   Sure.
12   A   **-- again, I don't know how much weight I can put**
13     **on this.**
14   Q   All right. I'm going to hand you what's marked
15     as Exhibit No. 11, and 11 is for the 63081, the
16     vertebrectomy or the corpectomy. And that --
17     once again, that lists your rate at 18,400, and
18     the average for this surgery is 5,491.
19        Is that surprising to you, that you're
20     over three times higher than the average?
21   A   **Again, I don't know what their numbers are.**
22     **And, again, you know -- again, I don't know if**
23     **that's the average for neurosurgeons with 20**
24     **years' experience. Is that the average, you**
25     **know -- you know, we're -- who's in this**

Page 70

1   average? You know, is it a -- is it a
2   neurosurgeon in XYZ city who just started out?
3   You know, I mean, we don't know what these
4   numbers are.
5       You know, so I -- I think that
6   absolutely there is going to be variation.
7   Absolutely. But, you know what -- you know,
8   there is going to be variation in car prices.
9   There is variation in hotel prices. There is
10   variation in airline prices. So absolutely
11   there is going to be variation.
12 Q   Lastly, I'm going to hand you what's been marked
13   as Exhibit No. 12. That is the -- for the
14   fusion, 22551 code. And there your price is
15   listed at 18,750, with the average cost being
16   about 5,500 in the United States.
17       Once again, I assume you would testify
18   just as you did the previous two that --
19 A   Yeah. Basically I don't know how -- how much --
20   how value this has -- how much value this has.
21 Q   But this -- the price that's in here for all
22   three of these is actually less than what you
23   charged in the incident matter?
24 A   The price is this is --
25 Q   Yes.

Page 71

1 A   -- less than what we charge --
2 Q   In Exhibits 10, 11, and 12, the price they have
3   for you, the average price, is less than what
4   you charged in the incident matter here today?
5 A   Yeah. But you don't know how they even come up
6   with any of these numbers, you know. Is it from
7   the year 2010? Is it from the year 2019? We
8   don't know. So, I mean, it's great to print
9   this from the internet. I -- I'm impressed that
10   you're able to find it, but to me it has no
11   value.
12 Q   Well, thank you for the compliment, and I
13   appreciate your opinion.
14       So going to -- back to the surgery in
15   this question. You're a member of the North
16   American Spine Society?
17 A   I used to be. I stopped going to the meetings.
18   I just didn't have time.
19 Q   Okay. And tell us what that organization is.
20 A   I think it's just an organization of spine
21   surgeons throughout the country.
22 Q   Okay. And what -- do you find any value? Do
23   you attend their training seminars?
24 A   I haven't gone because our surgeries -- I mean,
25   we do cutting-edge surgeries, and I'm kind of at

Page 72

1   the point now where what I do doesn't
2   necessarily get trained at their seminars,
3   because you really can't learn from a two-day
4   seminar how to do something very complicated,
5   you know. And I used to go to these things a
6   lot, and there is -- it's really just a taste of
7   something. It doesn't really teach you
8   anything.
9       So, you know, there wasn't a ton of
10   value to go to that, so I pretty much keep my
11   meetings to the American -- AANS, American
12   Association of Neurological Surgeons. It's
13   broader. It gives me both cranial and spine and
14   peripheral nerve --
15 Q   Okay.
16 A   -- education.
17 Q   Were you aware that the North American Spine
18   Society publishes appropriate use criteria for
19   the surgery that you performed on Ms. Gard here?
20 A   I'm sure that they do.
21 Q   You've heard of -- so it's called a checklist,
22   that one should go and look through that
23   checklist to see what -- for example, what the
24   patient is exhibiting which could be objectively
25   seen as necessitating the need for the surgery?

Page 73

1 A   Sure. Sure.
2 Q   Okay. And did you do that in this incident
3   case?
4 A   No, I didn't go through the checklist --
5 Q   Okay.
6 A   -- because a checklist doesn't always -- if you
7   don't know what you're doing, then go to a
8   checklist. You know, get a page out of a
9   textbook, read it through, and then follow the
10   recipe, you know. You know, if you're a
11   Michelin star -- star chef -- and I'm not saying
12   I'm a Michelin star neurosurgeon -- you know,
13   they don't go to a recipe -- Julia Child's
14   cookbook and say "How I do make XYZ?" You know,
15   a lot of the stuff we do, you know, we use
16   standard of care and common sense.
17 Q   But where does the standard of care come from?
18 A   Standard of care comes from talking to other
19   neurosurgeons, from our meetings, textbooks, so
20   forth, and cumulative experience.
21 Q   So in this particular case, as I understand your
22   testimony, the only proffered reason for this
23   surgery was the subjective pain which Ms. Gard
24   was suffering?
25 A   Correct.

Case 2:20-cv-00256-NJ    Filed 03/01/22    Page 19 of 36    Document 37-11

Page 74

1  Q   So --
2  A   And there was some abnormalities on the imaging,
3      too.
4  Q   Okay.  And so just let me -- let me run down
5      this checklist.
6          So there was no neurological deficit?
7  A   No.
8  Q   No indication of instability?
9  A   No.
10 Q   No persistent loss of feeling, weakness, or
11     muscle control?
12 A   No.
13 Q   No evidence of nerve compression?
14 A   No.
15 Q   No radicular pain?
16 A   No.
17 Q   No neck pain causing weakness or pain in the
18     arms?
19 A   No.
20 Q   No numbness -- no numbness, tingling, or
21     weakness?
22 A   No.
23 Q   All right.  So you did not have occasion to meet
24     with Ms. Gard to a significant period -- excuse
25     me -- a significant period after the motor

Page 75

1      vehicle accident?
2  A   Can you be more specific with that question.
3  Q   Yeah.  For example, she didn't see you within
4      the week or a month after the accident; fair?
5  A   No.  No, she did not.
6  Q   There was a significant period of time that
7      elapsed in the chronological history before she
8      had an opportunity to see you after the
9      accident, she was referred to you by other
10     doctors; is that correct?
11 A   That is correct.
12 Q   All right.  So what can you tell us, what was
13     the injury in your opinion that the motor
14     vehicle accident caused here that necessitated
15     your surgery?
16 A   I believe the injury caused damage to the disc
17     and damage to the facet tissue behind the spinal
18     cord at that -- at the levels that she had
19     between 5 and 6.
20 Q   And what objectively can you point us to, what
21     CAT scan, what X-ray, what MRI which provides
22     support to that opinion?
23 A   Yeah.  Our review of the MRI show that the C5-6
24     disc was abnormal looking.  Additionally,
25     Dr. Ong's diagnostic studies point to the fact

Page 76

1      that her pain improved when he treated those
2      levels.
3  Q   Okay.  So that tells us where the pain is coming
4      from.  What is there out there that tells us
5      this pain was caused by the motor vehicle
6      accident?
7  A   You know, I guess that's a great question.  So I
8      think you can't say based on that data that it
9      was intrinsically for sure caused by the motor
10     vehicle accident, because there is nothing on
11     the imaging that has a little sign with an arrow
12     pointing saying "Caused by the MVA."  However,
13     we never have that.  We rarely do.
14         So all we have is history, and history
15     of pain, both what she had before and after the
16     accident, and the imaging, and so we have to put
17     all that together.  And so basically the
18     narrative is that, you know, she didn't have the
19     neck pain before the accident, she has it
20     afterwards.
21         We -- certainly she goes through the
22     entire gamut of non-surgical treatment, and
23     really I think she wasn't looking for surgery,
24     you know, and I wasn't looking to do surgery on
25     her, as evidenced by our initial meetings.  That

Page 77

1      wasn't the conclusion that we were jumping to.
2          And so I think, you know, the
3      narrative is she approached this in a very
4      reasonable manner and I think all her providers
5      approached it reasonably and it wasn't until she
6      got to the very end where she's, like, "You know
7      what, I'm not getting 100 -- you know, I'm not
8      getting the relief I really need, you know,
9      let's discuss the surgical option."  And -- and
10     we talked about it.  You know, there is no
11     guarantees here.
12 Q   So you often use the phrase "disease" throughout
13     your reporting here to describe the area that
14     was the situs of the surgery.  Why do you call
15     it a disease?
16 A   It's just a general term.  It's just -- because
17     physicians treat disease.  You know, I mean,
18     it's a -- it can be an acute injury or disease.
19     There is no subtext to that word, meaning that
20     it's -- you know, I'm not implying that it's not
21     related to the motor vehicle accident.
22 Q   Is that a common -- common term for surgeons to
23     use the word "disease," when they really mean an
24     acute injury?
25 A   Well, I think her injury -- because her

Page 78

1    injury -- when was her car -- when was her MVA
2    accident?  When was the surgery?  The surgery
3    was in 2019.  So her accident was, was it in
4    twenty --
5  Q   Her -- the surgery was December 24th, 2019.
6          MR. KNOBLOCH:  If I may, the accident
7    was March 27th of 2017.
8          THE WITNESS:  Okay.  So it's been two
9    years; right?  Approximately two -- over two
10   years.  So, I mean, first and foremost, you
11   know, we're -- I'm not treating an acute injury,
12   you know, because I didn't even meet her until
13   well after her motor vehicle accident, so I'm
14   not treating an acute injury.
15          Number two, you know, we just -- I use
16   the word "disease" because that's just -- you
17   know, that's an easy term to use.  And I think
18   that certainly if you want to interpret that to
19   mean something different, certainly you could do
20   that, but in my mind, you know, she's got pain,
21   she's got damage, and that's part of the
22   disease.  You know, that's part of the problem.
23   So "disease" and "problem," you know, in my mind
24   are interchangeable.
25

Page 79

1  BY MR. PAWLAK:
2  Q   And do you think that's generally accepted in
3    the medical profession, to use that term of art
4    in such a fashion?
5  A   I don't know.  I mean, it might be.  It may not
6    be.  I don't think it's super critical.  I mean,
7    perhaps it's critical for you, but I don't think
8    it's super critical, because I think I know what
9    I'm talking about.
10         MR. KNOBLOCH:  And I have to correct
11   the record.  It's march 24th of 2017.  I don't
12   think it changes his testimony.
13 BY MR. PAWLAK:
14 Q   Okay.  So you also talk about degenerative
15   changes throughout your reports in terms of
16   describing the area that was the situs of the
17   surgery, don't you?
18 A   I may have mentioned some degenerative changes.
19   Yeah.  I have to see the exact wording and
20   language.  But, you know, at her age she's
21   probably going to have some degenerative
22   changes, and I think that is perfectly accurate
23   to assume that.
24 Q   And degenerative changes would be caused by
25   disease, aren't those two terms more

Page 80

1    interchangeable than --
2  A   I think to the common layman, yeah, you know,
3    and certainly you can push that point.  But in
4    my interpretation "injury," "damage," "disease,"
5    I mean, that's -- you know, that's what I'm
6    thinking.
7  Q   Okay.  Now, you talked earlier under direct
8    examination that -- if I understood your
9    testimony, that Ms. Gard was complaining that
10   she wasn't receiving any permanent relief, and
11   you talked about providing permanence with
12   surgery?
13 A   That was the goal.
14 Q   Okay.  And, in effect, you only had a 20 percent
15   success with that; is that correct?
16 A   That is correct.
17 Q   So you did not achieve permanence?
18 A   I didn't achieve a -- greater than 50 percent,
19   which is what I believe to be roughly the
20   standard, pain relief.  Did we achieve
21   permanence?  I think permanence is more an issue
22   of time.  And so if she got 20 percent relief
23   forever, then we did achieve permanence -- a
24   modest permanence of pain relief.
25          So I think for me "permanence" means

Page 81

1    time, but I think your question is really the
2    degree of permanence or the degree of pain
3    relief.  No.  We didn't achieve a high level of
4    pain relief.  Did we -- did we achieve pain
5    relief forever?  We don't know because that --
6    you know, we have to wait for that to come
7    through the wash.
8  Q   And you haven't seen Ms. Gard for a significant
9    amount of time; right?
10 A   That is correct.
11 Q   So you don't know what her situation is today;
12   correct?
13 A   I do not.
14 Q   All right.  Is there any objective evidence out
15   there that you can point to that, in fact,
16   Ms. Gard's physical abilities have improved
17   since you performed the surgery?
18 A   I don't have any information.
19 Q   So when you say the goal -- you were -- if I
20   understand your testimony, your goal was you
21   thought the surgery would be a success if you
22   could permanently reduce her pain by 50 percent;
23   is that accurate?
24 A   Yeah.  I mean, initially -- so, I mean, the word
25   "permanent" means that it's long-lasting

Case 2:20-cv-00256-NJ   Filed 03/01/22   Page 21 of 36   Document 37-11

Page 82

1    relative to what she was achieving from the
2    injections, and the goal was to achieve -- or
3    the aim was to get at least 50 percent pain
4    relief.
5  Q    So why didn't you simply recommend that she
6    continue with the facet procedures which she had
7    achieved significant success with 50 percent
8    improvement?
9  A    Is your question why didn't I recommend that --
10 Q    Yeah.
11 A    -- instead of the surgery?
12 Q    Yeah.
13 A    We did.  We, in fact, recommended that she
14    continue that as long as she can.  She was not
15    getting relief long enough with the facet
16    procedures, and facet procedures are --
17    especially radiofrequency, over time becomes
18    less and less effective.
19 Q    And is it the same with the ablation procedure?
20 A    Yes.  Yeah.  So they become -- over time they
21    become less effective.
22 Q    Is she -- can she undergo these procedures even
23    now, after the surgery?
24 A    Yes.  Yes, she can.
25 Q    How is it that the ablation procedure, which as

Page 83

1    I understand you said you -- it removes or it
2    desensitizes the nerve endings, do those nerve
3    endings grow back eventually?
4  A    Yes.
5  Q    You talked earlier -- briefly talked about the
6    physical therapy.
7        You -- you're not really familiar with
8    the physical therapy procedure that she went
9    through at all, are you?
10 A    I'm not a therapist.  No.
11 Q    Okay.  You don't know if she missed
12    appointments?
13 A    I do not.
14 Q    And you don't know if she was urged to schedule
15    additional appointments or how hard she worked
16    at any of that; right?
17 A    No.  I was not there with her.
18 Q    So how much have you been paid today for your --
19    today and any other cooperation you made with
20    the plaintiff for your testimony in this regard?
21 A    For today, I don't know.  I would have to talk
22    to my manager.  She -- she processes all that.
23 Q    Okay.  Is that your booking agent or your
24    manager?
25 A    Kind of does both.

Page 84

1  Q    So you don't know what you were paid today.
2    Okay.  And you don't know if you received any
3    payment whatsoever for the surgery that you
4    performed?
5  A    Yeah.  I -- I am assuming from Exhibit 9, if
6    this is accurate -- and I don't know when this
7    was -- so this looks like this was generated in
8    March 2021.  It says we haven't been paid.
9  Q    Yeah.  Okay.
10 A    So if we haven't been paid by March 2021, I
11    doubt that we got paid, you know, at all.
12        MR. PAWLAK:  All right.  That's all I
13    have.  Thanks.
14        EXAMINATION
15 BY MR. KNOBLOCH:
16 Q    A couple follow-up, Doctor.  You have Exhibit 9
17    there in front of you.  We've had an extensive
18    discussion today about the codes and whatnot.
19    That discussion also included billing for your
20    time and also billing for your assistant or your
21    physician assistant's time.  I want to talk
22    about that concept in general.
23        Is it common in your experience,
24    Doctor, for neurosurgeons or any surgeon to bill
25    for their own time and also bill for an

Page 85

1    assistant's time?
2  A    Yeah.  So it depends on the practice.  So there
3    is a lot of practices where two neurosurgeons
4    will work together, and the primary surgeon gets
5    paid the lion's share of the fee, and then the
6    assistant surgeon will get paid a fraction,
7    whatever that may be.
8        Because practices have grown, because
9    neurosurgeons are in short supply, often
10    physician extenders, PAs, are now involved.  And
11    they -- and they -- what they do is no less
12    skilled than what a second neurosurgeon would
13    do, you know, and so a really good physician
14    assistant can do pretty much what another
15    neurosurgeon does.  There is a lot of rules and
16    regulations that they have to do it under
17    supervision, but they're very skilled.  So
18    that's -- that's how it works.
19 Q    Is it fair to say with respect to the codes and
20    the procedures and what you can bill and how
21    much you can bill and what codes for this --
22    this, that, and the other thing, are those
23    ever-changing within your industry, would you
24    say?
25 A    I mean, the codes can change because it's all

1    determined I guess by a larger body that
2    determines these codes.  So the code numbers can
3    change, but the idea, the principles, don't
4    change.
5  Q    Regardless of your charges and the codes
6    associated with them, do you have any reason to
7    dispute that Ms. Gard was actually charged --
8    looking at Exhibit 9 -- this $101,527 by your
9    office for the totality of the treatment
10    received by you?
11  A    I mean, yes, I believe that this -- these were
12    the charges that were sent out.
13  Q    What I was getting at is -- well, strike that
14    question.
15         MR. KNOBLOCH:  I would like to move
16    those exhibits that I proffered earlier into
17    evidence, but subject to that, I have nothing
18    further.
19         Any objection to that?
20         MR. PAWLAK:  Well, I don't know if we
21    want to keep -- I would like to have a
22    discussion with you afterwards, or unless you
23    want to do it now on the record now about those
24    exhibits.
25         MR. KNOBLOCH:  Well, how long it is it

1  going to take?  Let's -- I would prefer to do it
2  on the record, so we don't have to brief it
3  after.
4         MR. PAWLAK:  Okay.  Well, yeah.  My
5  issue is if your intention is to enter, like,
6  for example, the physical therapy records based
7  upon the testimony of this witness, yeah, I'm
8  opposed to that.
9         I'm not necessarily opposed to you --
10  to us coming to a stipulation that those records
11  can entered on the face of it for what they're
12  worth, in the sense that she went to therapy on
13  those days.  I just object -- he doesn't have
14  the foundation, I don't think, to say that
15  that's reasonable based upon his -- his, you
16  know, carefree review here today, and I don't
17  think he possesses the expertise, as he's
18  indicated there.
19         So, I mean, but I'm -- that being
20  said, I think we can come to arrangement to get
21  those in.  Otherwise you can move and I can
22  object and we can let the judge decide, but I
23  think we can probably work that, depending on
24  what you want to do with those physical -- if
25  you just want to --

1         MR. KNOBLOCH:  Is your only objection
2  to the therapy records?
3         MR. PAWLAK:  What was the other one
4  that he -- well, all of the other records, too,
5  that he testified that were reasonable, it's my
6  position that -- I'm not -- I'm not opposed to
7  the document coming in for what it says on the
8  face of it.  I'm -- what I'm objecting to is his
9  opinion that they're reasonable.
10         Now, we can let those documents in for
11  face value, but I'm not agreeing that his
12  testimony that they're reasonable is relevant.
13  And I guess we can deal with that, if you're
14  relying on that for some purpose.
15         MR. KNOBLOCH:  Well, I'm trying to
16  figure out the distinction.
17         MR. PAWLAK:  Yeah.  Yeah.
18         MR. KNOBLOCH:  It's going to come in
19  on its face, so the numbers are going to be
20  heard by the Court.
21         MR. PAWLAK:  The number is going to be
22  heard.
23         MR. KNOBLOCH:  The Court still has to
24  make a determination on reasonableness.
25         MR. PAWLAK:  Yeah.

1         MR. KNOBLOCH:  I think there was
2  enough foundation, shaky or not, that his
3  testimony comes in, and I think your cross goes
4  to the weight of the evidence, not to the
5  admissibility of it, so I think it comes in, and
6  the judge is going to have to weigh it all --
7         MR. PAWLAK:  Okay.
8         MR. KNOBLOCH:  -- and come to a
9  reasonable number.
10         MR. PAWLAK:  I will -- then what I
11  will do is I will --
12         MR. KNOBLOCH:  We're almost done,
13  Doctor.
14         MR. PAWLAK:  Yeah.  I'm going to --
15  I'm going to keep my objection there, then,
16  based upon that provision that it goes to the
17  weight of it.  So if I think if I -- I'm going
18  to have to preserve that objection.  If she says
19  it comes in and then she decides the weight
20  based upon the direct and the cross, then we can
21  deal with that.  So I'm going to -- I'm going to
22  keep my objection.
23         MR. KNOBLOCH:  As to what
24  specifically?
25         MR. PAWLAK:  Well, I'm going to keep

Page 90

1   it to the physical therapy -- I'm going to keep
2   it to the physical therapy records. If you're
3   relying upon him to get those into the record,
4   that's -- that's my -- that's the crux of my
5   objection.
6       MR. KNOBLOCH: Okay.
7       MR. PAWLAK: I don't buy his testimony
8   that they're reasonable. If they have to be
9   reasonable to come into the record, then I'm
10   objecting to it, I guess, because I don't think
11   they're reasonable. That's part of my argument
12   in this case.
13       MR. KNOBLOCH: But we're focused just
14   on the therapy at this point?
15       MR. PAWLAK: Therapy record and --
16   well, of course, all of his charges, too. I
17   mean, they're there. I agree that they
18   happened, obviously. We know that they were
19   billed out. I'm objecting on the issue of their
20   reasonableness.
21       MR. KNOBLOCH: Sure. You can preserve
22   all objections --
23       MR. PAWLAK: Okay.
24       MR. KNOBLOCH: -- to reasonableness --
25       MR. PAWLAK: Yeah.

Page 91

1       MR. KNOBLOCH: -- because that's, in
2   my mind, a jury question or a Court question --
3       MR. PAWLAK: Yeah.
4       MR. KNOBLOCH: -- so I don't know if
5   you're -- you need to place it.
6       But as far as the admissibility of
7   these documents, that's what I would like to get
8   straightened out here on the record. So I would
9   like to move those --
10       MR. PAWLAK: Yeah.
11       MR. KNOBLOCH: -- into evidence.
12       MR. PAWLAK: Okay. That's fine.
13       MR. KNOBLOCH: So no objection?
14       MR. PAWLAK: I think I've gone over
15   backwards trying to preserve my --
16       MR. KNOBLOCH: So just to be clear, no
17   objection to my exhibits --
18       MR. PAWLAK: Coming into the record.
19   Right. Yeah.
20       MR. KNOBLOCH: Okay.
21       MR. PAWLAK: That's fine.
22       MR. KNOBLOCH: All right. I think
23   we're done.
24       MR. PAWLAK: And then I'll -- excuse
25   me. I'll move my exhibits in the record, too,

Page 92

1   for what they're -- for the same reason. The
2   Judge can decide whether or not --
3       MR. KNOBLOCH: No objection.
4       MR. PAWLAK: -- what weight she wants
5   to give them. Okay. Thank you.
6       MR. KNOBLOCH: All right. We're done.
7       THE VIDEOGRAPHER: We're going off the
8   record. The time is 5:15 p.m. This concludes
9   today's testimony. The total number of media
10   units used today is one.
11       (Proceedings concluded at 5:15 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1   STATE OF WISCONSIN   )
                       ) SS:
2   COUNTY OF MILWAUKEE   )
3
4        I, Sarah M. Gilkay, RPR, RMR, CRR, and
5   Notary Public in and for the State of Wisconsin,
6   do hereby certify that the preceding deposition
7   was recorded by me and reduced to writing under
8   my personal direction.
9        I further certify that I am not a
10   relative or employee or attorney or counsel of
11   any of the parties, or a relative or employee of
12   such attorney or counsel, or financially
13   interested directly or indirectly in this
14   action.
15        In witness whereof, I have hereunder
16   set my hand and affixed my seal of office on
17   this 28th day of February, 2022.
18
19
20
             <%26888,Signature%>
21             _____
22              Sarah Gilkay
           RPR, RMR, CRR, and Notary Public
23   My commission expires March 8th, 2026
24
25

**$**

**$10,519** 66:14

**$10,868** 39:10

**$101,527** 86:8

**$103,127** 40:10

**$20,251** 57:9

**$3,420** 67:15

**$3,826** 66:13

**$34,822.59** 39:21

**$5,434** 42:5

**$7,365** 57:2

**$76** 39:10

**$80,878.92** 38:9

**$987** 67:8

**1**

**1** 9:11,21 40:5
53:12

**1,300** 68:9

**1,770** 66:3

**1.2** 49:5

**1.3** 49:6

**10** 3:18 7:22 12:2
67:18 68:5,6 71:2

**100** 77:7

**100,000** 45:1,6

**101** 4:18

**101,527** 50:11

**103,127** 50:9

**11** 3:11,20 12:25
69:15 71:2

**110** 48:4

**12** 3:21 7:22 13:13,
14 32:8 70:13 71:2

**120** 48:5

**125** 48:25

**13** 13:24 53:14

**15** 20:1 32:8

**150** 45:1 48:25

**17** 8:12 10:1,11
14:17 51:24

**18** 15:25

**18,400** 69:17

**18,750** 70:15

**18-plus** 51:24

**19** 23:19

**2**

**2** 10:9 33:6 37:14
49:6

**20** 6:4 16:22 33:17
45:9,17 46:6,9,19
49:23 50:1 69:23
80:14,22

**20,625** 65:11

**2001** 7:9 45:17

**2002** 45:17

**2003** 45:18

**2010** 71:7

**2017** 5:19 36:7,18
78:7 79:11

**2018** 6:14,16 11:7
12:3 13:14 16:1,24
18:8 20:1 21:2,19
23:19 36:7

**2019** 25:3 26:7,11
28:8,25 71:7 78:3,
5

**2020** 3:16 33:6

**2021** 53:14 84:8,10

**2022** 4:5

**20th** 28:8

**21** 17:2

**22** 63:10

**2251** 64:19

**22551** 3:22 70:14

**22845** 66:6

**22853** 65:13

**22nd** 16:24

**23rd** 4:4

**24** 8:11

**24th** 5:19 28:25

**36:18** 78:5 79:11

**25** 17:22 32:9

**27** 25:3

**27th** 10:1 78:7

**29** 21:2

**2:20-CV-256** 4:16

**3**

**3** 3:10 9:9 11:2
12:2 41:8 49:6

**30** 24:1

**30th** 10:10 11:7
26:7

**33** 19:24 20:11

**34,822** 44:15

**35** 3:12

**36** 3:14

**37** 21:1

**39** 21:17

**3:34** 4:4

**4**

**4** 3:11 11:2,3,10,13
41:8

**4,866** 66:4

**4/30/2018** 3:11

**41** 3:5

**43** 21:23,24

**44** 21:25

**45** 23:18

**4600** 4:17

**48** 25:2

**5**

**5** 3:5,12 21:19
35:23 41:9 75:19

**5,491** 69:18

**5,500** 70:16

**5-6** 26:22 30:23

**50** 3:17 7:16 14:5,
9,15 23:24 55:22

**56:**7,17 80:18
81:22 82:3,7

**51** 56:9

**53** 25:6

**53220** 4:19

**54** 26:5

**55** 54:12

**56** 26:10 27:9,18

**58** 28:6,7

**5:15** 92:8,11

**6**

**6** 3:14,15 7:23
36:21 37:11,21,22
40:3,5 41:9 42:2
50:8,16 75:19

**60** 28:11 54:15

**606301** 61:9

**61783** 66:18

**63081** 3:20 52:9
56:23 58:22 60:25
61:6,14 62:10
63:10 64:1 69:15

**63081s** 61:11

**63082** 3:19 60:16
61:8 62:7,17 64:4
68:6

**66** 28:24

**67** 3:18 33:20
53:16

**69** 3:20 33:5

**69990** 67:10

**7**

**7** 3:15 6:6 41:9

**7,500** 65:10

**70** 3:21

**71** 33:9

**77003** 67:3

**79** 53:17

**8**

**8** 3:16 7:23 8:15
41:9

**82** 63:10

**84** 3:6

**9**

**9** 3:10,17 50:4
84:5,16 86:8

**9,200** 68:9

**9th** 16:1

**A**

**AANS** 72:11

**abbreviations**
51:1

**abilities** 81:16

**ablation** 15:7
20:13,16 21:3
82:19,25

**ablations** 22:14

**abnormal** 26:2,21
75:24

**abnormalities**
74:2

**absolutely** 19:4,6
21:16 22:15 23:12
27:25 32:22 35:1
36:11,19 56:4
70:6,7,10

**accepted** 79:2

**accepting** 43:18

**accident** 5:18
8:12,13,18,20 9:2,
5,25 17:12 36:18
75:1,4,9,14 76:6,
10,16,19 77:21
78:2,3,6,13

**accurate** 31:9
57:2 68:15,18
79:22 81:23 84:6

**Acharya** 3:15

**achieve** 80:17,18,
20,23 81:3,4 82:2

achieved 82:7

achieving 82:1

action 4:22 14:20 17:8

activities 25:21

actual 20:23 31:8 37:13

acute 77:18,24 78:11,14

Adam's 30:24

add 46:14

additional 59:4,6, 18 62:15 64:6 83:15

additionally 10:7 75:24

address 6:20,21 36:17

addressing 47:10

adjusting 49:24

administer 4:20

admissibility 89:5 91:6

advice 17:7

affiliation 4:25

afternoon 4:2

age 79:20

agent 83:23

agree 4:9 6:7 16:4, 25 21:20,21 23:21, 22 25:4,5 28:9,10 38:12 39:7,13,15, 24 43:6 51:3 90:17

agreeing 88:11

aim 82:3

airline 70:10

Aleve 15:14

alive 43:17

alleviate 20:15

allograft 30:5

allowed 45:20

alternate 7:18

America 4:13 51:18

American 71:16 72:11,17

amount 43:12 49:10 57:1 58:13 81:9

amounts 37:9 44:1,4 49:11

Amy 10:11

analysis 69:5

anchor 32:5 66:12

anchors 30:11

anesthesiologist 42:20,22 43:2,3,5, 8

Anesthesiologists 38:24 39:5 42:4

anesthesiology 39:6

anterior 29:7

appearances 4:25

appeared 10:15 26:21

appears 5:6 6:6, 12 9:24 10:10 12:2 13:1 15:25 16:23 19:7,24 20:4 21:18 22:21 23:23 25:2, 7,23 26:6,10 27:9, 18 28:7,11,24

apple 30:24

application 54:22

appointments 83:12,15

approach 26:24

approached 77:3, 5

appropriately 66:2

approximate 43:13

approximately 7:15 42:19 43:11 78:9

April 11:7 36:6

area 6:13 12:24 19:19 24:22 34:5 45:3 47:24 68:1

77:13 79:16

areas 9:14

argument 90:11

arms 74:18

arrangement 87:20

arrow 76:11

art 79:3

artery 34:4

arthrodesis 64:22 65:7,8

arthropathy 20:6

Ascension 8:2

asks 23:3

asleep 29:9

aspects 6:2

assign 60:20 63:24

assigned 47:1 51:19

assistant 5:7 47:8 50:18,21,23 51:11 59:14,23,24 64:13 68:25 84:20 85:6, 14

assistant's 56:24 84:21 85:1

assisting 57:16, 24

Association 72:12

assume 31:14 39:4 70:17 79:23

assuming 32:18 84:5

Attached 3:24

attack 34:18

attend 71:23

attention 12:1 25:1 28:23 35:23 36:20 37:11,18

attorney 5:1,7 50:7

atypical 14:9 23:2

audio 4:7

August 16:1,24 18:8

Aurora 3:12 11:21 36:3 44:23

authorized 4:20

auto 5:18

average 7:10,11, 14,19 68:7 69:18, 20,23,24 70:1,15 71:3

averagely 68:9

averages 69:7

aware 11:17 37:6 47:22 48:8 55:20 72:17

**B**

B-E-A-U-B 51:9

back 10:21 11:2 15:2 22:3 26:24 27:5 28:18 29:18 34:10 44:13 54:17 55:2 58:17 59:15 71:14 83:3

background 37:1, 16

backwards 91:15

ballpark 52:6

base 46:16

based 8:17 10:23 11:12 12:18 18:24 21:9,15 22:7 26:2, 3 33:12 37:13 41:5 44:19 45:2,19,20, 21 46:9 49:22 76:8 87:6,15 89:16,20

basically 33:24 53:22 64:22 70:19 76:17

basing 44:18

basis 42:25 43:7, 10

Bates 9:15,20 10:9 12:25 13:13,24 15:25 16:22 17:2 19:23 20:11,25 21:17,23 25:1,6 28:23

Beau 50:24 51:12 56:25 57:1 60:4 61:14 63:9,11 64:13 68:24

beginning 5:1 24:23

behalf 5:4

big 34:15

bigger 47:21

bilateral 10:5,18

bill 3:14 42:7,9 46:18 49:12 51:20 58:21 62:6 63:16, 18 64:17 84:24,25 85:20,21

billed 44:4,5 49:10 90:19

billers 49:18

billing 37:3 45:9, 14 46:24 47:13,15 51:17 54:17,23,24 58:2,7,8,9,10 61:22 64:18 84:19, 20

bills 37:14

bit 11:9 17:11 24:3 27:7,22 29:13

bits 29:24

black 19:21

blade 25:19

blades 10:21

bleeders 59:18

bleeding 29:24 34:1,9 59:13,14 65:2

block 12:10,13,23 14:4 15:8

blocks 16:8,10

blood 34:11,19

board 6:12,15

board-certified 6:17,19

bodies 59:8 64:23

body 29:12 31:16 32:25 62:14 64:1 86:1

**Boedecker** 50:24
51:12 56:25 57:1

**Boedecker's**
68:24

**bone** 29:22 30:5,6,
8 31:8,15 32:5,12,
25 58:25 59:1,4,6
65:22,23 66:12

**bones** 30:13 31:17
32:1,15,20,23

**booking** 83:23

**bottom** 17:23 38:9

**box** 31:12,25

**brace** 32:14,16,17

**bracing** 32:14,18

**branch** 12:7,12
14:4 15:8 16:8,10

**brand** 60:3

**break** 34:15

**breakdown** 3:14
63:20,22

**breaking** 64:10,11

**breakthrough**
18:5

**breeze** 35:25

**Brian** 5:7

**briefly** 17:23 38:2
83:5

**bring** 29:14 59:24

**brings** 28:6

**broader** 72:13

**broken** 50:10
51:23 52:2

**bunch** 63:10,13

**bundle** 20:23,24

**burning** 20:17,20

**business** 6:20

**buy** 90:7

---

**C**

**C4** 21:4

**C4-5** 12:12

**C5** 21:4 25:24

30:14 32:1,23
54:6,11 59:7 61:4,
6 62:9,24 63:21
64:2,11 66:11

**centers** 38:16

**central** 6:2

**certainty** 41:18

**C5-6** 12:12 26:2,4,
18,21,23 29:11
75:23

**C5s** 61:17

**C6** 21:4 25:24
30:14 32:1,23
54:7,12 59:8
60:19,22 61:4,8
62:9,11 63:1,21
64:4,11 66:11

**cadaver** 30:6,9
31:7 65:23

**cage** 65:17,20,21,
22

**California-
berkeley** 6:25

**call** 21:14 28:18
39:19 56:23 68:6
77:14

**called** 5:10 8:8
15:6 20:19 29:7,17
30:5 52:16 53:19
62:15 72:21

**calls** 12:12

**capitalism** 48:19

**car** 9:4 70:8 78:1

**care** 5:16 9:25
21:14 36:13,19
38:5 43:20 65:2
73:16,17,18

**carefree** 87:16

**case** 4:14,15 54:21
55:23 59:21 64:12
68:11 69:1 73:3,21
90:12

**cases** 46:11,13
60:5,6

**CAT** 19:17 75:21

**categories** 58:15

**caused** 8:20
75:14,16 76:5,9,12
79:24

**causing** 74:17

**center** 8:8

**certification** 6:13,
16

**certified** 9:12
37:13 53:6

**cervical** 9:3 19:12
29:8 47:2 66:8

**cetera** 49:15

**chance** 6:9 17:25
35:20 36:22

**change** 43:23
85:25 86:3,4

**changed** 47:15,16

**charge** 39:20,24,
25 40:6,18,23 41:4
42:21 43:22 44:20,
23 46:12 48:20,25
49:4,13,21 55:22
57:1 66:3,4,21
67:8,21 68:9 71:1

**charged** 44:1,3
57:9 65:10 66:13
68:10,19,21 70:23
71:4 86:7

**charges** 38:3,13
39:1,9 40:4,13
42:17 44:9 46:22
58:15,16 86:5,12
90:16

**charging** 47:22
48:4

**check** 29:20 67:20

**checked** 45:15

**checklist** 72:21,
23 73:4,6,8 74:5

**chef** 73:11

**Child's** 73:13

**choice** 27:4 64:17

**choose** 35:8

**chooses** 30:2

**chronic** 13:22

**chronological**
75:7

**city** 8:6 70:2

**clear** 35:2 91:16

**clinic** 7:2,12,16,19
9:25

**clinical** 24:18
54:22

**close** 50:12 68:19

**closer** 7:23 25:10

**clot** 34:11,19

**code** 3:19,20,22
51:19 52:9,16
60:18 62:7,8,14,
15,16 63:16 68:6
70:14 86:2

**codes** 51:14 52:8
55:1 62:24 63:9,
11,13 66:16 84:18
85:19,21,25 86:2,5

**coding** 62:12,13

**collar** 32:16

**collusion** 41:3

**Columbia** 8:1,4
39:1,16

**column** 37:18,20
38:4 51:2

**comfortable**
18:25

**comment** 24:19
25:11 33:9 42:13
43:7

**commercially**
30:9

**common** 5:9 13:5,
10 16:9 21:6 22:13
24:3 27:23,25
40:21 73:16 77:22
80:2 84:23

**commonly** 65:4

**community** 40:23

**companies** 44:2
45:20 54:25

**company** 56:13

**complain** 48:15

**complaining** 80:9

**complaints** 10:3

**complete** 42:13

**complex** 46:11

**complexity** 46:10

**complicated** 72:4

**complication**
55:14

**compliment**
71:12

**components**
51:25 52:3

**compression**
74:13

**concept** 84:22

**concerned** 23:4,9

**concluded** 92:11

**concludes** 92:8

**conclusion** 23:16
77:1

**conducted** 53:4,
13

**confidence** 16:20

**confirm** 26:14

**connected** 20:22

**conservative**
19:3 22:8 23:1
68:21

**consumer** 67:19,
20

**continue** 4:8
15:14,17,21 17:17
19:8 82:6,14

**continued** 10:18

**Continues** 24:14

**continuing** 24:23

**continuous** 59:13

**contrary** 27:21

**control** 48:20
74:11

**convention** 58:7,
8,9 61:21,22 64:15

**conversation**
55:4

**conversations**
23:15

**cookbook** 73:14

**cooperation**
83:19

copy 52:23 53:7

cor- 57:4

cord 34:1 54:12,14
55:21 62:20 75:18

corner 9:16

corpectomies
61:4

corpectomy
52:16,18 53:20,25
56:15,16,21,23
57:5,19 58:19,22
62:3,16,19 63:18
64:5 69:16

correct 13:4
28:15,21 29:2
31:2,10,13,19
32:18 37:4,5
44:16,17 48:10,11,
14 49:25 50:2,13,
14 51:5,15,16,21
53:4 54:8,9 57:6,7,
8,10,20,25 58:1
60:25 61:2,13 62:4
63:14 65:11,12
66:4,5,14,15
67:15,16 69:2
73:25 75:10,11
79:10 80:15,16
81:10,12

correctly 28:14
29:1 30:15

correlate 39:18

correlation 20:17
22:23

cost 68:7 70:15

costs 37:6

counsel 4:24

count 52:5

countersunk
66:1

counting 52:5

country 48:20
71:21

couple 35:13,18
38:20 40:7 84:16

court 4:14 5:2,22
33:12 88:20,23
91:2

COVID 47:16,20

cranial 72:13

crazy 55:18

criteria 72:18

critical 18:19
54:20,22 60:7
79:6,7,8

cross 89:3,20

cross-examine
41:13

crux 90:4

CT 19:12

cumulative 49:23
73:20

curette 29:17

curettes 29:17

cutting 57:22

cutting-edge
71:25

CV 3:15 6:6,18

cylinder 31:12
32:1

**D**

D-A-G-A-M 51:7

Dagam 3:15,16
4:11 5:10,15,25
45:24 55:2

daily 25:21

damage 19:18,19
20:9 75:16,17
78:21 80:4

damaged 20:24
31:4,15

data 76:8

date 9:25 11:6
12:3 13:14 16:1
21:1

dated 10:10 16:24
19:25 21:19

dates 39:17,18

day 18:19 34:12
52:1

days 7:12,17,19
87:13

deal 88:13 89:21

December 21:19
23:19 28:25 78:5

decide 12:19
87:22 92:2

decided 28:18

decides 89:19

decompression
54:11,14 55:21
62:18,20 68:7

deem 57:25

defendant 5:6

deficit 74:6

define 46:23

definition 56:15,
19

degenerative
79:14,18,21,24

degree 41:2,18
49:3 81:2

Department 7:5

depending 87:23

depends 63:23
64:7 85:2

deposition 4:6,8,
11,17 6:10 36:23
53:4,13

describe 31:23
58:17 65:19 77:13

describing 20:12
79:16

description 55:12

descriptor 60:20

desensitizes 83:2

destroying 20:21

detail 3:17 29:5
35:22 50:5,11
55:19 56:12

detailed 42:16
50:17 54:19 55:6,
18

details 40:5

determination
12:17 88:24

determined 86:1

determines 86:2

developed 9:4

developing 44:7

device 59:11

devices 4:5

diagnostic 27:11
75:25

dictate 56:6

difference 53:24
57:12

difficult 59:22

direct 80:7 89:20

direction 15:10
26:25

disc 26:2,21
29:18,23 31:5,15
58:23,24 60:23
75:16,24

discectomy 29:8

discuss 13:25
28:2 77:9

discussion 9:15,
17 17:3 18:1 22:6
40:3 84:18,19
86:22

disease 20:8
25:24 77:12,15,17,
18,23 78:16,22,23
79:25 80:4

Disposition 3:23

dispute 86:7

disrupt 27:1

distinction 56:15
88:16

distraction 29:12

District 4:14,15

doctor 8:22 9:9
10:3,17,23 11:4
13:2,5,13 14:7
15:25 25:1 35:19
36:14 37:2,25
38:7,13 40:17
41:17,22 67:21
84:16,24 89:13

doctor's 28:3

doctors 46:5
48:15,23 49:4 55:7

75:10

document 10:2
16:6 20:4 24:25
36:23 37:19 50:8,9
88:7

documents 29:3
88:10 91:7

double 44:24

doubt 84:11

Downtown 8:2

draft 8:14

draw 12:1 25:1
36:20 37:11,17

due 8:11

duly 5:11

duplicate 53:9

**E**

earlier 50:15
58:19 80:7 83:5
86:16

early 36:7

Eastern 4:15

easy 78:17

education 72:16

effect 80:14

effective 21:11
82:18,21

elapsed 75:7

employed 7:7

encourage 28:1

end 77:6

ended 9:5 46:7

endings 12:11
20:13,21 83:2,3

ends 6:14

enforce 58:9

enter 87:5

entered 87:11

entire 51:8 64:20
76:22

entitled 58:21

**envision** 57:21,22

**ER** 36:13

**Eric** 5:3

**esophagus** 34:6
59:16

**establish** 14:21
17:8

**et al** 4:13

**evaluate** 24:16

**evening** 64:25

**event** 11:9

**eventually** 40:6
83:3

**ever-changing**
85:23

**evidence** 12:21
41:8,21 74:13
81:14 86:17 89:4
91:11

**evidenced** 76:25

**exact** 37:9 52:2
79:19

**exam** 12:18

**examination** 5:13
41:24 80:8 84:14

**examined** 5:12

**excerpt** 3:10

**excess** 65:1

**excuse** 36:13
54:13 74:24 91:24

**exhibit** 3:9,10,11,
12,14,15,16,17,18,
20,21 6:5 8:15 9:9,
11 11:2,10,13 12:2
35:23 36:21 37:11,
14,21,22 40:3,5
41:8 42:2 50:4,8,
16 53:12,16 67:18
68:5,6 69:15 70:13
84:5,16 86:8

**exhibiting** 72:24

**exhibits** 3:23
41:13 71:2 86:16,
24 91:17,25

**expect** 14:16

**experience** 13:5
14:7 21:10 41:6

45:3 46:10,20 60:9
69:24 73:20 84:23
25

**feeling** 74:10

**feels** 25:20

**fees** 45:7,8,11,13,
16,19,23,25 46:1,
5,6 50:8,16

**fellowship** 7:4

**felt** 15:10 18:6,21,
24 21:10 26:4
33:14

**fibers** 12:11

**fight** 56:13

**figure** 88:16

**filaments** 20:23

**filed** 4:14

**fill** 30:4 31:7 65:22

**finally** 23:15

**financially** 4:22

**find** 15:11 16:13
30:22 63:8 67:24
71:10,22

**finding** 16:12

**findings** 16:21

**fine** 17:18 61:20
91:12,21

**finger** 30:17

**finished** 42:2

**flip** 9:18 10:9
12:25 13:24 14:17
16:22 17:2 20:25
21:23 23:18 26:10
28:7,11

**fluid** 34:2

**fluoroscope** 67:6

**focused** 90:13

**folks** 58:21

**follow** 11:15 73:9

**follow-up** 84:16

**foremost** 78:10

**forever** 80:23 81:5

**form** 27:11 42:15
43:9 57:24

**forward** 8:13

**found** 52:18

**foundation** 42:13
87:14 89:2

**fraction** 85:6

**frame** 36:6

**free** 29:21 52:5
53:18

**front** 6:5 8:15 9:22
26:19,22 27:5,6
29:10 30:16 42:10
50:10 84:17

**full** 51:7

**fuse** 29:25 31:16,
17 32:20 34:14

**fuses** 32:24

**fusion** 9:3 26:18,
22 27:3 29:8 32:25
39:19 47:2,3 59:11
64:24 65:5 70:14

**future** 18:2

**G**

**gamut** 76:22

**Gard** 4:12 5:5,16
8:11,19 9:1 10:3,
23 13:18 14:21
17:4,9 21:14 22:2,
7 23:24 27:19
28:16 29:6 33:23
35:14 36:2,9,17
40:14 72:19 73:23
74:24 80:9 81:8
86:7

**Gard's** 33:13
81:16

**gave** 55:25

**gene-** 16:13

**general** 8:23
34:17,21 37:8,9
55:12 77:16 84:22

**generally** 35:25
37:6 38:12 39:13
41:1 46:12 79:2

**generate** 42:6
44:11 46:13

**generated** 44:6
46:21 84:7

**generator** 16:13

**George** 7:1

**give** 7:10 23:10
32:9 35:20 47:10
50:3 52:13 53:11
55:12 92:5

**goal** 80:13 81:19,
20 82:2

**good** 4:2 60:4
85:13

**Gotcha** 19:23
20:25 23:18

**gradually** 45:18

**graduated** 7:9

**grand** 50:12

**graph** 37:12

**graphs** 38:20

**great** 15:19 35:22
44:12 71:8 76:7

**greater** 80:18

**Greenfield** 4:18

**group** 45:10

**groups** 39:6

**grow** 83:3

**grown** 85:8

**Gruber** 5:4

**guarantee** 35:5

**guarantees** 77:11

**guess** 28:16 76:7
86:1 88:13 90:10

**guidelines** 56:1

**H**

**hand** 67:17 68:5
69:14 70:12

**happen** 35:4

**happened** 90:18

**happening** 60:15

**hard** 55:17 83:15

**he'll** 12:19,20,23

**head** 10:7

**heal** 59:12

**healing** 32:24

**exhibiting** 72:24

**F**

**face** 87:11 88:8,
11,19

**facet** 12:11 13:25
14:25 19:19,21
20:5,9,14 38:5
75:17 82:6,15,16

**facilities** 36:3
44:19,20

**facility** 39:20,25

**fact** 12:24 16:11
17:19 27:25 28:4
40:21 43:21 55:20
75:25 81:15 82:13

**factors** 18:14
33:23 35:12,14

**fair** 17:5 18:9 19:9
41:5 75:4 85:19

**faith** 68:17

**familiar** 52:10
60:1 83:7

**fashion** 79:4

**faster** 27:6 57:12

**February** 4:4 25:3

**fee** 43:3,8 45:12,15
46:8 47:8 67:14
85:5

**feedback** 22:7

**feel** 18:11 35:3
52:5 53:18 58:24,

**heard** 20:16 44:19 48:3,19,23 49:3 67:19,23 72:21 88:20,22

**hearing** 31:2

**heart** 34:18

**Heidi** 47:17,19 49:24

**held** 4:17

**helping** 57:23

**Hey** 45:24

**high** 47:24 81:3

**high/low** 49:22

**higher** 45:6 46:14 49:7 69:20

**highlighted** 9:14 13:1 17:23 21:24 22:21 24:13 25:7

**highly** 59:23

**history** 3:17 12:18 17:3 50:5 75:7 76:14

**hit** 52:6

**hold** 32:17 59:15

**holes** 32:4

**hoped** 34:25

**horrible** 60:14

**hospital** 8:4,6 11:22 39:17,25 44:14

**hospitals** 7:24

**hotel** 70:9

**hundreds** 60:5,6

**hurt** 24:23

**hurting** 24:22

**I**

**idea** 31:14,16 32:19 37:9 86:3

**identical** 42:5

**IDENTIFIED** 3:9

**identify** 12:16 14:11 29:11,19 31:4 58:23

**identifying** 59:18

**imaging** 12:18 24:18 27:11,16 38:6 74:2 76:11,16

**implying** 77:20

**importance** 54:15

**important** 54:10

**impressed** 71:9

**improved** 33:14 76:1 81:16

**improvement** 33:11 82:8

**inch** 32:9

**incident** 70:23 71:4 73:2

**incision** 29:10 30:15,20,21 31:1

**include** 61:17

**included** 10:8 84:19

**includes** 34:4 38:5 47:8,9

**including** 5:17

**increase** 46:1

**increased** 45:19, 23 46:6

**increases** 16:20

**increasing** 46:4

**indication** 74:8

**individual** 14:13

**industry** 85:23

**Infection** 34:13

**inflation** 45:21

**information** 60:9 81:18

**initial** 76:25

**initially** 23:24 81:24

**injecting** 19:20

**injections** 14:1,14 15:1 22:11 82:2

**injuries** 9:1 21:15 36:17

**injury** 33:25 34:2,8

75:13,16 77:18,24, 25 78:1,11,14 80:4

**inside** 31:10 59:11

**instability** 74:8

**instruments** 29:16

**insurance** 44:2 45:19 54:25 56:13

**intention** 87:5

**interbody** 31:25

**interchangeable** 78:24 80:1

**interested** 4:22 17:15

**interfere** 4:7

**internal** 32:17

**internally** 32:14

**internet** 67:20 71:9

**interpret** 78:18

**interpretation** 80:4

**interpreting** 67:4

**interrupt** 25:14

**interventional** 13:2

**intra-residency** 7:3

**intrinsically** 76:9

**introduce** 5:21

**invasive** 15:12

**invent** 58:8 61:21

**investment** 43:19

**involved** 31:20 85:10

**involves** 30:15

**issue** 13:22 41:3 47:11 80:21 87:5 90:19

**issues** 23:5

**itemizations** 42:5

**J**

**January** 3:16

**job** 55:17

**joint** 13:25 20:5,9 38:5

**joints** 12:11 19:21 20:14

**judge** 87:22 89:6 92:2

**Julia** 73:13

**July** 13:14

**jump** 35:9

**jumping** 77:1

**June** 12:3

**jury** 91:2

**K**

**keeping** 43:17

**Keke** 5:9

**kind** 23:13 30:17 46:7,20 54:17 55:8,19 56:10 60:10 71:25 83:25

**knew** 18:18

**Knobloch** 3:5,6 5:3,14 41:7,15,16, 20 42:15 43:9 78:6 79:10 84:15 86:15, 25 88:1,15,18,23 89:1,8,12,23 90:6, 13,21,24 91:1,4, 11,13,16,20,22 92:3,6

**knowledge** 8:17 40:22 45:3 49:2 59:25

**L**

**lack** 32:19 42:13

**Lakeland** 11:21

**language** 79:20

**large** 20:23,24 38:15 65:25

**larger** 45:10

46:15,18 86:1

**lasted** 24:9

**lastly** 67:10 70:12

**lasts** 24:12

**Law** 5:4

**layman** 80:2

**leading** 15:6

**leak** 34:2

**learn** 72:3

**led** 9:2

**left** 10:6 21:4 51:13

**left-hand** 37:18,20 38:3

**leg** 34:19

**length** 32:8

**level** 16:16 29:11 55:19 81:3

**levels** 75:18 76:2

**Lewandowski** 5:9

**Lidoderm** 15:22

**ligament** 59:9

**linear** 30:25

**lion's** 85:5

**listed** 51:6 68:25 70:15

**lists** 68:19 69:17

**literally** 55:12 58:18 60:15

**location** 12:16 14:12 16:12

**lock** 32:13

**long** 6:3 7:6 22:15 55:4 82:14,15 86:25

**long-lasting** 81:25

**long-term** 17:13 23:4

**longer** 24:9 27:2 47:19

**looked** 17:22 27:21 52:17 68:2

**Loomis** 4:18

**loss** 74:10

**lot** 43:19 44:1 59:7, 12 68:17 72:6 73:15 85:3,15

**low** 47:24

**lower** 9:16

**lung** 34:20

**M**

**M.D.** 5:10

**made** 22:2 32:2 37:13 83:19

**magnify** 29:15

**main** 13:22 25:21

**maintain** 7:24

**maintained** 6:15

**make** 12:23 29:10 30:21,25 56:9,11 59:9 62:10 65:24 66:1,24 73:14 88:24

**makes** 12:17

**making** 18:15 20:18 26:12 27:10 43:1 65:1

**manage** 17:17

**management** 11:15,21 13:2,8 23:5

**manager** 45:9,14 47:15 54:18,24 83:22,24

**manager's** 47:13

**managing** 18:3

**manner** 77:4

**march** 5:19 8:11 10:1,10 36:18 78:7 79:11 84:8,10

**marked** 6:5 9:9 50:4 53:12 67:18 69:14 70:12

**market** 42:18

**Mary's** 8:2,5 39:1, 16

**material** 58:24

**matter** 4:12 50:6 70:23 71:4

**maximize** 14:23 18:13

**Mayo** 7:2

**meaning** 22:24 34:23 77:19

**meanings** 54:3

**means** 20:7,8 24:17 64:25 80:25 81:25

**measure** 65:21

**measurements** 32:7

**measures** 23:1

**mechanically** 58:18

**media** 4:10 92:9

**medial** 12:7,12 14:4 15:8 16:8,10

**medical** 3:10,11, 14 6:22,25 9:12 37:2,14 41:18 65:9 79:3

**Medicare** 48:5,8, 13,16,24 49:1,5, 13,14

**medication** 16:16

**medicine** 43:21

**Medpricemonkey .com** 3:18,20,21

**meet** 74:23 78:12

**meetings** 71:17 72:11 73:19 76:25

**member** 71:15

**Memorial** 8:6

**memory** 29:3

**men** 30:23

**mention** 52:18 53:19

**mentioned** 79:18

**metal** 32:3 34:14

**metaphor** 60:14

**method** 15:12

**Metropolitan** 38:24 39:5 42:4

**Michelin** 73:11,12

**microscope** 29:14 57:17 67:13

**midline** 30:22

**midpoint** 30:22

**midst** 18:20

**millimeter** 32:7

**millimeters** 32:8, 9

**million** 45:1

**Milwaukee** 8:2,8 47:23 67:25

**mind** 18:12 53:1 78:20,23 91:2

**mindset** 18:17

**minutes** 6:10 35:13

**misinterpreting** 63:6

**missed** 83:11

**missing** 11:16

**mistakenly** 16:15

**mixture** 30:7

**modest** 80:24

**moment** 17:16

**month** 7:11 75:4

**months** 22:17 24:10 27:16

**motor** 74:25 75:13 76:5,9 77:21 78:13

**move** 32:23 41:8 60:16 86:15 87:21 91:9,25

**moved** 47:21

**movement** 33:1

**moving** 41:20

**MRI** 19:17,18 25:23 26:3 27:11, 14,15 75:21,23

**multiple** 16:10 23:14 49:4 52:7 53:9

**muscle** 27:2 74:11

**muscles** 25:17,18

**musician** 60:13

**MVA** 76:12 78:1

**N**

**names** 51:6

**narrative** 76:18 77:3

**national** 45:15,20

**naturally** 31:16,18 32:20

**nature** 24:7 40:15

**navigation** 66:22, 23

**necessarily** 37:3 54:20,22 72:2 87:9

**necessitated** 75:14

**necessitating** 72:25

**neck** 8:21 9:4,7 10:8,18 12:17,18, 20 13:6,22 17:12 24:14,19 25:16,18 29:10 30:16,23 34:3 74:17 76:19

**needed** 56:13

**needle** 24:7

**needles** 27:1

**nerve** 12:10 20:13, 16,19,21,23,24 72:14 74:13 83:2

**nerves** 12:7 20:21 29:19,20 33:25 34:5

**nervous** 6:2

**Nessler** 47:18

**neurologic** 33:24

**neurological** 50:5 72:12 74:6

**neurosurgeon** 6:1,3 7:7 70:2 73:12 85:12,15

**neurosurgeons** 40:22,25 45:11

**muscle** 27:2 74:11

46:4 69:23 73:19 84:24 85:3,9

**neurosurgery** 7:2,5,8

**non-movement** 32:19

**non-surgical** 9:6 76:22

**nonsurgical** 18:13

**normal** 25:21 38:17

**North** 71:15 72:17

**note** 10:11 11:4,6, 14 16:2 19:25 25:15,23 26:5 28:25 33:5,13 47:5 54:10

**noted** 33:11

**notes** 13:13

**noticing** 5:1

**November** 20:1 21:2 28:8

**nuance** 54:3 60:9

**nuances** 56:14

**number** 4:10 7:20 9:21 10:9 12:2,25 13:13 15:13 21:17 25:2,6 28:24 33:19 42:10 43:13,23 44:22 45:5 46:17 52:2 66:16 78:15 88:21 89:9 92:9

**numbers** 38:15 39:11 44:6,8,12 45:12,15 46:9,14, 15 48:2 49:14 60:8 62:23 68:23 69:3, 21 70:4 71:6 86:2 88:19

**numbness** 74:20

**O**

**oath** 4:21 5:12

**object** 41:12 87:13,22

**objecting** 88:8 90:10,19

**objection** 41:10 42:15 43:9 86:19 88:1 89:15,18,22 90:5 91:13,17 92:3

**objections** 90:22

**objective** 12:14, 16,21 81:14

**objectively** 72:24 75:20

**observed** 21:15

**obtained** 23:24 27:10

**occasion** 74:23

**occupation** 5:23 6:1

**occur** 32:24

**occurred** 5:18 55:14

**October** 26:7,11 53:14

**offer** 41:6

**offering** 43:1

**office** 5:8 13:17 16:23 21:18,19 23:19 25:2 26:6 28:4 37:4,13 40:5, 7 53:14 86:9

**Offices** 5:4

**official** 26:12

**older** 6:18

**Ong** 11:17,19,20, 24 12:9 13:1 14:24,25 15:3 16:3 19:8,20,25 23:20 26:25 36:14

**Ong's** 21:9 75:25

**op** 47:5

**open** 17:17 29:13 52:25 53:8

**operating** 67:13

**operative** 12:6 16:2 19:25 28:25 52:21 53:16 55:3, 7,10 64:7

**opinion** 12:14 19:1 43:1 45:2 71:13 75:13,22 88:9

**opinions** 41:17

**opportunity** 5:21 8:14 41:12 75:8

**opposed** 87:8,9 88:6

**opt** 27:5

**option** 17:13 25:9 77:9

**order** 11:8 19:11, 12 59:2,17

**ordinary** 5:9

**organization** 71:19,20

**original** 3:23,24 16:20 53:6

**originally** 47:17 55:7

**osteophytes** 59:9

**outcome** 4:23

**outpatient** 8:8

**Ozaukee** 8:4,5

**P**

**P-R-O-V** 51:2

**p.m.** 4:4 92:8,11

**PA** 60:3

**pages** 11:16 37:20 53:16,18

**paid** 44:3 49:12, 16,19 83:18 84:1, 8,10,11 85:5,6

**pain** 8:21 9:4,7 10:3,6,7,8,18,19, 20 11:15,20 12:10, 17,18,20,22,24 13:2,6,8,23 14:5 15:12 16:13 17:10, 12,17 18:5,16,22 20:15,22 23:24 24:14,19 25:16,19 73:23 74:15,17 76:1,3,5,15,19 78:20 80:20,24 81:2,4,22 82:3

**paper** 68:16 69:10

**paragraph** 18:1

**paralegal** 5:8

**paralyzed** 18:21

**part** 17:3,24 37:14 45:10 47:3 64:20 78:21,22 90:11

**partial** 54:6,7,11, 12 55:24

**parties** 4:9

**party** 4:21

**PAS** 85:10

**past** 35:13

**patches** 15:22

**patient** 3:17 16:9 18:16 20:5 23:3,4 28:1,5 29:9 30:3 33:11 34:24 35:2 43:17 50:5 65:23 72:24

**patient's** 30:4 31:8 34:23

**patients** 24:4 37:7

**Pawlak** 3:5 5:6,7 41:11,23 42:1,23 44:10 79:1,13 84:12 86:20 87:4 88:3,17,21,25 89:7,10,14,25 90:7,15,23,25 91:3,10,12,14,18, 21,24 92:4

**pay** 48:5 49:5 55:1 58:12

**payment** 84:3

**pays** 48:16,24 49:1

**people** 14:13 37:3 59:20

**percent** 7:16 14:5, 9,15 23:24 24:1 33:17 48:5,25 54:12,15 55:22 56:7,9,17 80:14, 18,22 81:22 82:3,7

**percentage** 46:2

**perception** 33:13

**perfectly** 79:22

**perform** 7:13 51:19

**performed** 9:3 29:5 40:1,14 51:25 57:7 58:5,6 72:19 81:17 84:4

**performing** 12:9

**period** 8:13 28:17 36:9 43:12 74:24, 25 75:6

**peripheral** 72:14

**permanence** 80:11,17,21,23,24, 25 81:2

**permanency** 23:10

**permanent** 15:6,7 80:10 81:25

**permanently** 81:22

**persistent** 25:13 74:10

**person** 14:12 22:19 50:22 54:23

**personally** 10:13 42:9 58:11

**perspective** 7:10

**pertaining** 36:2

**phenomenon** 24:3 27:24 40:21

**phones** 4:5

**phrase** 77:12

**physical** 3:12 10:24 13:7 35:19 36:1,5,10,14 38:6 81:16 83:6,8 87:6, 24 90:1,2

**physician** 11:12, 20 43:11 50:23 51:11 84:21 85:10, 13

**physicians** 77:17

**piece** 68:16 69:9

**pinched** 29:21

**pins** 29:12

**Pittsburgh** 7:4

**place** 91:5

**placing** 57:23

**plaintiff** 5:5 83:20

**Plaintiff's** 9:11 50:7

**plan** 14:20 15:13 17:7 19:7,11 28:12

**planning** 66:20

**plastic** 53:7

**plate** 30:11,12 32:2,4,5,13 33:1 34:14 66:8,9,10,25

**plates** 31:20

**played** 60:11

**pneumonia** 34:20

**point** 10:22 11:11 13:11,21 18:6,11 19:1 22:9 24:24 25:12 30:20 33:2, 16 41:7 43:2 44:13,25 72:1 75:20,25 80:3 81:15 90:14

**pointing** 76:12

**points** 54:16

**policy** 62:12

**pop** 22:22

**position** 47:21 88:6

**possesses** 87:17

**possibility** 18:2

**post-op** 33:8

**postoperative** 43:20

**potentially** 15:5

**practice** 6:4 7:15 41:5 45:10 46:9 47:20 48:19 85:2

**practices** 11:20 38:17 44:6 85:3,8

**practicing** 7:8

**practitioners** 54:2

**prefer** 87:1

**prefers** 30:3

**preoperative** 66:20

prepared 64:24

present 5:8 6:16 53:15

preserve 89:18 90:21 91:15

pretty 68:18,19 72:10 85:14

prevent 32:25

preview 47:10

previous 70:18

previously 53:3, 11

price 40:18 41:5 67:25 70:14,21,24 71:2,3

prices 38:5 39:14 40:23 42:14 48:9 49:21 57:13 70:8, 9,10

pricing 41:2

primary 36:14 85:4

principles 86:3

print 71:8

printout 3:18,20, 21

prior 21:5 27:9,14, 16 35:16 36:23

private 48:19

privileges 7:24 8:1,3,5,9

problem 19:15 78:22,23

problems 13:20

procedure 12:6,8, 15 16:7 20:10,12, 17 22:22 23:25 29:7 47:1 58:20 64:11 68:8,22 82:19,25 83:8

procedures 21:7 24:5,7 37:7 38:13 51:14 82:6,16,22 85:20

proceedings 4:1 92:11

process 35:11 50:19 51:18 60:21

64:20

processes 83:22

profession 79:3

proffered 73:22 86:16

program 7:9

progression 19:15

promise 22:15

promotes 32:19

proper 14:11

provide 5:21 32:14

provided 5:17

provider 51:1,4 63:16 64:12

providers 40:18 77:4

providing 43:12 80:11

provision 89:16

publishes 72:18

pull 52:24

purpose 88:14

purposely 35:10

pursue 23:17

push 19:2 80:3

put 29:12 30:1,10, 11 31:10,24 32:2, 11 34:14 55:14 59:11 64:24 65:23, 24 66:10,11,23 68:17 69:12 76:16

putting 66:8

**Q**

qualifies 58:20

quarter 45:1

question 8:23 17:21 22:4,5 64:9 71:15 75:2 76:7 81:1 82:9 86:14 91:2

questioning 33:18

questions 38:19 41:21 61:23

quickly 55:9

**R**

radiating 24:14,20

radicular 74:15

radiofrequency 15:7 20:13,16 21:3 22:11,14 23:7 24:8 26:3 82:17

radiology 38:21 39:4,6

range 38:18 67:25

rarely 76:13

rate 69:2,17

rates 48:9 49:24

read 17:23,25 64:7 73:9

reading 25:23 28:14

ready 65:16

realize 38:14

realm 21:13

reason 55:18 73:22 86:6 92:1

reasonable 10:22,25 14:16 15:2 19:1 21:14 36:9,16 38:12 39:13,24 40:14 41:18 42:12,14,19 43:8,14,24 44:9, 16,22 77:4 87:15 88:5,9,12 89:9 90:8,9,11

reasonableness 88:24 90:20,24

received 8:11 22:9 84:2 86:10

receiving 14:2 80:10

receptors 20:22

recipe 73:10,13

recommend 19:8 82:5,9

recommendation 18:15 25:9 26:12 27:10

recommendations 22:1

recommended 15:16 18:9 26:19 82:13

recommending 26:15,17,18

recommends 11:14

record 3:11 4:3,9, 25 23:23 52:25 79:11 86:23 87:2 90:3,9,15 91:8,18, 25 92:8

recorded 4:7,8,11

recording 25:8

records 3:10,13 9:10,12,13 35:20 36:2 87:6,10 88:2, 4 90:2

recovery 27:2,6

reduce 81:22

reduced 47:20

refer 52:12

reference 32:10

referral 11:11,23

referred 13:8 65:4,17 75:9

referring 51:22

refers 51:11

reflect 60:8

reflected 50:16

regard 83:20

regulations 85:16

reimbursement 48:9 49:14

related 3:19,20,22 4:21 77:21

relationship 11:23

relative 40:1 43:23 44:8 46:24 47:3 82:1

recommendation 18:15 25:9 26:12 27:10

relevance 54:15

relevant 88:12

relief 13:7 14:2,6, 9,25 15:12,20 22:14 23:25 34:24 77:8 80:10,20,22, 24 81:3,4,5 82:4, 15

relying 88:14 90:3

remedies 19:5

remember 27:14 43:25 51:10 61:18 66:6

remove 31:5,14 34:11 58:24 59:6, 8,9

removes 83:1

repeat 27:15 48:7

repeating 16:19

replace 31:15

report 3:16 8:14, 15,17,22 52:17,21 55:3,10 56:11 64:8

reported 14:5

reporter 5:2

reporting 10:4 25:15 77:13

reports 10:17 53:16 54:18 55:8 79:15

represent 36:5 37:12

representation 36:8 37:17

reproducibility 16:12

require 62:13

required 63:16

residency 6:23 7:9

respect 5:18 38:20 85:19

respond 14:14

responding 14:13 22:10

result 16:19

retract 59:16

review 12:19
36:22 42:9,17
75:23 87:16

Rhonda 47:16

right-hand 9:16

risk 33:22 34:8,9,
13,22 35:1,12,13
43:18

risks 23:12 33:21,
24 34:15,17,21

road 4:18 17:14
18:23

room 29:14

rough 29:23

roughly 36:6
42:18 45:18,23
80:19

round 15:4

rules 48:19 62:13
85:15

run 74:4

runs 37:22

RV 46:17

RVU 46:14,15,23

RVUS 46:17

S

sake 9:17

satisfaction
34:23

scan 75:21

scans 19:17

schedule 28:18
83:14

scheme 50:12

school 6:25 60:3

screw 32:12

screwed 30:12

screws 31:20
32:4,6,11 66:11,24

second-to-last
14:18

segment 26:23
38:22

segue 44:12 53:2

seminar 72:4

seminars 71:23
72:2

sense 62:10 73:16
87:12

sentence 22:20
24:13

sentences 55:11

separately 63:19

September 33:6

series 10:24 13:6
62:23

served 17:22

service 12:3 16:1
21:1 43:12 67:22
68:14

services 39:14
40:13,24 41:6
67:20,25

set 45:7,8,13,16
58:5,8,13 63:9

sets 48:9

setting 48:23

shaky 89:2

shape 57:24

shaping 59:7

share 45:12 85:5

shave 59:2

sheet 50:25 58:2
63:21

Sheila 4:12 5:5,16
35:6

Shekhar 3:15 4:11
5:10,25

shocked 44:23,25
68:3

short 85:9

shoulder 10:6,21
25:16,18,19

shoulders 24:15,
20

show 11:1 19:18

75:23

showing 9:8

shown 9:8

sic 61:9 64:19

side 10:6,20 21:4,
5,8,11,12 30:22
37:21 51:14 60:22,
23

sides 10:19

sign 76:11

significant 25:24
50:11 74:24,25
75:6 81:8 82:7

significantly 45:5

silence 4:5

similar 32:15
40:24 48:6,12

simply 82:5

sister 8:3

situation 27:19
81:11

situs 77:14 79:16

size 65:21

skill 60:7

skilled 59:23,25
85:12,17

skipped 33:20

slow 35:7,10

small 29:12 30:11
31:11,12 32:2

so-called 67:1

Society 71:16
72:18

soft 34:3

solution 15:6

sort 12:21 23:15
46:25

sorts 16:2

sounds 15:19

space 29:13,18
31:7 58:23 60:23

spacer 30:1,2,10
31:11 64:25 65:15,
24

span 21:7

specialist 13:9

specialty 5:24

specific 34:16
37:8 54:19 75:2

specifically 18:16
36:25 89:24

specifics 8:24

spelling 5:9

spend 7:17

spent 66:20

spinal 33:25 34:2
54:11,14 55:21
75:17

spine 19:13 26:25
46:11,13 71:16,20
72:13,17

spine-type 47:23

split 58:2,14

spread 16:17

St 8:2,5 39:1,16

stabilization
26:23 27:8

stack 53:10

stamp 10:9 12:25
13:13,24 16:22
17:2 19:24 20:11,
25 21:17,23 25:1,6
23

stamped 9:16,20
15:25

standard 36:19
73:16,17,18 80:20

standpoint 24:18

stands 51:3

star 73:11,12

start 42:2 45:14
59:1 62:25

started 45:9 70:2

starting 13:12
22:22

state 4:24

statement 17:5
18:10 19:9

States 4:13 5:7

68:8 70:16

statistically 35:4

stay 39:17 40:1
44:15

Stealth 67:1

steered 15:9

stick 11:10 47:11

stipulation 87:10

stopped 71:17

story 58:3

straightened
91:8

streaks 19:21

strike 86:13

stronger 27:7

structural 31:10

structures 34:3,7

studies 75:25

stuff 21:22,24 58:5
73:15

subject 41:20
86:17

subjective 73:23

submit 49:12,13

submitted 44:2
50:7

subtext 77:19

success 80:15
81:21 82:7

suction 59:14

suctioning 59:19

suffering 73:24

suggesting 62:22

Suite 4:18

Suites 8:9

super 27:25 79:6,8

superfluous 33:2

supervision
85:17

supply 85:9

support 17:19
75:22

supportive 18:4

supposed 42:20

surface 64:23
66:11

surfaces 59:5

surgeon 30:2
57:22 84:24 85:4,6

surgeons 27:5
30:21 48:1 71:21
72:12 77:22

surgeons' 40:6

surgeries 7:13,
20,22 40:19 47:23
48:12 49:17 71:24,
25

surgery 6:1 7:12,
16 8:8 17:15,18
18:2,6,12,19,23
19:2 22:25 23:10,
16 25:9,10 26:13,
15,18 27:20 28:2,
13,19 29:5 30:8
33:3,15,21,23
34:10,12,16,22
35:7,9,16 39:17,
19,25 40:1 48:6,9,
25 49:21,23 50:6,
18 51:23,25 60:1
62:9 69:18 71:14
72:19,25 73:23
75:15 76:23,24
77:14 78:2,5 79:17
80:12 81:17,21
82:11,23 84:3

surgical 8:9 9:6
18:15 22:22 46:12
51:14 64:10 77:9

surprised 67:24
68:3

surprising 68:13
69:19

sustained 9:2
36:17

swear 5:2

Swift-johnson
10:11

switch 11:3

sworn 5:11

symphony 59:20
60:13

symptoms 10:14
25:13,14,22

system 6:2 58:13
66:24 67:1

T

table 29:9

tags 40:19

taking 8:22 15:18
56:7 59:1 65:1
67:4

talk 5:15 8:10 9:13
14:1,10 21:22
33:10,21 41:1 54:6
79:14 83:21 84:21

talked 15:3 17:14
24:2 35:19 39:18
46:5 77:10 80:7,11
83:5

talking 16:7 22:24
52:20 61:11 73:18
79:9

talks 15:13

tap 65:25

target 26:4

targeting 21:8

targets 21:4

taste 72:6

teach 72:7

technically 20:20

telling 44:8

tells 24:22 76:3,4

temporary 15:9
22:13 24:6

term 65:9 77:16,22
78:17 79:3

terms 79:15,25

testified 5:12
42:11 44:15 53:3
88:5

testify 70:17

testimony 73:22
79:12 80:9 81:20
83:20 87:7 88:12
89:3 90:7 92:9

textbook 73:9

textbooks 73:19

therapies 15:22

therapist 83:10

therapy 3:12
10:24 13:7 14:24
35:20 36:2,6,10,14
38:6 83:6,8 87:6,
12 88:2 90:1,2,14,
15

thing 23:16 33:20
51:23 53:23 60:22
85:22

things 19:16
23:14 25:7 31:3
35:18 47:6 50:12
65:3 72:5

thinking 80:6

thinks 12:20

thought 16:15
17:16 28:17 62:17
81:21

thoughtful 35:11

thousands 60:6

thyroid 34:7

tight 59:1

time 4:3 7:3 8:13
10:4 15:17 17:9,10
18:8 21:7 22:2,7
25:15 27:13 28:3,
17 33:11 36:6,9
43:13,19 46:1
47:12 55:5 66:20
71:18 75:6 80:22
81:1,9 82:17,20
84:20,21,25 85:1
92:8

times 49:6 53:9
57:11,12 69:20

timing 18:23
22:24

tingling 74:20

tiny 20:23 29:24

tissue 27:2 34:3
59:15 75:17

titanium 32:3
66:10

title 52:15

today 4:4 5:15
8:10 9:14,17 36:12
41:17 48:13 51:18
53:8,15 71:4 81:11
83:18,19,21 84:1,
18 87:16 92:10

today's 6:10
36:23 92:9

told 45:13 55:23

tolerable 17:11

tolerate 33:3

ton 72:9

top 32:1 40:4 59:3
61:1 62:23

topic 9:15 22:21
40:3

total 37:22 38:9
40:10 46:17 92:9

totality 86:9

town 8:7

trachea 34:6
59:16

train 35:7,10

trained 72:2

training 6:23 7:2
71:23

Transcript 3:24
4:1

trapezius 25:17

treat 77:17

treated 76:1

treating 78:11,14

treatment 5:16,
17,20 8:10,25 9:6
22:9 36:12,16
76:22 86:9

treatments 14:24

trends 45:20

trial 37:15

trials 65:21

true 26:14 27:12,
23 56:14

trust 52:4

turn 15:24 19:23
21:17 25:6 26:5
28:23 35:23

twenty 78:4

two-day 72:3

two-week 21:7

type 33:23

types 24:4

typical 14:8,9
23:1,3

typically 27:15
30:7 32:6 49:5,6
51:17

U

U.S. 4:14

ultimately 9:2,5

uncomfortable
25:20

undergo 10:24
16:9 36:10 37:7
82:22

undergoes 13:6

undergrad 6:22,
24

underlying 20:5

underneath 58:24

understand 24:16
37:24 40:17 62:4
73:21 81:20 83:1

understanding
8:18 13:3

understood 80:8

unheard 24:10

unit 4:10 46:24

United 4:13 5:7
68:8 70:16

units 92:10

University 6:24
7:1,4

unreasonable
43:3 45:2

urged 83:14

urgent 9:24 36:13
38:5

useless 60:2

**V**

**variable** 22:18

**variables** 16:18

**variation** 70:6,8,9, 10,11

**varies** 7:20

**vehicle** 75:1,14 76:5,10 77:21 78:13

**vein** 34:4

**verifiable** 33:22

**version** 6:13,19 15:8,9

**versus** 4:13 7:12

**vertebral** 58:25 59:8 62:14 64:1,23 65:15

**vertebrectomy** 53:22,25 54:7,13 56:16,21 60:18 62:20 69:16

**violin** 60:11,12

**visit** 10:15 13:17 14:19,22,23 16:23 17:4 21:18 23:19 25:3 26:6 28:7 33:8

**visits** 36:15 40:6,7

**W**

**wait** 81:6

**wanted** 14:23 17:12 18:12 21:10 23:6,11,17 27:20, 21 28:18 47:21

**wash** 81:7

**Washington** 7:1

**Watertown** 8:6,7

**weakness** 74:10, 17,21

**wearing** 32:16

**Weber** 47:17 49:24

**Wednesday** 4:4

**week** 7:10,14,18, 22,23 75:4

**weeks** 7:18 22:17 24:12

**weigh** 89:6

**weight** 69:12 89:4, 17,19 92:4

**West** 4:18

**whatnot** 84:18

**whatsoever** 53:25 84:3

**Wisconsin** 4:15, 19 38:21 39:4

**withdraw** 22:3

**word** 50:18 53:21 77:19,23 78:16 81:24

**wording** 79:19

**words** 52:13

**work** 29:14 34:23 50:17 57:14 59:12, 17 61:18,20 62:5 85:4 87:23

**worked** 83:15

**working** 47:19 57:17,18 59:21 63:15,18

**works** 11:21 30:3 37:19 51:18 62:2 85:18

**worse** 10:19

**worth** 87:12

**wrong** 31:13 53:10 57:20 60:25

**X**

**X-RAY** 12:23 29:11 75:21

**X-RAYS** 66:23 67:4,5

**XYZ** 70:2 73:14

**Y**

**year** 24:11 45:16 47:16 71:7

**year-to-year** 7:21

**years** 6:4 7:21 45:8,9,17,22,25 46:6,9,10,19 49:23 50:1 55:5 78:9,10

**years'** 69:24