UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

```
-----------------------------------------------------------
                                )
SHEILA GARD, et al.,            )
                                )
                    Plaintiffs, )  Case No. 20-CV-256
                                )
    vs.                         )  Milwaukee, Wisconsin
                                )
UNITED STATES OF AMERICA, et al., )  March 4, 2022
                                )  8:40 a.m.
                    Defendants. )
-----------------------------------------------------------
```

TRANSCRIPT OF COURT TRIAL - **EXCERPT**
BEFORE THE HONORABLE NANCY JOSEPH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs          Gruber Law Offices, LLC
                            By:  MR. ERIC M. KNOBLOCH
                            and MS. PATRICIA A. STONE
                            100 East Wisconsin Avenue
                            Suite 2800
                            Milwaukee, Wisconsin 53222
                            Ph:  414-977-1691
                            emk@gruber-lawcom
                            patriciastone@gruber-law.com


For the Defendant           United States Dept of Justice
                            (ED-WI)
                            By:  MR. BRIAN E. PAWLAK
                            Office of the US Attorney
                            517 East Wisconsin Avenue
                            Room 530
                            Milwaukee, Wisconsin 53202
                            Ph:  414-297-4134
                            brian.pawlak@usdoj.gov


U.S. Official Court Reporter:  THOMAS A. MALKIEWICZ, RMR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer aided transcription.

```
1                              I N D E X

2

3    WITNESS                EXAMINATION                    PAGE

4    DENNIS MAIMAN, M.D.    Direct by Mr. Pawlak             3

5                          Cross by Mr. Knobloch            39

6                          Redirect by Pawlak              68

7                          Recross by Mr. Knobloch         70

8                          By the Court                    71

9                          Recross by Mr. Knobloch         84

10                         Redirect by Mr. Pawlak          88

11

12                          E X H I B I T S

13   EXHIBIT NO.            DESCRIPTION                    REC'D

14   1003                                                   39

15   1004                                                   39

16   1009                                                   39

17   1017                                                   39

18   1021                                                   39

19   1023                                                   39

20

21

22

23

24

25
```

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 2 of 89    Document 77

| | 1 | TRANSCRIPT OF PROCEEDINGS |
| | 2 | (REPORTER'S NOTE:  The following is an excerpt of the |
| | 3 | proceedings.) |
| | 4 | THE COURT:  All right.  Please proceed. |
| 08:40 | 5 | MR. PAWLAK:  Government calls Dr. Maiman to the |
| | 6 | stand. |
| | 7 | THE CLERK:  Would you raise your right hand, please? |
| | 8 | Do you solemnly affirm that the testimony you are about to give |
| | 9 | will be the truth, the whole truth, and nothing but the truth |
| 08:56 | 10 | under the penalties of perjury?  If so, please answer I do. |
| | 11 | THE WITNESS:  I do. |
| | 12 | DENNIS MAIMAN, M.D., called as a witness herein, |
| | 13 | after having been first duly sworn, was examined and testified |
| | 14 | as follows: |
| 08:41 | 15 | THE COURT:  Could you state and spell your first and |
| | 16 | last name for us? |
| | 17 | THE WITNESS:  Sure.  Dennis Maiman.  D-E-N-N-I-S, |
| | 18 | M-A-I-M-A-N. |
| | 19 | DIRECT EXAMINATION |
| 08:41 | 20 | BY MR. PAWLAK: |
| | 21 | Q.   Good morning.  Sir, please tell us what your profession or |
| | 22 | occupation is. |
| | 23 | A.   I am a neurosurgeon. |
| | 24 | Q.   And describe your background, please. |
| 08:41 | 25 | A.   Sure.  I have a bachelor's degree from UWM.  I went to |

3

08:41 1    medical school at the Medical College of Wisconsin, did a

2    residency in neurosurgery at the Medical College of Wisconsin.

3    Obtained a Ph.D. in biomedical engineering and biomechanics

4    from Marquette University and an MBA from the University of

08:41 5    Wisconsin-Parkside.

6    Q.    Are you currently a practicing physician?

7    A.    I see --  I'm semi-retired.  I see patients a half day a

8    week -- half day every other week, and that's going to increase

9    now that the pandemic has hopefully closed, and I also do

08:42 10   research in biomechanics.

11   Q.    And you've been affiliated as a professor at the

12   department of neurosurgery at the Medical College of Wisconsin;

13   is that correct?

14   A.    Yeah, I was faculty my entire career, or I have been my

08:42 15   entire career.  Went through the ranks, became chairman in

16   2009, stepped down as chairman in 2015.  2016?  2015.  And at

17   the same time stopped -- decided to stop operating.  And since

18   then I've done just office practice and research, and some

19   teaching and a lot of mentorship.

08:42 20   Q.    Describe when you say teaching, what do you mean by that?

21   A.    Well, I get involved with -- with more graduate students

22   interested in the health than residents in teaching about

23   biomechanics and the relationship to the spine and spinal

24   disorders.

08:42 25   Q.    And overall, so how many years have you been working in

4

08:42  1   regards to the human spine?

2   A.   I'm sorry?

3   Q.   How many years have you been working in regards to the

4   human spine, either doing surgeries or teaching?

08:43  5   A.   Well, if you include residency, it's about 45 years.

6   Q.   All right.  And I'm going to --  In front of you is

7   Government's Exhibit 1003, for those of you, that's found in

8   the Government's binder and it's Exhibit 1001 through 1006.  Do

9   you see that in front of you, Dr. Maiman?

08:43  10  A.   Yes.

11  Q.   And can you tell us what that is, please?

12  A.   That is a very old curriculum vitae.

13  Q.   Now, it's dated May 31st, 2016; is that correct?

14  A.   Yes.

08:43  15  Q.   And it is 50 pages long; is that accurate?

16  A.   That one is, yes.

17  Q.   Now, is there anything that you would like to add to that

18  CV since it's so old to bring us up to date?

19  A.   Well, I have more publications since then.  Probably at

08:44  20  least half a dozen, maybe 10 more scientific papers.  And see

21  if there's anything else here.  It ends with me as chairman in

22  2015.  I --  I would probably add on my current roles as

23  professor or professor emeritus of neurosurgery.  I no longer

24  have --  I resigned all my hospital staff privileges somewhere

08:44  25  around 2017.

5

08:44   1   Q.   Okay.  Very good.  Thank you.  Now, just so I understand,
        2   as a professor at the department of neurosurgery, did you teach
        3   other would-be neurosurgeons?
        4   A.   I did.  I mean, until I -- until I stepped down.  Frankly,
08:44   5   teaching neurosurgery residents is predominantly in the
        6   operating room, and when I stopped operating, that just seemed
        7   to be a good time to leave off.  And I left enough people on
        8   that we had trained that there was really no need for me to be
        9   involved in that that much.
08:45  10   Q.   How many years did you actually do that, do you estimate?
       11   A.   My entire academic career.
       12   Q.   Which, again, please, how many years?
       13   A.   I became an assistant professor in 1982 and stepped down
       14   as chair in fall of 2015.
08:45  15   Q.   And do you have an estimate of how many other
       16   neurosurgeons that you taught to do neurosurgery?
       17   A.   Oh, hundreds.  I mean, I had 34 fellows, we had hundreds
       18   of residents.
       19   Q.   Now, you were retained in this case by the defendant to
08:45  20   review medical records in regard to the plaintiff in this case,
       21   Sheila Gard; is that correct?
       22   A.   Yes.
       23   Q.   And you've done that?
       24   A.   I have.
08:45  25   Q.   And in that regard, you compiled a written report at the

6

08:45  1    Government's request; is that correct?

2    A.    Yes.

3    Q.    I direct your attention to the next document in the binder

4    in front of you marked as Government's Exhibit 1004.  Do you

08:46  5    see that, sir?

6    A.    Yes.

7    Q.    And is that your report?

8    A.    Yes.

9    Q.    And are your opinions in that report, were they rendered

08:46 10    to a reasonable degree of medical certainty?

11    A.    Yes.

12    Q.    In regard to Ms. Gard, what was the --  And you're

13    familiar with Dr. Dagam who was the surgeon in this case?

14    A.    Yes.

08:46 15    Q.    How were you familiar with him other than this case, if at

16    all?  Just generally speaking.

17    A.    Just he's another neurosurgeon in Milwaukee.  It's not

18    that big of a circle.

19    Q.    And what does -- what does one have to do or attain to

08:46 20    actually be able to claim the title of neurosurgeon?

21    A.    Well, once one becomes a physician, we do a residency,

22    which is a training program, of course, with varying years.

23    It's currently seven years, I believe.  You are then a board

24    eligible neurosurgeon.  You then have to take a written exam

08:47 25    and an oral exam in order to become board certified.

7

08:47  1    Q.    Very good.    Thank you.    And in regard to this case, you

       2    reviewed all of Dr. Dagam's notes; is that correct?

       3    A.    Yes.    The ones that I have, yes.

       4    Q.    Yes.    Very good.    Just the ones that were made available

08:47  5    to you, whether you had secret notes, you would have no idea,

       6    you didn't get those?

       7    A.    No.

       8    Q.    And you reviewed images, x-rays, MRI's that were provided

       9    through the Aurora facility, the Aurora -- I'm not sure what we

08:47  10   should call them, the cluster, the business entity known as

       11   Aurora?

       12   A.    I believe --   I reviewed images, yes.

       13   Q.    Yes.    Okay.    Now, I know this becomes a little more

       14   complicated and detailed.    What --   How would you describe the

08:47  15   surgery that Dr. Dagam actually performed?

       16   A.    He did an --   May I?

       17   Q.    Surely.    Note for the record that Dr. Dagam [sic] brought

       18   in a demonstrative exhibit which you can describe.

       19   A.    Maiman.

08:48  20   Q.    Maiman.    I'm sorry.

       21   A.    So this is a $31 Amazon model of the cervical spine, and

       22   it's anatomically incorrect in that it does not have the normal

       23   curve of the cervical spine, it's actually fairly straight,

       24   which is -- they didn't want to spend the money to bend the

08:48  25   rod.

8

08:48 1      When we look at the cervical spine, we have the vertebral

2    body or the corpus here, we have a disk here, and a vertebral

3    body here.  Now, the disks serve as shock absorbers, and in

4    between the vertebral bodies are also ligaments which are tough

08:48 5    tissues that limit the amount of motion allowed at any given

6    segment of the spine.

7      When we go to the back of the spine, because we're going

8    to talk about this more later anyways, we have bones in the

9    back, the lamina -- lamina is Latin for shingle -- which goes

08:48 10   across the back of the spine; and we have joints called facet

11   joints, just like diamonds have facets, so does the spine.  And

12   what they do is they allow, again, a certain amount of motion,

13   but they prevent excess motion.

14     Coming out of the spine then through the holes called the

08:49 15   foramina -- foramen is Latin for hole -- are nerves that go to

16   the arms.  In the operation that Dr. Dagam did in this case, he

17   removed the disk -- I need some sort of a pointer, my finger's

18   too fat -- he removed the disk and cleaned up the bone spur at

19   the edge of the nerve hole, the foramen, and then he placed in

08:49 20   a small titanium mesh cage filled with bone from this area.

21   It's called an anterior cervical decompression and fusion.

22   Q.   And have you yourself personally performed that surgery?

23   A.   I've done thousands.

24   Q.   Thousands?

08:50 25   A.   Thousands.  At least a couple thousand.

08:50   1    Q.   And you've instructed other neurosurgeons in how to
        2    perform that surgery?
        3    A.   Yes.
        4    Q.   Okay.
08:50   5    A.   It's one of the most common operations in neurosurgery.
        6    Q.   Very good.  Now, up in front of you on a screen is x-rays
        7    identified as being of Ms. Gard taken on March 27th, 2017, and
        8    you've reviewed that image before, have you not?
        9    A.   Yes.
08:50   10   Q.   So this would've been just three days after the accident
        11   that Ms. Gard, which is the basis for this litigation, and
        12   you're familiar with that, correct?
        13   A.   Yes.
        14   Q.   Tell us what is relevant or pertinent about what we can
08:50   15   see up there on that screen.
        16        MR. PAWLAK:  And, Judge, Dr. Maiman has asked with
        17   your permission to be able to walk down to that screen and
        18   point at things.
        19        THE COURT:  You may.
08:50   20        THE WITNESS:  Thank you.  So in the left image, we
        21   have a side view of the cervical spine, and there are three
        22   things, four things that are immediately evident.  First of
        23   all, the spine is straight.  Normally the cervical spine is not
        24   straight.  It has what's called a lordotic curve, a nice gentle
08:51   25   sweeping curve.

                                                                        10

08:51   1        Now, there are three reasons why the spine might be

        2   straight.  Number one reason is she may have been born that

        3   way, which is unlikely.  There are certain number of people

        4   that are, but I don't think that is the case here.

08:51   5        Number two reason is because as the spine degenerates, and

        6   I don't want to use that term pathologically because wear and

        7   tear changes happen to everybody and probably at least

        8   75 percent of the people in this room, it's part of life.

        9   Where the disk starts to just wear out and the facet joints

08:51  10   start to wear out as well, and so then the spine becomes

       11   straight because it doesn't happen at an even rate; in other

       12   words the only way that the spine would maintain its curve if

       13   all the changes in the spine are occurring at the same rate,

       14   which doesn't typically happen.

08:52  15        The third reason that this can happen that the spine can

       16   become straightened would be as a direct result of the trauma,

       17   and that is that as you develop spasm in the muscles in the

       18   back of your neck and your upper shoulders in the trapezius, it

       19   kind of pulls the curve away, so we have three reasons for

08:52  20   that.  In addition, at C-1, C-2, C-3, C-4, C-5, C-6, and C-6,

       21   7, we -- we see changes in the disks themselves.

       22        If you look up higher, there's a nicely maintained disk

       23   space with a nicely maintained end plate, this is called the

       24   end plate, which is where the attachment to the disk occurs.

08:52  25   However, at C-5 and C. -- C-5, 6 in between these two vertebra

11

08:52   1   and C-6, 7, it's a big -- I thought you did that on purpose.

    2   It's a little bit more irregular, and the space is a little bit

    3   collapsed, and you see a little bit of a boney ridge here in

    4   front.  In a sense that's almost a body's attempt to do a

08:53   5   fusion on itself; it's one of the things that we do.

    6       When we look at the second view here, we're looking at the

    7   foramina.  I mentioned earlier there's a nerve hole called the

    8   foramina where the nerves come out to the arms.  Now, the

    9   spinal cord and the nerves are like a telephone cable with

08:53   10  branches coming out into the individual holes, and these are

    11  the foramena where the nerves come out.  These can be narrowed

    12  by -- by bone spurs caused by old disk bulging here and here.

    13  And indeed at C-5, 6, we do see some narrowing of the foramen

    14  as compared to the ones up above it.

08:53   15      So there are some changes that are evident three days

    16  after the trauma, after the crash.  The boney changes, of

    17  course, preexist the crash.  Only possible change that resulted

    18  from the crash is straightening from spasm.

    19  Q.   Now, when you talk about a spasm, is that something that's

08:54   20  temporary, that's the muscle contracting?  If you could

    21  elaborate on that, please?

    22  A.   Sure.  It's a response to trauma.  You know, people make

    23  fun of the phenomenon called whiplash, but it's very, very

    24  real.  If you take a muscle beyond its normal capacity, you

08:54   25  strain it, it causes some -- some micro damage to the muscles

12

08:54  1  themselves.  There may be some bleeding in them, may be muscle
       2  fibers that are stretched or even torn.  And as a result of
       3  that, there are nerve fibers in the muscle, and that will
       4  produce pain.  So that is typically temporary.  Now, we've all
08:54  5  had muscle strains, we all have had muscle -- what's called
       6  myofascial syndromes, and they usually get better.
       7  Q.   Is that what happened as a result of this accident?  Was
       8  it whiplash?
       9  A.   I --  I hesitate to use the term, again, because it has a
08:54 10  negative connotation, although it's very real.  She definitely
      11  had what's called a myofascial syndrome, or myofascial injury,
      12  which means again that the muscle and the tissues surrounding
      13  the muscles and supporting them had -- were strained and
      14  probably at least microscopically damaged.
08:55 15  Q.   But those were the muscles?
      16  A.   Those are the muscles.
      17  Q.   Okay.
      18  A.   As far as the spine itself is concerned, as I've said
      19  previously, there are tiny little nerves in the facet joints,
08:55 20  you remember the joints on the side of the spine, and those can
      21  be irritated in a -- in a traumatic event since there already
      22  is some degeneration, they can be traumatized in a neck and
      23  that can produce neck pain as well and that will produce neck
      24  pain because it causes more spasm in the muscles.
08:55 25  Q.   And as you look at this x-ray, is there evidence of acute

13

08:55    1    damage?

         2    A.    Damage?  No.

         3    Q.    No.  What causes the foraminal, if I pronounced that

         4    correctly, narrowing?

08:56    5    A.    When -- As we -- As we age, and we hopefully don't do,

         6    the disks lose some of their capacity.  The disk is composed

         7    significantly of water, and then of certain kinds of gels.  As

         8    these become --  As the water leeches out of the disk, which

         9    happens over decades, and as the disk becomes less capable, it

08:56    10   will bulge, and those bulges will turn on a long term basis

         11   into calcium.  In addition, the ligaments that support the

         12   spine will thicken over time as they become less capable, and

         13   that will -- between the two of them they -- they will cause a

         14   narrowing of the foramen.

08:56    15   Q.    Has it been appropriate or correct to use the word

         16   "degenerative" in the sense that these are just normal

         17   degenerative changes?

         18   A.    I mean, they're degenerative.  They're not --  They're

         19   wear and tear.  So it -- degenerative is a term we use.

08:57    20   Q.    Okay.  And directing your attention to Government's

         21   Exhibit 1004, your first paragraph, you, in fact, note that in

         22   your report stating, quote, "X-rays of the cervical spine

         23   demonstrated degenerative changes at C-5, 6 and straightening

         24   of the normal cervical lordosis consistent with spasm and acute

08:57    25   pain."  Do you see that, Doctor?

14

08:57 1    A.    I do.

2    Q.    All right.  Was that accurate, what I stated?

3    A.    I think so, yes.

4    Q.    All right.  Thank you.  Now, you had an opportunity

08:57 5    approximately a year later, I believe, to look at an MRI which

6    was dated April 27th, 2018; is that correct?

7    A.    Yes.

8    Q.    Now, can I have a moment, please?  All right.  So I'm

9    going to direct your attention to what has Government's

08:58 10   Exhibit 1017 --

11              MR. PAWLAK:  Judge, and you won't have this in your

12   binder, and I'll give an explanatory note, if I may.  This is a

13   series of MRI's, and there's approximately 450 or 350 images on

14   here, so this is only available in this special sort of

08:58 15   platform.

16              THE COURT:  Thank you.

17   BY MR. PAWLAK:

18   Q.    I believe, Dr. Maiman, you had indicated to me that --

19   Oh, there it is.  Okay.  Here we go.

08:59 20   A.    You went too far.

21   Q.    Too far?

22   A.    Keep going.  You can go a little bit further.  You're

23   going to the T-2 images.

24   Q.    I thought you had mentioned --

08:59 25   A.    I did.

15

08:59    1    Q.    Right there?

2    A.    One more.

3    Q.    I thought you had mentioned you wanted to see 129 through

4    131, but --

08:59    5    A.    There you go. You're fine right there.

6    Q.    Okay. What I'm showing now is image 129 of 317 on here.

7    Can you tell us what we're seeing?

8    A.    May I --

9    Q.    Yes.

09:00    10    A.    -- Your Honor?

11        THE COURT: Yes. Yes, you may. Thank you.

12        THE WITNESS: So this is -- this is a T-2 sagittal

13    section, slicing -- slicing it like a croissant this way. And

14    this is the front of the spine, this is the back of the spine.

09:00    15    These are vertebral bodies, these are the disks. Here's the

16    spinal cord coming out of the brain, and then as I mentioned,

17    there are ligaments in the back and in the front of the spine

18    here at C-5, 6, which is the area of --

19       Well, let's look at the characteristics of the disks

09:00    20    first. A normal healthy disk has this whitish in the middle

21    which reflects the water content. At C-5, 6 we do see some

22    water here, but overall her disks are fairly degenerated. That

23    has to do with something that she probably doesn't even know

24    that she has, which is scoliosis in the thoracic spine.

09:01    25       But what we see here is a thickening of ligaments right

09:01 1   here at C-5, 6. With some disk bulge. That on the axial

2   views -- Do you want to go to the axial view, please?

3   Cross-section views?

4   BY MR. PAWLAK:

09:01 5   Q. Do you know what number that is? Or keep advancing in the

6   same direction?

7   A. Yeah, you're advancing it. I don't know.

8        MR. PAWLAK: Keep advancing it, Keke.

9        THE WITNESS: It really shows the picture better.

09:01 10   Keep going, slowly.

11        MR. PAWLAK: Try 218 to 221 range.

12        THE WITNESS: Perfect. So this is an axial view or

13   cross-section view slicing like a salami, and I'm not being

14   funny. Here's the front, here's the -- this is probably

09:02 15   trachea, windpipe, and here we have the vertebral body. This

16   is a T-2 weighted cut, which is designed to show nervous

17   structures better than boney structures, but it gives us the

18   information that we need.

19     Here's the spinal cord coming out of the brain. The white

09:02 20   structure stuff is spinal fluid around the spinal cord, which

21   we want to see. That's the nutritional and protective

22   environment, it's almost like a -- like a bathtub for the

23   spinal cord.

24     When you look at the -- the -- When you look at the

09:02 25   vertebral body itself, which is right here, you see that

09:02    1    there's a nerve root coming out of here.  This is the left and

2    this is the right.

3        Now, the nerve hole for the right, the nerve looks very

4    happy here, but there's an asymmetry here that you can

09:02    5    perceive, and this is an example of an -- what an osteophyte

6    looks like or what a bone spur looks like right here.  You have

7    a thickening ligament, and it's slightly darker, and you can

8    see how thickened it is.  There's an old bulging disk, which is

9    ancient.  It's actually turned to calcium.  And it is narrowing

09:03   10    the foramen, but not in a direction that affects the nerve.  It

11    can affect the nerve, but it's not.  So this is what an

12    osteophyte looks like on an axial view, on a cross-section

13    view.

14    BY MR. PAWLAK:

09:03   15    Q.    Is there any additional images you'd like to point to on

16    this MRI?

17    A.    Do you want to go down one more?

18    Q.    To 217?

19    A.    So this one's a little bit even cleaner in that it shows

09:03   20    some stuff going on in the left side too.  Interestingly enough

21    here's the nerve going to the left, and again the nerve still

22    has plenty of room, but you've got thickening with the ligament

23    here, which is causing compromise or narrowing of the nerve

24    hole.  Of the foramen.

09:03   25    Q.    And once again those are all -- those are all natural

18

09:03  1  degenerative changes?

2  A.    In a study by Gore, from Sheboygan, interestingly, two of

3  them he followed patients for 10, 15 years, he found this sort

4  of stuff in virtually everybody.  Most of the studies have

09:04  5  going way back into the fifties.  Anybody over the age of

6  probably into the forties.

7  Q.    And does that narrowing cause -- have anything to do with

8  Ms. Gard's pain?

9  A.    Only inasmuch as the facet joints are part of the complex.

09:04  10  In other words the narrowing itself is not, because if the

11  narrowing itself was involved in her -- in her symptoms, she'd

12  be having radicular pain or pain going down her arms, which she

13  does not have.  And did not have.

14  Q.    So what is the consequence or significance of the

09:04  15  narrowing over time?

16  A.    None.  In and of itself, none.

17  Q.    But what's in terms of Ms. Gard's condition, you're aware

18  of her complaints of pain and stiffness and so forth, correct?

19  A.    Yes.

09:04  20  Q.    Is there any relationship between that degenerative

21  narrowing and her symptomology?

22  A.    Well, I -- I think that the wear and tear, the

23  degenerative changes, how do I say this, sort of they're not

24  the cause of the pain, but they -- they facilitate the pain

09:05  25  from the trauma, if you were.

09:05 1       I mean, if you say would a perfectly normal 20-year-old

2  spine be at as high of risk of having the pain that she has,

3  the answer would be no.  There's no question that degenerative

4  changes play into the -- into the ability to have the pain.

09:05 5  Q.  Could you elaborate on that just a little bit?

6  A.  I'm struggling.  The compliance, translating it into

7  English.  The ability of the absorptive of the disk, the -- the

8  anatomy of the facet joints when they're perfectly formal are

9  more -- are more resistant to the kinds of pain problems that

09:05 10  she has than those of us who have wear and tear changes in our

11  spine.  So we're at higher risk, if you will, if we have these

12  changes.

13  Q.  Okay.

14  A.  And I include myself because I obviously have them.

09:06 15  Q.  Now, you're aware that Ms. Gard was directed to

16  participate in physical therapy as a result of this accident;

17  is that correct?

18  A.  Yes.

19  Q.  And based upon your training and experience and knowledge,

09:06 20  was this sound advice for her to help deal with her issues from

21  the accident?

22  A.  Yes.

23  Q.  Can you elaborate on that, please?

24  A.  Sure.  There's very, very good evidence that all over the

09:06 25  scientific literature that an aggressive nonoperative treatment

20

09:06  1  program, including physical therapy, often including

2  chiropractic treatment, will lead to significant improvement in

3  pain.

4  Q.   And in order to participate in physical therapy, one needs

09:07  5  to follow the prescription of, for example, showing up and

6  actually participating in the physical therapy on a regular

7  basis?

8  A.   Well, you need to be trained in the exercises, you need to

9  do the exercises, and you need the professional expertise to

09:07  10  facilitate to make that happen.

11  Q.   And in your review of the records for Ms. Gard, she had

12  significant difficulty in actually fulfilling her obligations

13  to participate in the physical therapy; is that correct?

14  A.   In several places in the record it indicates that she had

09:07  15  difficulties because of her work schedule to participate in the

16  therapy.

17  Q.   Now, if Ms. Gard had, what can you tell us -- what's your

18  opinion as to whether Ms. Gard had completed and aggressively

19  pursued her physical therapy, could she have eliminated or

09:08  20  significantly reduced the pain that she was suffering?

21  A.   I think she --  You know, speaking to a reasonable degree

22  of medical probability, she would have benefited significantly

23  from a more involved nonoperative treatment program.

24  Q.   And if you were Ms. Gard's surgeon in this case, you

09:08  25  would've recommended that she would've engaged in physical

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 21 of 89    Document 77

09:08 1 therapy; is that correct?

2 A.  I wouldn't have even seen her without --

3 Q.  I understand.  But -- Okay.  Let me rephrase the

4 question.  If you had been involved in this case and you

09:08 5 knew --  If you had been one of her -- or on her treating team,

6 let's call it that, would you have recommended that she

7 participate in physical therapy?

8 A.  Strongly.

9 Q.  All right.  I'm going to direct your attention to the

09:09 10 surgery that took place on this case on December 24th, 2019.

11 Do you have an opinion as to whether or not the surgery that

12 Dr. Dagam conducted in this case was appropriate?

13 A.  I have an opinion.

14 Q.  Could you provide it to the Court, please?

09:09 15 A.  There's absolutely no evidence that cervical fusion for

16 axial pain is a benefit to most patients.  The indications for

17 cervical fusion, and I had afforded some -- during my

18 deposition I had mentioned some -- some guidelines that have

19 been produced, the spine organizations that surgical treatment,

09:09 20 including fusion, is indicated for gross instability, that is,

21 where the spine isn't holding together well, for pressure on

22 the spinal cord, for pressure on the nerves.  That's pretty

23 much about it.

24       And axial pain, meaning neck pain, just doesn't respond to

09:10 25 fusion very well.  In fact, there have been a few papers that

22

09:10  1    suggest that the complication rate and the long term negative

2    outcome is -- is higher than the small percentage of patients

3    who do indeed improve.

4    Q.    Thank you.  One moment, please.  Doctor, what is the North

09:10  5    American Spine Society?

6    A.    The North American Spine Society is the largest spine

7    group in the United States and one of the two largest in the

8    world.  It is a group of orthopedic spine surgeons,

9    neurosurgeons, physiatrists, meaning rehab doctors,

09:11 10    chiropractors, therapists, psychologists, and even social

11    scientists who are interested in spinal disorders and

12    researchers, Ph.D. researchers as well, so it's a big group,

13    and, yes, I'm a member.  I used to be more involved than I am

14    now.  A couple of my former trainees have been president.

09:11 15    It's -- It is, again, the -- probably the definitive spine

16    organization in the hemisphere.

17    Q.    And in your opinion is this a worthy organization for a

18    neurosurgeon to belong to?

19    A.    Yes.

09:11 20    Q.    And could you tell us why?

21    A.    Well, because they work very hard to bring forward the

22    science.  It doesn't mean that everybody has to belong to it,

23    you can only belong to so much, but it's a good group.

24    Q.    For brevity sake I'm going to show you what's been marked

09:12 25    as Government's Exhibit No. 1029, which is found in the binder

23

09:12   1   marked Exhibit 1007 through 1029.  And I'm going to show you a

2   document --  That exhibit is marked as defining appropriate

3   coverage positions, cervical fusion, and I'm going to show you

4   what's marked on page three and direct your attention to the

09:12   5   title called clinical criteria for the procedure.  Have you

6   seen that document before?

7   A.    Yes, I have.

8   Q.    And can you explain generally what it is?

9   A.    So the North American Spine Society in addition to

09:12   10  advancing the science is very involved in advocacy and in

11  setting fees in conjunction with the Government.  There are

12  several surgeons and non-surgeons who participate in the

13  process of determining appropriate coverage and indeed battle

14  for surgeons to get things covered when new procedures come

09:13   15  out.

16      As part of their activities the North American Spine

17  Society has developed evidence based guidelines, meaning

18  guidelines for the performance of certain procedures that are

19  based on scientific valid data incorporating hundreds of

09:13   20  thousands of cases using our best artificial intelligence as

21  well as simple data.  They've developed criteria for several

22  operations, to not only for our purposes as physicians but also

23  to assist payors and others in determining what's appropriate

24  and what's not appropriate in the medical world.

09:13   25  Q.    And so do they have a list, if I can use the term,

24

09:13  1  checklist as to when the surgery that Dr. Dagam performed would
       2  be appropriate?
       3  A.    Yes.
       4  Q.    Could you describe or list -- or just tell us what those
09:13  5  items would be or the symptomology or conditions?
       6  A.    Well, they say infection, of course, tumor, traumatic
       7  injury, which I discussed earlier, which is instability of the
       8  spine and meaning it's not hold together.  Deformity, meaning
       9  when the head's bent forward on the chest, and we've seen
09:14 10  people like that, pressure on the spinal cord, causing partial
      11  paralysis or weakness.  Radiculopathy, meaning pressure on a
      12  nerves causing problems in the arms -- in the arms.  And,
      13  non-traumatic instability, so changes in the spine that aren't
      14  due to trauma which are usually congenital, that -- that
09:14 15  produce abnormal movement and put the spine -- spinal cord at
      16  the -- the nerves at risk.
      17  Q.    Now, does it also say when the surgery should not be
      18  performed for a condition for symptomology?
      19  A.    Yes.
09:14 20  Q.    When would that be, sir, in relation to this case?
      21  A.    Well, one is cervical radiculopathy or nerve pressure,
      22  which is due to a little narrowing but no other problems in the
      23  spine, which can be handled much more simply.
      24        And then the other one is what's called discogenic or
09:15 25  axial neck pain, meaning that there's just neck pain without

25

09:15    1    x-ray evidence of root or spinal cord compression, instability,

2    or deformity.

3    Q.    So this axial neck pain, is that what Ms. Gard was

4    suffering from?

09:15    5    A.    Yes.

6    Q.    So just to be clear, the society recommends against this

7    surgery for Ms. Gard's condition?

8    A.    That's correct.

9    Q.    Now, when Dr. Dagam testified, I asked him about this, and

09:15    10    he opined that if you were a four star Michelin chef you don't

11    need a cookbook in comparison to whether or not a trained

12    neurosurgeon should defer to these kinds of checklists. Do you

13    have an opinion on that?

14    A.    What? I don't know what that means.

09:16    15    Q.    Well, I think it means essentially that if you're someone

16    like Dr. Dagam and you have all the knowledge you don't need to

17    defer or look to another agency or someone else's

18    recommendation, but that's my opinion.

19    A.    Again, these guidelines are based on -- on a group of

09:16    20    people who are among the best minds in the field, but it's not

21    their opinion, this is based on, you know, tons and tons and

22    tons of data. To ignore the literature -- To ignore the

23    scientific literature, doctors are supposed to keep learning,

24    and to ignore the scientific literature is highly

09:16    25    inappropriate.

09:16   1    I certainly changed my practice over the decades and I've

2    changed my attitudes over the decades. And I ain't a four

3    star, but I did okay. And I -- I -- I don't know where he's

4    coming from.

09:16   5    Q. Now, in the field, do you have an opinion as to whether or

6    not what you've just testified to regarding what's in the

7    publication from the North American Spine Society that that's

8    generally accepted by the neurosurgeon -- the collection of

9    generally accepted principles for neurosurgeons?

09:17   10    A. And orthopedic spine surgeons, yes.

11    Q. All right. If you had been Ms. Gard's surgeon in this

12    case, would you have recommended that she undergo this surgery?

13    A. No.

14    Q. And why?

09:17   15    A. Because the literature is clear that it doesn't do much.

16    I mean, it doesn't lead to significant improvement in pain.

17    And I would've sent her back for an aggressive nonoperative

18    program. I might well have sent her to a chiropractor as well,

19    in fact, I probably would have and I would've pursued with pain

09:18   20    management.

21    Q. Now, before Ms. Gard had her surgery, and during and after

22    her PT, she also underwent various other pain reduction

23    procedures with Dr. Ong; is that correct?

24    A. Yes.

09:18   25    Q. What's your opinion on those?

27

09:18 1   A.   The facet -- She had facet injections which gave her

2   substantial temporary improvement, which is what you expect.

3   It's a good adjunct, in other words it's not going to solve the

4   problem, but it can be a valuable contribution to making things

09:18 5   better.

6      She did not have, as I recall she didn't have the

7   epidurals, which is injecting steroids into the nerves instead

8   of the joints, and she didn't have them and, frankly, they

9   would not have done her any good, but the -- the facet

09:19 10   injections were at least temporarily helpful.

11      Facet rhizotomy, meaning burning the nerves, if you will,

12   would -- may have -- would likely have been equally helpful and

13   promoted the ability to do -- for the other improvement.

14   Q.   Okay.  All right.  You should have another binder up there

09:19 15   that should be Exhibit 1000, part one of four.  It's a larger

16   one.  Do you have that one?

17   A.   I don't know what I have here.

18   Q.   Yeah, I think I -- it should be -- I'll double-check for

19   you.

09:19 20   A.   Getting a little crowded here.  Need a bigger desk.

21   Q.   Yes.  It's this one.  And I've marked -- premarked the

22   pages for you.  If you'll turn to page 77.  For the record

23   that's Gard 77, Exhibit 1000, part one of four, and that's the

24   operative procedure report from Dr. Dagam; is that correct?

09:20 25   A.   Yes.

28

09:20    1    Q.    You've seen that document before?

         2    A.    Yes.

         3    Q.    And generally speaking what is that document that

         4    Dr. Dagam created there?

09:20    5    A.    An operative report is designed to let anyone who wants to

         6    know exactly what was done in the operating room.

         7    Q.    So tell us what Dr. Dagam said that he did that day in the

         8    operating room.

         9    A.    He said he took out half of the vertebra or the corpus of

09:20   10    C-5, half of the vertebra of C-6, actually more than half, he

        11    put in a fusion mass, used fluoroscopy, he used an operating

        12    microscope, and what's called a stealth navigation system,

        13    which is a computerized system to -- to predict where things

        14    should go, if you will.

09:21   15    Q.    All right.  And did Dr. Dagam in your opinion actually

        16    perform the surgeries he's alleging that he performed?

        17    A.    No, he did not.

        18    Q.    Tell us why.

        19    A.    I need the x-rays, please.

09:21   20    Q.    Yes.  Which one would you want, Doctor?

        21    A.    The postoperative film.

        22    Q.    All right.  There you go.  What I've brought up is the

        23    postoperative x-ray from February 20th, 2000 -- excuse me --

        24    February 10th, 2020.

09:22   25              THE COURT:  You may step down, Doctor.  You don't

09:22   1    need to ask for permission.  You're free to step down as

2    needed.  I appreciate it.  Thank you.

3              THE WITNESS:  So here we have a side view of the

4    cervical spine postoperative, and this is important.  When

09:22   5    Dr. Dagam said that he did a 50 percent vertebrectomy, that

6    means he says he removed 50 percent of the height of the

7    vertebral body.  And that he removed 50 percent of the bottom

8    of the vertebral body.

9              If you look at the heights of the vertebral bodies, no, he

09:22   10   didn't.  He didn't do that.  Had he done that, this 14

11   millimeter -- I can't remember if it was 12 or 14 millimeter

12   implants he put in would've been a 25, 26 millimeter implant.

13   The operation that he did was to connect the cervical spine, it

14   is done from the front, but it is not a carpectomy or

09:23   15   vertebrectomy, which again means the same thing.

16             What he did was he shaved off the end plate at C-5, shaved

17   off the end plate of C-6, which you have to do because you want

18   to try to give bone surfaces in there, and actually shaving off

19   is a bad term, he roughened them up and he placed a device, I'm

09:23   20   not familiar with the one he used because there are hundreds of

21   them on the market, looks like it's plastic or some sort of

22   ceramic with a titanium marker in the front and the back to let

23   you know where you are on x-ray, and it's filled with both bone

24   that he took from right here from the bone spur as well as --

09:23   25   as bone substitute.

30

09:23   1        He then placed a titanium plate which is well placed, it's

2    fine, and on the front view it's a little bit off to the side,

3    but that's immaterial.  I mean, it's okay.  But the

4    vertebrectomy was not done.

09:24   5    Q.    Do you have an opinion as to why he called it

6    vertebrectomy when it wasn't?

7    A.    I have none.  I don't --  I mean, did he remove a little

8    bit of vertebra?  Yeah, you have to in order to roughen it up.

9    You're removing some bone, so in a sense that's scraping as --

09:24  10    but that's not a 60 percent vertebrectomy, and that's not a

11    50 percent vertebrectomy.  It is not.  So you'd have to ask him

12    that question.

13    Q.    Although the procedure that he did is fine, correct?

14    A.    I mean, from a technical perspective, there's -- you know,

09:24  15    as I mentioned in my deposition, there's a lot of overkill, but

16    it's fine.

17    Q.    But in terms of actually addressing Ms. Gard's symptoms,

18    is this something you would've expected to have any positive

19    effects towards limiting or -- eliminating the symptomology

09:25  20    from which she was suffering?

21    A.    Again, the literature doesn't support it.  I wouldn't --

22    It wouldn't even come into my head to do this for isolated neck

23    pain.  And I don't know anybody whose it would.

24    Q.    I'm actually sort of mystified myself in the sense of this

09:25  25    particular surgery, what is it designed to rectify that's

31

09:25    1    causing her pain since her pain is coming from foraminal

2    narrowing, correct?

3    A.    No, pain is not coming from foraminal narrowing, her pain

4    is coming from the muscles, from a lot of muscle trouble as

09:25    5    well as the facet joints.  I don't know.  I --  I, you know,

6    that's -- I can hear my mentor saying, Sanford Larson, you

7    know, the old expression, when all you got is a hammer every

8    problem is a nail, but I -- I can't conceive of doing an

9    anterior cervical diskectomy for isolated neck pain with no

09:26    10    instability and no neurological deficit.

11    Q.    Were there any potential negative outcomes, not just the

12    fact that the surgery would be unsuccessful, but with this

13    particular surgery were there any particular alternative

14    negative outcomes?

09:26    15    A.    You mean complications?

16    Q.    Yes, complications.

17    A.    People die having surgery.  Anesthetic complications

18    happen commonly.  Within the specific ones to this procedure,

19    first of all infection, of course, nerve damage.  Probably the

09:27    20    most common complications are swallowing difficulties and

21    hoarseness due to scarring or injury to the nerves that control

22    the voicebox.  Nonunion, the bone not healing proper.  She's a

23    nonsmoker, as I recall, so the pseudarthrosis or failure to

24    fuse rate is fairly low, but it does exist, and when it

09:27    25    happens, then we get to redo the fusion again.  So overall this

32

09:27  1  is a -- this is a pretty safe operation, but it still carries

2  complications.

3  Q.  Now, based upon your generations of experience in

4  neurosurgery, do you have any knowledge of common billing

09:27  5  practice for this type of surgery?

6  A.  More than I would like to.

7  Q.  So I'm going to direct your attention, I preplaced it

8  in -- on your -- on the witness stand there, it's Exhibit

9  No. 9, it's actually Plaintiff's Exhibit No. 9, so I can't tell

09:28  10  you where to find it, Judge, it's the itemized billing that's

11  been -- was used for cross-examination of Dr. Dagam.  Did you

12  find that, Doctor?  It's just --  It's a free --

13  A.  Is it this?

14  Q.  Yes, it is.

09:28  15  A.  Okay.

16  Q.  Take a minute to peruse that, if you would.  Are you

17  ready?

18  A.  Sort of, yeah.

19  Q.  So there's two sheets, but sheet one is of my principal

09:29  20  concern.  Dr. Dagam for his self and for his associate here,

21  his physician's assistant he testified that he billed

22  approximately $101,527 for this surgery.  Do you have an

23  opinion as to the reasonableness of just the price for what he

24  did?

09:29  25  A.  That's really high.

09:29    1    Q.    Now, he billed this -- he billed it out by the codes for

         2    each portion of the surgery.  For example, 6301, 6302.  Let's

         3    address the 6301.  Do you --  Do you know that to be the

         4    carpectomy of what he --

09:30    5    A.    Yes.

         6    Q.    Okay.  And, in fact, in your opinion he never even

         7    performed a carpectomy, correct?

         8    A.    He did not perform a carpectomy.

         9    Q.    And for his assistant, the charge was 7,365 and for

09:30   10    Dr. Dagam it was 20,251.  Just for that one code what is your

        11    opinion on those approximately $27,000?

        12    A.    I'm --  That's unbelievably high.

        13    Q.    There was a separate billing here for 22 -- 22551, which

        14    in -- during this case we called a fusion, but do you know what

09:31   15    that code is for, sir?

        16    A.    22551 is an inner body fusion, isn't it?

        17    Q.    Yes.  And for that he also billed approximately -- billed

        18    $20,625 for himself, and for his assistant 7,500.

        19    A.    That's unbelievably high.

09:31   20    Q.    And then there's a code for 22845, which during these

        21    proceedings we referred to as the plate.  Are you familiar with

        22    that?

        23    A.    Yes.

        24    Q.    And for himself he billed $10,519 and for his assistant

09:31   25    $3,826.  What's your opinion on that?  The breakdown.

34

09:32   1   A.    Again, I -- these numbers are staggering for this.

        2   Q.    Now, there's a couple other billings in here which are

        3   unique in the sense that they were not -- there are two of

        4   them, we have a billing code 61783, which Dr. Dagam testified

09:32   5   to, we called for the purposes of this hearing the use of the

        6   stealth or the stealth device, and that was $3,485.  Are you

        7   familiar with what that -- that code is about?

        8   A.    You know, I -- I use the stealth routinely, in fact, we

        9   had the first stealth around in -- one of the first ones

09:32  10   around.  The stealth is a very, very valuable technique.

       11   Basically what it does is it provides computer directed

       12   guidance of surgery, but I've never heard of it being used in

       13   the anterior cervical spine before in my entire -- my entire

       14   career.

09:32  15        In the lumbar spine it's extremely valuable, thoracic, but

       16   for these purposes, I don't know what you would do with it.

       17   You're putting screws in the vertebral body in a premeasured

       18   placement.  The screws can only go in a certain direction

       19   because of the way the plate is arranged, and as long as your

09:33  20   plate is properly sized, which you do fluoroscopy, I'm not sure

       21   what you would do with stealth.

       22        So I can't -- I mean, that's a lot of money for stealth,

       23   that is a lot more than we ever charged for using stealth, or

       24   currently charge for using stealth, but I'm troubled -- I don't

09:33  25   understand what its purpose is.

35

09:33  1  Q.  Thank you.  Then charge 69990 is $3,420, and Dr. Dagam
       2  testified that was for use of a microscope.
       3  A.  We don't bill for using a microscope anymore.  That's
       4  like --  A microscope is a tool of surgery, and the olden days
09:34  5  we did that, until I think probably about 2002, 2004, that was
       6  routine because it wasn't routine to use a microscope in the
       7  operating room.  But since it's routine, we haven't charged for
       8  that in years.
       9  Q.  So if I understand it is this literally Dr. Dagam looking
09:34 10  in through a microscope and charging $3,400?
      11  A.  That's correct, it's using the microscope for doing the
      12  decompression, yes.  And there are different ways of doing it.
      13  Some people do it with loops, with lenses put onto their
      14  glasses.  Some people do it without anything and some people do
09:34 15  it with a microscope.  It's a tool.
      16  Q.  And in this -- for this particular procedure, what would
      17  he be looking at in the microscope?
      18  A.  He'd be looking in the field as he removed the disk.
      19  Q.  So the use of the microscope is appropriate, the separate
09:34 20  fee in your mind is not; is that correct?
      21  A.  It's like the court reporter using a keyboard, I mean,
      22  it's part of what we do.  I don't --  Again, we haven't charged
      23  separately for it since it became normal practice.
      24  Q.  And then there's a last one, a minor charge, 77003, which
09:35 25  Dr. Dagam testified to or described we use the term

36

09:35 | 1  "fluoroscope" for that.  Are you familiar with that?

2  A.   Yeah, fluoroscope is, you know, the radiology -- the

3  radiology technician brings in a machine, they flash an image

4  and we say, oh, good.  We don't bill for that.  That's not

09:35 | 5  considered normal billing for our purposes anyways.  It may be

6  for other things, for example, interventional pain people who

7  are doing a procedure under fluoroscopy is a much bigger issue,

8  but it -- our billing people, billing people just don't do

9  that.

09:35 | 10  Q.   So do you have an opinion whether or not this Dr. Dagam

11  and his physician's assistant's fees in this case were

12  reasonable for the surgery that they performed?

13  A.   They are quite unreasonable.

14  Q.   Now, in regard to the surgery itself, do you have an

09:36 | 15  opinion as to whether or not it was successful for the purpose

16  it was offered, that is to ameliorate the pain from which

17  Ms. Gard indicated she was suffering?

18  A.   Well, the message I get from the deposition Miss Gard

19  offered and from Dr. Dagam's records that it was marginally

09:36 | 20  helpful.  Twenty percent improvement is not improvement.  It's

21  meaningless.

22  Q.   When you refer to 20 percent, that was Dr. Dagam's

23  official line that there was 20 percent improvement; is that

24  correct?

09:36 | 25  A.   Yes.

37

09:36   1    Q.    Why is that meaningless?

2    A.    It's not enough to make a difference in somebody's life.

3    We have a principle in the scientific literature, in the

4    medical literature called minimum -- well, I won't bother you

09:36   5    with the term, but the minimum amount of improvement that we

6    consider to be really improvement based on, you know, again

7    based on millions of cases, and unless it can restore an

8    individual to a quality life doing what they were doing, it's

9    not successful.  And if indeed that is the goal.  I mean, if

09:37   10   the goal's to get somebody out of a wheelchair and you don't

11   get out of a wheelchair, you didn't meet your goal.  You may

12   have tried, but you failed.  Then the question becomes was it

13   an acceptable attempt?

14   Q.    Now, postsurgery under these circumstances, would you have

09:37   15   recommended that Ms. Gard once again undertake physical

16   therapy?

17   A.    Absolutely.

18   Q.    And why is that?

19   A.    Because she was coming around --  You know, there are a

09:37   20   number of patients who have anterior cervical fusions who have

21   acute radiculopathy, that is, they have an acute herniated disk

22   and they have surgery and their arm pain goes away and they

23   don't need therapy, I mean, they don't.  There are a few of

24   them, not a lot.  But in her case where there was lingering and

09:37   25   a lot of lingering neck pain where she wasn't really making the

38

09:37   1   kind of progress we would hope for, therapy would be very, very

2   useful.

3           MR. PAWLAK:  Thank you.  I move those exhibits that

4   haven't been moved into evidence yet into evidence, which would

09:38   5   be 1003, 1004, 1009, 1017, 1021.  The CD itself is 1023, and

6   the guidelines are 1029.

7           THE COURT:  Any objection?

8           MR. KNOBLOCH:  Can you repeat those one more time?

9           MR. PAWLAK:  Yeah.  It's 1003, the CD; 1004, that's

09:38   10  the actual report; 1009 is the x-ray; 1017 is the MRI; 1021 is

11  the x-ray of the cervical spine postsurgery -- postaccident,

12  I'm sorry; 1023 is the CD, which had the MRI and actually has

13  all the other images on it also; and 1029 are the guidelines.

14          MR. KNOBLOCH:  No objection.

09:39   15          THE COURT:  All right.  They're all received.

16          (Exhibit Nos. 1003, 1004, 1009, 1017, 1021, and 1023

17  were received into evidence.)

18          THE COURT:  Mr. Knobloch, cross-examination.

19          MR. KNOBLOCH:  Thank you.

09:39   20                      CROSS-EXAMINATION

21  BY MR. KNOBLOCH:

22  Q.   I want to start with, Doctor, kind of your role in this

23  proceeding.  You were retained by, in this case, the Government

24  to provide independent opinions based upon your review of the

09:39   25  medical records; is that accurate?

39

09:39    1    A.    Yes.

2    Q.    You've done this type of work in the past going back

3    several decades and working for both the Government and auto

4    insurance companies; is that accurate?

09:40    5    A.    Not a lot.  I did one previous case with the Government

6    about -- in fact, I looked it up, six years ago, five years

7    ago.

8    Q.    You've been retained as an expert in medical malpractice

9    cases; is that accurate?

09:40    10    A.    Three or four times over the decades.

11    Q.    You understand in this process that your review of the

12    medical records is an important process, correct?

13    A.    I do.

14    Q.    You understand that part of your review of the medical

09:40    15    records both in a general sense and in this specific sense is

16    to review medical records that predate an accident or an

17    injury; is that accurate?

18    A.    Yes.  I insist on it.

19    Q.    You did that in this case, correct?

09:40    20    A.    I did.

21    Q.    So you asked for medical records predating this

22    March, 2017, accident and you actually received those; is that

23    true?

24    A.    I reviewed records.  I can't say I reviewed every single

09:41    25    record she ever had, but I reviewed some records from before

09:41   1    the crash.

2    Q.    You reviewed all the records that were provided to you in

3    this matter, correct?

4    A.    Yes.

09:41   5    Q.    Can we agree that in your review of those medical records

6    there is nothing to indicate that Miss Gard had any neck

7    problems prior to this accident?

8    A.    To the best of my knowledge she had no neck problems prior

9    to the crash.

09:41   10    Q.    To the best of your knowledge in your review of those

11    medical records predating this accident she never sought

12    medical care for any sort of neck pain; is that accurate?

13    A.    To the best of my knowledge, that's correct, yes.

14    Q.    All of her neck problems started after this accident,

09:41   15    correct?

16    A.    Yes.

17    Q.    I want to address Dr. Dagam for a while, Doctor. You're

18    aware of Dr. Dagam as a neurosurgeon in the community, correct?

19    A.    Vaguely, yes.

09:42   20    Q.    Can we agree that neurosurgeons doing any surgery in

21    particular can charge whatever they want for a particular

22    service?

23    A.    No, I disagree. I strongly -- We've had this discussion

24    in the deposition. No, we have -- we have fee schedules, we

09:42   25    have principles that are -- well, we can talk about this all

09:42 1  day long, but relative value units, RUV's [sic], that are

2  determined on the basis of not only the difficulty of the

3  surgery, the expertise required, the risks involved, as well as

4  the other care provided, and -- and in the organizations, in

09:42 5  the neurosurgical organizations as in other professional

6  organizations we have a -- a quasi agreement to kind of be in a

7  range.  It doesn't mean that healthcare costs don't -- aren't

8  different in different parts of the country, they are, but not

9  dramatically so.

09:43 10  Q.  I just want to make clear your opinion.  Are you telling

11  this Court that a neurosurgeon in, I'll say, Waukesha is

12  prohibited from charging whatever he wants from --

13  A.  No, I'm sorry, if that's what I said, nobody's --

14  Prohibited is a strong word.  We live in America.  Well, a lot

09:43 15  of things are prohibited.  But it is considered, what is the

16  term I'm looking for, I'm having trouble coming up with the

17  word.  Just ain't right, I guess, to be off.  And then the

18  question becomes, and there are others who are more -- yes, I

19  do have an MBA, but there are others who would say, is this

09:44 20  individual charging the same under these circumstances they

21  would if this -- send the same bill for this one as if it were

22  a Medicare case, or a private insurance case.

23     In other words there are those who would argue that what's

24  called strategic billing is unacceptable.  According to the

09:44 25  rules of the American Association of Neurological Surgeons.

09:44    1    That is, you can't send a bill of $100,000 for a cervical

2    fusion for someone who has a liability case and $18,000 to a

3    United Healthcare patient.

4    So you can put it any way you want to on a piece of paper,

09:44    5    whether it's legitimate or not is another story. And whether

6    it falls into what -- what the neurosurgical and orthopedic

7    community feels is being acceptable is also questionable.

8    Q.    I want to make my question and your answer clear. In this

9    case nothing prohibited Dr. Dagam from charging what he did for

09:45    10    the cervical fusion; is that accurate?

11    A.    Is there a law that says you can't? No.

12    Q.    And he actually did charge a lot of money for his surgery,

13    can we agree on that?

14    A.    I use the term "outrageous".

09:45    15    Q.    But he actually did bill for that surgery and billed it to

16    Miss Gard as far as you can tell, can we agree on that?

17    A.    Well, according to this thing he billed it to Golden Rule

18    Insurance Company, whatever that is, but ultimately he billed

19    it to her.

09:45    20    Q.    So regardless of what you think is reasonable or usual and

21    customary or within the standard of practice within the

22    neurosurgeon practices or groups that you know of, regardless

23    of what that fair and reasonable is, in your mind he actually

24    did bill a little over $101,000 for the fusion that he

09:45    25    performed, true?

43

09:45  1   A.   He did bill that, yes.

       2   Q.   And you don't blame Ms. Gard for that, do you?

       3   A.   Not at all.

       4   Q.   Because as a consumer of the medical service -- services,

09:46  5   she has no idea what the actual billed amount is going to be

       6   either before she has that surgery or likely even after she has

       7   the surgery; is that true?

       8   A.   Unfortunately consumers do not -- healthcare consumers do

       9   not consume wisely.

09:46 10   Q.   So you don't blame Miss Gard for being overcharged for a

      11   surgery, correct?

      12   A.   I do not.

      13   Q.   While we're on that topic, the operative report at the

      14   time stated that a surgery was done that in your opinion was

09:46 15   not done, true?

      16   A.   It is absolutely certain that it was not done.

      17   Q.   You don't blame Ms. Gard for that, do you?

      18   A.   Not at all.

      19   Q.   She had no role in the exact procedures that Dr. Dagam

09:46 20   decided to do or in how he billed it throughout the course of

      21   the surgery, true?

      22   A.   You are absolutely correct.

      23   Q.   Just to highlight that point, you talked about the

      24   stealth, you talked about the microscope and the fluoroscope

09:47 25   and generally speaking were critical of Dr. Dagam for billing

44

09:47   1   those procedures.  My question is you have no criticisms with

2   respect to Ms. Gard and Dr. Dagam billing for those procedures,

3   correct?

4   A.   None.

09:47   5   Q.   If we agree that Dr. Dagam charged too much and perhaps

6   charged for a procedures or processes that he didn't do,

7   Ms. Gard is simply an innocent victim in that circumstance,

8   correct?

9   A.   Yes.

09:47   10   Q.   With respect to Miss Gard not receiving any improvement or

11   de minimis improvement of 20 percent, if that's accurate,

12   postsurgery, that's also something in your mind that Miss Gard

13   was simply an innocent victim of, can we agree on that?

14   A.   I think at some point patients have to take control of

09:48   15   their destiny, and I would encourage her to pursue things that

16   would -- would improve things further.  How's that for an

17   answer?

18   Q.   I think you're referring to physical therapy?

19   A.   And other --  And other procedures, yes.

09:48   20   Q.   Can we agree that if she were to under do -- undergo

21   physical therapy at this point it's probably not going to

22   eliminate her neck problems?

23   A.   First of all, I never use the term "eliminate" when it

24   comes to pain.  I did 13,000 operations.  I can assure you none

09:48   25   of them was ever a hundred percent eliminated with anything.  I

45

09:48  1  think that physical therapy and other nonoperative care would

2  likely be helpful.

3  Q.  It's not going to make all of her pain go away, can we

4  agree on that?

09:48  5  A.  I think it will make her substantially better, enough that

6  I think she has a good chance of being better enough that it

7  ceases to be an issue in her life.

8  Q.  And just to be clear, that's if she were to undergo

9  physical therapy at this point?

09:49  10  A.  Not limiting it to physical therapy.  You are, I'm not.

11  Q.  Okay.  You're including chiropractic care?

12  A.  I think so, yes.

13  Q.  Chiropractic care, as far as you can tell from the

14  records, has never been recommended for Miss Gard, has it?

09:49  15  A.  It has not.

16  Q.  Back to the billing for just a moment.  You're aware

17  that --  Well, I'm going to strike that.

18  You're aware that neurosurgeons and surgeons in general

19  throughout this community and other communities sometimes

09:49  20  charge more than others, correct?

21  A.  I think we're pretty standard throughout the community.

22  There are certain surgeons who at least in the spine world who

23  have gone out there and Dr. Dagam obviously in this case is one

24  of them, but most of 'em are pretty -- most of us are pretty

09:50  25  comparable, and, of course, that's largely defined by the

46

09:50   1   payors.

2   Q.   Is that also defined by the institution that you're

3   working for, for instance, you during your career you were a

4   faculty at the Medical College and did your work at Froedtert

09:50   5   Hospital, whereas in that context you're constrained to billing

6   what the institution deems as correct; is that accurate?

7   A.   No, that is not the way how it works.  We develop a fee

8   schedule based on the usual and customary.  The number of

9   RVU's, relative value units, that are required for the

09:50  10   procedure.

11       We then, we definitely look at what other people are

12   charging for the same thing in the area.  And then, of course,

13   can negotiate contracts with the payors.  The goal is to be --

14   Because of who we are, we were certainly higher than average,

09:51  15   but not outrageously so.  But no one's --  In other words it's

16   based more on a standard that pervades the community than some

17   arbitrary number that we pick out of a hat.

18   Q.   I want to go through the treatment that Miss Gard received

19   after the accident.  I think we can agree that after the

09:51  20   accident her developing neck pain as a result of whiplash

21   would've been a common circumstance?  I know you don't like

22   that term "whiplash".

23   A.   We don't use it.  Again, it's pejorative.  I would be

24   surprised if she didn't have some sort of neck pain after a

09:52  25   flexion-extension injury like that.

47

09:52  1    Q.    And assuming she did, which the records indicate that she

2    did, going to an Urgent Care a couple days later was a

3    reasonable option for her?

4    A.    Yes.

09:52  5    Q.    And that Urgent Care physician, if they referred her to

6    her primary care physician for further follow-up, that's a

7    reasonable thing to do?

8    A.    Yes.

9    Q.    The primary care physician at that point recommending

09:52 10    physical therapy is a reasonable thing to do?

11    A.    Yes.

12    Q.    There was the discussion about physical therapy and

13    Miss Gard's inability to go to all of those.  You're aware that

14    she was unable to make all of her physical therapy

09:52 15    appointments, correct?

16    A.    I'm aware that in several of the therapy notes it says

17    that she cannot come to therapy because of her work schedule.

18    Q.    In your experience dealing with patients, that's life,

19    that happens sometimes, correct?

09:52 20    A.    We've generally been able to work it out with evening

21    hours and things like that.  Part of it has to do with

22    motivation and part of it has to do with availability.

23    Q.    You told me in your deposition that you weren't critical

24    of Miss Gard for not being able to make all of her

09:53 25    appointments.  Is that still your opinion?

48

09:53  1   A.   You know, if someone works 8:00 to 4:00 and therapy's only

2   available 8:00 to 4:00, we got a problem, and the employer's

3   not willing to let you go, we got a problem.  So I can't

4   criticize her if indeed that's the case.

09:53  5   Q.   I took your deposition in this matter a month or so ago;

6   is that true?

7   A.   I don't remember the date, but yes, you did.

8   Q.   And you know how this works, there's a transcript of that

9   deposition testimony and we can go back and look at the words

09:53  10  that you said under affirmation at that time, right?

11  A.   Yes.

12  Q.   You told me back then that your opinion was that she

13  suffered several injuries in this accident, and I want to see

14  if we can agree on those today without the need to go back to

09:54  15  your deposition transcript.  You told me that Miss Gard

16  suffered a cervical muscular strain in this accident.  Is that

17  still your opinion?

18  A.   Yes.  I would say myofascial syndrome, but it's the same

19  thing.  Yes.

09:54  20  Q.   You told me back then that in your opinion Miss Gard

21  suffered a facet joint injury.  Can we agree upon that today?

22  A.   I wouldn't use the term "injury", I would say "syndrome"

23  because that's -- I'm sure that is the term I used, and I --

24  that's exactly what I've said before.  Yes.

09:54  25  Q.   Facet joints, we've talked about that.  That's the sides

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 49 of 89    Document 77

09:54  1   and I know you're going to correct me on that, but it's the
       2   sides of the vertebrae; is that accurate?
       3   A.    Yeah.  It's the articulating joints of the vertebrae.
       4   Yes.
09:54  5   Q.    Miss Gard suffered a cervical strain or a myofascial
       6   injury and also a facet joint injury which you call facet joint
       7   syndrome.  Do we have that squared away?
       8   A.    Well, we have to be careful.  We can't say injury because
       9   injury implies fracture.  There's no fracture.
09:55 10   Q.    But pain was emanating from the facet joint region, can we
      11   agree upon that?
      12   A.    Yes.
      13   Q.    Right.  You told me in your deposition awhile back that
      14   regardless of the physical therapy that she did or that she was
09:55 15   supposed to do had she not had work problems, that she was
      16   still going to have pain emanating from the facet joints as a
      17   result of this accident.  Can we agree upon that today?
      18   A.    I'm not sure I used those exact words.  I --  What I think
      19   I would've said is I would be surprised if she didn't still
09:55 20   have some -- some residual pain.
      21   Q.    And to be clear, if she underwent all of the physical
      22   therapy that was suggested to her by her primary doctor and the
      23   physical therapists, it is your opinion she was still going to
      24   have facet joint pain, correct?
09:56 25   A.    Yes.

09:56    1    Q.    To take that further, had she done all that physical

         2    therapy and done the medial branch block injections and the

         3    radiofrequency ablations, she was still more likely than not

         4    going to have that facet joint pain, true?

09:56    5    A.    I would suspect that she would have some, again, the goal

         6    is not complete relief because it's unrealistic.  The goal is

         7    to make it better enough so it ceases to be an issue.

         8    Q.    And there's a degree of speculation in how she would've

         9    been and to what degree she would've still had pain, true?

09:56   10    A.    I think --  Speculation?  My opinions are to a reasonable

        11    degree of medical probability, and I'm comfortable saying that

        12    to a reasonable degree of medical probability that she would've

        13    gotten better enough such that it would cease to be an issue in

        14    her life.  That's been my experience with tens of thousands of

09:57   15    patients running five spine clinics.

        16    Q.    I guess there's always a degree of subjectivity when you

        17    talk about how it would've interfered with someone else's life,

        18    though, true?

        19    A.    That's true.

09:57   20    Q.    In the entire spectrum of her care, it was reasonable for

        21    her to go to the Urgent Care, to her primary doctor, to

        22    physical therapy, and to the pain management specialists, true?

        23    A.    Yes.

        24    Q.    You're not providing any opinions with respect to the

09:57   25    adequacy or inadequacy of the billing that was done through the

51

09:57   1   pain management course of treatment, true?

         2   A.   I don't have enough familiarity with it.

         3   Q.   So you're offering no opinions in that regard?

         4   A.   That's correct.

09:57   5   Q.   Doctor, you told me that you have been retained a handful

         6   of times, I think you said, to provide opinions in medical

         7   malpractice cases; is that accurate?

         8   A.   Yes.

         9   Q.   And I don't mean this in a disrespectful way, I'm just

09:58  10   trying to lay a foundation.  You have also been sued several

        11   times for medical malpractice, correct?

        12   A.   I was sued in --

        13            MR. PAWLAK:  I'm going to object as to relevance.

        14            THE COURT:  Relevance?

09:58  15            MR. KNOBLOCH:  Your Honor, we're just trying to lay a

        16   foundation that he is well aware of the standard of care

        17   because he has been highly critical of Dr. Dagam in this

        18   matter.

        19            THE COURT:  Overruled.

09:58  20   BY MR. KNOBLOCH:

        21   Q.   You may answer, Doctor.

        22   A.   I was really sued twice, once in 1998 for a hospital drug

        23   error, and -- it was expunged, and then I was sued in 2016 for

        24   a serious error that I made in a case.  We settled that.

09:59  25   Q.   My question in that regard, Doctor, is you're aware of the

09:59  1    standard of care, that phrase, correct?

       2    A.   I am.  Well aware.

       3    Q.   And the standard of care is what doctors should always

       4    strive to achieve in their practice?

09:59  5    A.   Standard of care is a minimal standard.  It's not a

       6    maximal standard.  That's not what we're striving for.  That's

       7    the minimal acceptable.

       8    Q.   And if a physician falls below the standard of care, in

       9    your mind that's malpractice, correct?

09:59  10   A.   Not in my mind.  That's a legal opinion.  I'm not a

       11   lawyer.  Falling below the standard of care when it hurts a

       12   patient is malpractice.

       13   Q.   You've given opinions on standard of care when you were

       14   retained as an expert in medical malpractice cases, correct?

09:59  15   A.   I'm thinking back, because again I don't do much of that,

       16   but at least in two or three of the cases when I was retained I

       17   was retained for a Frye hearing, not in -- not standard of

       18   care.

       19   Q.   Okay.

10:00  20   A.   I mean, to establish the scientific basis for what

       21   happened.  I think that's a Frye hearing, isn't it?  Yeah.

       22   Q.   Sounds correct.  In your 45 years of experience, you're

       23   familiar with the standard of care is with respect to

       24   neurosurgical procedures?

10:00  25   A.   Procedures, yes.

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 53 of 89    Document 77

10:00    1    Q.    With respect to anterior cervical decompression infusion,

2    a CDF, you're familiar with the standard of care in that

3    regard?

4    A.    Yes.

10:00    5    Q.    And you're familiar with the standard of care with respect

6    to a neurosurgeon's decision on whether or not to operate; is

7    that fair?

8    A.    That's not a standard of care issue.  Standard of care

9    issue is the care provided, in other words the technology

10:00    10    provided.  The decision making falls into a whole 'nother area.

11    And -- And so I would say this.  That doesn't fall into it,

12    the rigidly defined standard of care, but it's sort of allied

13    to it.  Part of the decision-making process.

14    Q.    Certainly a neurosurgeon can fall below the standard of

10:01    15    care in his or her decision making on whether to undertake a

16    particular surgery, correct?

17    A.    I would think so.

18    Q.    I'm going to pull you in here to Dr. Dagam.  I think it

19    was your strong opinion that -- that you believe is supported

10:01    20    by the literature that a neurosurgeon should very rarely, if

21    ever, do a cervical fusion for strictly axial pain.  Is that an

22    accurate synopsis of your opinion?

23    A.    I think that's the opinion of the aggregate spine surgery

24    world.

10:01    25    Q.    And when Miss Dagam [sic] appeared in Dr. Dagam's office,

10:01  1  as far as you can tell in the records, she simply presented

2  with axial pain, true?

3  A.    Yes.

4  Q.    No other complicating factors, neurological factors,

10:01  5  anything else in that regard, correct?

6  A.    No myelopathy, no radiculopathy.  Correct.

7  Q.    In that sense surgery was not indicated for Miss Gard at

8  that point, can we agree on that?

9  A.    Yes.

10:02  10  Q.    And the surgery that Dr. Dagam ultimately performed was an

11  unwarranted surgery at that point, can we agree on that?

12  A.    According to the literature, yes.

13  Q.    Can we agree upon --  Strike that.  Can we agree that

14  Dr. Dagam did an unnecessary surgery on Miss Gard?

10:02  15  A.    See, we get a little complicated.  He viewed it as being

16  useful.  Again, the spine surgery world would view it as being

17  unnecessary.

18  Q.    And that's supported by the literature in your regard --

19  A.    That's supported by --

10:02  20  Q.    -- or in your opinion?

21  A.    Excuse me.  -- by the guidelines.

22  Q.    Can we agree that Dr. Dagam fell below the standard of

23  care in his decision making and in his ultimate decision to

24  perform a cervical fusion on Miss Gard?

10:02  25  A.    Again, I'm going to hesitate to answer that the way you've

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 55 of 89    Document 77

10:02   1   asked it because I'm not sure there's an identified standard of

2   care for -- for cervical fusion for this indicator.  All I can

3   say to you is what I quoted you before.  The literature and the

4   guidelines and the standard teaching practice is that we do not

10:03   5   do cervical fusions for isolated axial pain in the absence of

6   instability for spinal cord compression.  Period.

7   Q.   And what you just described there, Doctor, is the standard

8   of care, wouldn't you agree?

9   A.   You're --  I'm reluctant to use that term.  Just because I

10:03  10   don't -- I don't see anything written somewhere that the

11   standard of care is.  How's that for --  I just can't do it.

12   Q.   You believe Dr. Dagam fell below the standard of care in

13   any regard, Doctor?

14   A.   I'm sorry?

10:03  15   Q.   Do you believe Dr. Dagam fell below the standard of care

16   in anything he did in this case?

17   A.   Well, is billing part of the standard of care?

18   Q.   Leave the bill out for a moment, if you could.

19   A.   I mean, the operation here looks -- the results of this

10:03  20   procedure that he did looks fine.  I have no criticism of the

21   decompression, I have no criticism with the placement of the

22   plate or the gravity.

23   Q.   In your opinion it's a surgery simply that should've never

24   been done, correct?

10:04  25   A.   It --  That's correct.

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 56 of 89    Document 77

10:04 1  Q.   Certainly there are situations where you can imagine if a
2  surgery is done that the particular surgeon who decided to do
3  it fell below the standard of care in their decision making,
4  right?

10:04 5  A.   Yes.

6  Q.   And can we agree that that's what happened in this case,
7  Doctor?

8  A.   Again, I'm not going to let you use the word "standard of
9  care" with me, but I don't think his decision making was

10:04 10  appropriate for this particular instance based on the
11  literature and based on training add experience.

12  Q.   Is part of your hesitancy, Doctor, the fact that you're
13  under oath and I'm essentially asking you to opine on whether
14  or not another physician committed malpractice?

10:04 15  A.   I don't know that it's malpractice to do a surgery that
16  isn't indicated.  I'm not a lawyer.  That's a legal issue, not
17  a medical one.

18  Q.   You would never recommend one of your residents to do a
19  surgery that wasn't indicated, correct?

10:05 20  A.   Slap 'em in the face.

21  Q.   And just a last question on this point.  If you were in
22  Dr. Dagam's shoes at the time where he made the decision to do
23  the surgery, you would've said, no way?

24  A.   I would've sent her back to Dr. Ong to get the rhizotomy

10:05 25  and sent her back to therapy.  I've said that before.

57

10:05  1    Q.   Doctor, you are aware that Miss Gard eventually was seen

       2    by a pain management interventionist by Dr. Ong, correct?

       3    A.   Yes.

       4    Q.   In your mind was it reasonable for Dr. Ong to do the

10:06  5    procedures that he did?

       6    A.   Very much so.

       7    Q.   It's common in your practice, Doctor, to see patients that

       8    have gone from a primary care physician to a pain management

       9    specialist and then to you as a neurosurgeon, correct?

10:06  10   A.   Yeah.

       11   Q.   You're not critical of Miss Gard for receiving care from a

       12   pain management specialist, true?

       13   A.   No.

       14   Q.   Miss Gard testified yesterday that it was Dr. Ong who

10:06  15   referred her to Dr. Dagam.  Do you have any reason to dispute

       16   that?

       17   A.   I --  I have no reason to dispute that at all.  I have no

       18   idea.

       19   Q.   Assuming that's true for a moment, it was reasonable in

10:06  20   that --  Strike that.

       21        Assuming that's true, in your opinion it's reasonable for

       22   Miss Gard to have relied upon the referral from Dr. Ong to

       23   Dr. Dagam, true?

       24   A.   I have no criticism of her for following through on that.

10:07  25   Q.   I looked through the records, and it seemed that there

10:07    1    were seven or eight visits with Dr. Dagam that Miss Gard had

2    prior to the surgical recommendation. Does that jive with your

3    recollection?

4    A.    I'm sorry, I don't recall -- I can't give you a number,

10:07    5    but I don't recall that many.

6    Q.    Let me try it this way. There were several visits that

7    Miss Gard had with Dr. Dagam where the conversation was other

8    things and not let's have surgery, true?

9    A.    There were at least two that I can recall.

10:07    10    Q.    In those records it was Dr. Dagam who initially said,

11    paraphrasing, you're not ready for surgery, you should continue

12    on with your treatment with Dr. Ong. Do you recall --

13    A.    I do recall him saying that, yes.

14    Q.    And you're okay with -- with that from Dr. Dagam at that

10:08    15    point, correct?

16    A.    Absolutely.

17    Q.    You're aware that at some point Dr. Dagam told Miss Gard,

18    now I believe you're a candidate for surgical intervention,

19    true?

10:08    20    A.    Yes.

21    Q.    You're aware at some point that Miss Gard agreed to have

22    the surgery, correct?

23    A.    Yes.

24    Q.    It's common for patients to rely upon the expertise and

10:08    25    experience of their physicians when it comes time for surgery

10:08   1   and decision making with respect to that surgery, right?

2   A.   Yes.

3   Q.   You're not critical of Miss Gard for relying upon the

4   experience and expertise and recommendation of Dr. Dagam, are

10:08   5   you?

6   A.   Not at all.

7   Q.   In that sense, Miss Gard's decision to go through with the

8   surgery that you deemed to be an unwarranted and unnecessary

9   surgery, in that sense she's just another innocent victim in

10:09   10   that sequence, correct?

11   A.   I hesitate to use the word "victim", but she is a

12   participant.   Yes, she followed through with the -- that

13   physician's recommendation.

14   Q.   And it was reasonable for her to do that at that time?

10:09   15   A.   Yes.

16   Q.   Last question on this point, Doctor.   Throughout her

17   sequence of treatment, Miss Gard reasonably relied upon her

18   doctors throughout the course of her treatment up and through

19   the surgery, true?

10:09   20   A.   There were a couple times when she told 'em no.   If I

21   recall correctly, Dr. Ong, and I could be incorrect, and I

22   apologize if I am, she did not follow through on the rhizotomy,

23   although she did have the medial bundle branch block.   I,

24   frankly, wish she had.   She didn't follow through on the

10:09   25   epidurals, which was wise.   She was less than robust in working

10:10   1   with the therapists, you know, but that takes awhile,

2   especially right after injury.

3   Q.   Throughout the course of your decades of practice, Doctor,

4   have you encountered patients that go through a series of

10:10   5   treatments and perhaps even a surgery and they don't get a

6   whole lot of relief and at the end of that they throw up their

7   hands and say, to heck with all of this, I'm done with all of

8   this, you guys haven't done anything to alleviate my pain in

9   any meaningful sense?

10:10   10   A.   Absolutely.

11   Q.   That happens, right?

12   A.   More often than not.

13   Q.   Did you get a sense from reviewing the records that that's

14   kind of where Miss Gard is at after having a cervical fusion

10:10   15   that didn't much help her?

16   A.   I get that sense.

17   Q.   Doctor, I'll represent to you that Miss Gard's primary

18   care physician at the early stages after this accident was a

19   doctor by the name of Dr. Swift-Johnson.  I assume you don't

10:11   20   know Dr. Swift-Johnson, true?

21   A.   No.  I do not.

22   Q.   Well, I'll represent to you that she is an Aurora doctor.

23   A.   I know.  I know that much.  Yes.

24   Q.   And I'll represent to you that Miss Gard's physical

10:11   25   therapy was through an Aurora clinic.

61

10:11   1   A.   Yes.

        2   Q.   And in the context of your practice with Froedtert and the

        3   Medical College, if you referred someone to physical therapy

        4   and it was done through a Froedtert facility, when that patient

10:11   5   returned to you, you would have full access to all of those

        6   physical therapy notes, correct?

        7   A.   Yes.

        8   Q.   And that's a common phenomenon within the medical practice

        9   that if you're within an institution, say Froedtert or Aurora,

10:12  10   you have access to that particular patient's entire medical

       11   history within that institution; is that a common practice?

       12   A.   It's actually beyond that.  With Epic we pretty much have

       13   access to everything.

       14   Q.   So to my question, when Miss Gard returned back to her

10:12  15   primary care physician through Aurora at the end of her

       16   physical therapy treatment, you would expect that physician to

       17   have access and knowledge of all of the physical therapy

       18   records that were generated throughout the course of her

       19   treatment, true?

10:12  20   A.   Access, yes; knowledge, can't testify to that.  I don't

       21   know if she ever looked at 'em.  We have no way of knowing.

       22   Q.   Sure.  But had she looked and prepared to have Miss Gard

       23   in, she would've had access to all of the physical therapy

       24   records, correct?

10:12  25   A.   She would've had access.

                                                                    62

10:12  1  Q.    Whether she looked at 'em would be pure speculation on

2  your part?

3  A.    That's correct.

4  Q.    Yesterday for a couple hours counsel went through almost

10:13  5  each physical therapy note with Miss Gard, and as part of her

6  response as to the general question of why didn't you go to

7  therapy that day, part of her answer was, I wasn't getting any

8  relief from the physical therapy.  My question to you, Doctor,

9  is that sometimes happens, correct, that a patient that you

10:13  10  refer to physical therapy is simply just not getting relief

11  from the physical therapy?

12  A.    Correct.

13          MR. PAWLAK:  I'm going to object to the question on

14  the grounds that I believe a more accurate recitation of what

10:13  15  she said was the relief was temporary, not that she wasn't

16  getting any relief.

17          THE COURT:  The fact finder is aware of what the

18  testimony was and will weigh that.  Thank you.  You may

19  continue, Mr. Knobloch.

10:14  20          MR. KNOBLOCH:  Thank you.

21  BY MR. KNOBLOCH:

22  Q.    The same question, because I think counsel is accurate

23  that some of the -- her testimony was along the lines of I

24  wasn't getting any relief and I think what she was really

10:14  25  saying was I was receiving temporary relief but then it would

63

10:14   1    wane in the next couple days. Is that a common phenomenon in

2    patients that you refer to physical therapy?

3    A.    Depends on what you're referring them for and what the

4    therapists are doing, so, you know, that's the answer. There

10:14   5    are certain therapy moves that really only work for a day or

6    two. Sometimes those -- those techniques are used specifically

7    to reduce pain temporarily so that patients can do their home

8    exercise program.

9        Other times, frankly, they're done because, you know,

10:14  10    therapists want people to get better too, and they like it when

11    people leave happy, and unfortunately there are certain

12    techniques that are very common in the therapy world that don't

13    produce meaningful improvement. They have evidence based

14    standards of care just like we do. And there are things that

10:15  15    work better than other things on a longer term basis. So often

16    the goal is to do temporary things to inspire the ability to do

17    the longer term things.

18    Q.    In your review of the records, it appears that Miss Gard's

19    testimony yesterday, it jives with the records that she was

10:15  20    receiving temporary relief but not permanent relief. Can we

21    agree on that?

22    A.    I think that's true.

23    Q.    Miss Gard testified yesterday to a large degree about her

24    ongoing problems, and I'm going to paraphrase. She has

10:15  25    consistent neck pain that manifests in tension and a very

10:15  1   significant tightness that goes from her neck down into her

2   shoulder blades.  Assuming that's true, what do you attribute

3   that to, Doctor?

4   A.   I think there's -- it's the exact same stuff she had since

10:16  5   she had the injury.  I think there's continuing muscle spasm

6   from -- from muscle weakness, if you will, due to injury as

7   well as the facet syndrome.  Nothing has changed.

8   Q.   To be clear, those problems that I just described in your

9   mind are largely coming from the facet joint syndrome that

10:16  10   you've testified to earlier?

11   A.   I can't break down a percent and between the muscles and

12   the facet, but I'm sure it's a combination of the two.

13   Q.   Miss Gard testified that when she turns to her right,

14   there is some crunching.  Assuming that to be true, what do you

10:16  15   attribute that to?

16   A.   We all have that as we get up there.  That's a facet

17   thing.  I can do it right now for you if you like.

18   Q.   There was a term used yesterday, and it perhaps was used

19   today, degenerative disk disease.  DDD is what you see in the

10:17  20   medical records, and I've heard that from doctors as being a

21   misnomer because it's not really a disease, it's just a

22   degeneration of the cervical spine.  You're shaking your head.

23   Are we in agreement?

24   A.   We're in absolute agreement.  It's not a disease, it's a

10:17  25   phenomenon.  Again, most of the time it's asymptomatic, as I

10:18  1   discussed earlier, it's just a convenient way of talking.

2   Q.   I've heard plenty of neurosurgeons say that most people

3   over the age of 40 have some degree of degeneration going on in

4   their cervical spine, whether they know it or not.  Is that

10:18  5   accurate?

6   A.   As I said earlier in this testimony, that's absolutely

7   true.

8   Q.   There's plenty of people walking around with a significant

9   state of degeneration going on in their neck and they have no

10:18  10   idea because it's not causing them any problems, true?

11   A.   Correct.

12   Q.   And then there are people with that degree of degeneration

13   in their neck and they get in a car accident and now they have

14   problems with their neck, true?

10:18  15   A.   Yes.

16   Q.   Common parlance that we use is now they've had an

17   aggravation of an asymptomatic condition.  Is that a fair way

18   of phrasing that?

19   A.   I think that's fair.

10:18  20   Q.   And that is -- is that a fair way of phrasing what

21   happened to Miss Gard in this case?

22   A.   Yeah, I believe that.  Yes.

23   Q.   You've seen that plenty in -- throughout your 45 years of

24   practice, true?

10:19  25   A.   Of course.

10:19  1  Q.   We can agree that on the day of the accident Miss Gard had

2  a level of degeneration going on or having already undergone in

3  her neck, true?

4  A.   As previously stated.

10:19  5  Q.   And you have no evidence to suggest that that degree of

6  degeneration, whatever degree it was on the day of the

7  accident, was giving her any problems whatsoever prior to the

8  accident, true?

9  A.   She certainly never had any treatment or complaints for

10:20  10  it.

11  Q.   Doctor, I see this sequence of treatment for Miss Gard in

12  a certain way and I want to see if you see it that way.  But

13  for this accident she would've never gone to her physical

14  therapist --  Strike that.  But for this accident she would've

10:20  15  never gone to her primary doctor complaining of neck pain when

16  she did.  Do you see that -- see it that way?

17  A.   Did you say when she did?

18  Q.   Correct.

19  A.   Yes.

10:20  20  Q.   And but for this accident she would've never seen Dr. Ong

21  for neck complaints when she did, correct?

22  A.   When she did, correct.

23  Q.   And but for this accident, she would've never been seen by

24  Dr. Dagam when she was, correct?

10:21  25  A.   Yes.

67

10:21 1  Q.   And but for this accident, she would've never seen

2  Dr. Dagam and therefore Dr. Dagam would've never recommended

3  surgery when she did, correct?

4  A.   That's correct.

10:21 5  Q.   But for this accident, she would have never undergone the

6  surgery that Dr. Dagam performed when he did it, true?

7  A.   Yes.

8       MR. KNOBLOCH:  That's all I have, Your Honor.

9       THE COURT:  Thank you.  Let's take about 15-minute

10:21 10 break so we could not be so cruel to our court reporter.

11 Dr. Maiman, if you will please remain, I have a couple of

12 clarifying questions for you.

13       THE WITNESS:  Yes, ma'am.

14       THE COURT:  Thank you, everyone.

10:21 15      MR. PAWLAK:  I also have some redirect.

16       THE COURT:  All right.  We'll do that.  Let's take a

17 15-minute break, and we'll do that.

18       MR. PAWLAK:  Thank you.

19       (A recess was taken.)

10:38 20      THE COURT:  Please be seated.  We're back on the

21 record.  Mr. Pawlak, redirect?

22       MR. PAWLAK:  Thank you, Judge.

23            REDIRECT EXAMINATION

24 BY MR. PAWLAK:

10:38 25 Q.   Dr. Maiman, on cross-examination plaintiff's counsel asked

68

10:39  1    you a couple questions based upon the testimony of his client

2    yesterday, describing some symptomology which she was suffering

3    from pain in her neck.  Based upon that new information as well

4    as your complete knowledge of the record, if you were

10:39  5    Miss Gard's doctor at this time or part of her treatment team,

6    what would you recommend for her?

7    A.    Right now?

8    Q.    Right now as we sit here.

9    A.    I would recommend an aggressive transdisciplinary

10:39  10   nonoperative program, incorporating physical therapy for -- for

11   stabilization, strengthening of the neck muscles, chiro -- a

12   brief course of chiropractic treatment, and a strong

13   consideration for redoing the facet blocks and facet rhizotomy.

14   Q.    And just for the record, the rhizotomy is the one you

10:39  15   believe she did not choose to partake in that procedure; is

16   that correct?

17   A.    I believe so.

18   Q.    Can you explain what it is?

19   A.    Basically when we -- there are little nerves inside the

10:40  20   facet joints, and they can -- they can be associated by

21   producing spasm.  They produce pain by producing spasm in the

22   muscles.  They irritate --  The muscles get irritated when

23   those nerves are irritated.

24        The blocks that Ms. Gard had gave her, according to the

10:40  25   record, at least 50 percent relief.  It's meant to be

10:40    1    temporary, and it was.  But I can't see anywhere that she had

         2    the actual rhizotomies where they -- where they kill the

         3    nerves, if you will, was done, and I think at least that should

         4    be considered.  It would have to be the blocks again, the

10:40    5    medial branch blocks as they're called, with steroids, with

         6    cortisone, and then see if that works, and if that works,

         7    consider burning the nerves.

         8    Q.    So is the rhizotomy in the grand scheme of things reported

         9    to or at least or hoped to be permanent?

10:40   10    A.    They're not permanent.  They last for years, though.  And

        11    if her muscles can get strong enough and healthy enough, if you

        12    will, and I'm being a little simplistic here, it's very likely

        13    that that will be the turning point, getting rid of that facet

        14    pain will be the turning point in allowing her to reduce the

10:41   15    muscle pain dramatically.

        16    Q.    And how does she strengthen those muscles?

        17    A.    That -- A therapy program that emphasizes stabilization.

        18    You know, we're not talking about sticking needles in there,

        19    doing dry needling.  We're not talking about massage.  We're

10:41   20    talking about a combination of certain kinds of exercise

        21    programs that are designed specifically for that purpose.

        22                MR. PAWLAK:  Thank you.

        23                        RECROSS-EXAMINATION

        24    BY MR. KNOBLOCH:

10:41   25    Q.    Doctor, this rhizotomy, I never saw that in the medical

                                                                        70

10:41   1    records post her surgery. Did you?

2    A. No.

3    Q. As far as you know, Dr. Dagam has never recommended that

4    one to Miss Gard, correct, post surgery?

10:41   5    A. He's never recommended anything after surgery.

6    Q. Miss Gard testified that she wakes up in the morning and

7    does a daily stretching routine and does that throughout the

8    course of the day. That's a good thing for her to do, correct?

9    A. It's minimally adequate, how's that for an answer? I

10:42   10    mean, that's what she's got.

11    Q. If it provides her with some sense of relief throughout

12    the day, then she should continue?

13    A. Oh, absolutely.

14        MR. KNOBLOCH: That's all I have, Your Honor.

10:42   15        THE COURT: Thank you. Dr. Maiman, I have a couple

16    of questions. Most of them have been -- you've answered them

17    through cross-examination and redirect, but I have a couple

18    remaining.

19                  EXAMINATION

10:42   20    BY THE COURT:

21    Q. My first question --

22        THE COURT: Mr. Pawlak, can you please put back up

23    the 2017 x-ray? So kind of going back to the beginning,

24    Dr. Maiman.

10:42   25        MR. PAWLAK: Yeah. Sure, Judge. There is the

10:43  1  March 27th, 2017, x-ray --

2          THE WITNESS:  Those little boxes there --  Yes, Your

3  Honor.

4          THE COURT:  I'm going to come down to get a good

10:43  5  view.

6  BY THE COURT:

7  Q.    Dr. Maiman, you testified at the beginning of your

8  testimony regarding this exhibit, which is the March, 2017,

9  x-ray of Miss Gard after the accident; is that correct?

10:43  10  A.    Yes, ma'am.

11  Q.    I want to understand the significance of your testimony

12  regarding this x-ray.  You started out by pointing out to us

13  that the spine was straight rather than curved as in a healthy

14  spine.  Can you clarify that testimony for me again and the

10:43  15  significance of this?

16  A.    Sure.  So, again, there are -- the cervical lordosis as

17  it's known generally is normal curve.  There are three

18  potential reasons why the spine is straight like this.  Number

19  one is she may have been born that way.  And you hear about,

10:44  20  you know, high school football players that wouldn't let 'em

21  play because one of the standards is that they do a cervical

22  spine x-ray to make sure that they have the curve.  If they're

23  straight they don't let 'em play because they're at much higher

24  risk of injury with congenital straightness.

10:44  25          Reason number two is by far and away the most likely one,

10:44  1  that the wear and tear changes in her spine have not happened

2  symmetrically, so if they happened at the same rate, so you get

3  10 percent here and 10 percent here, then the spine maintains

4  its curve, but if you get a little more at certain levels where

10:44  5  the curve is at its most, or if it's asymmetric from the front

6  to the back, the spine will straighten out and actually will

7  even start to bend forward, which she's demonstrating.  And

8  none of these needs to be isolated from the other.  They can

9  happen in combination.

10:45  10      The third reason is that even if a perfectly healthy

11  normal spine, the presence of muscle spasm because of the way

12  the muscle's oriented will tend to straighten out the spine.

13  So if -- if you ask me I'd say it's probably a combination of

14  two and three.  That she already had some -- a fair amount of

10:45  15  straightening just because she does have the wear and tear

16  changes and in addition the muscle spasm pulls the spine back a

17  bit.

18  Q.  And the muscle spasms that you speak of, how does that

19  relate to the accident?

10:45  20  A.  Well, because when the -- when the neck is moved forward

21  and backwards beyond the normal extension of the muscles, they

22  get irritated and they go into spasm.  That is part of the

23  pain.  I mean, that's the pain process.  When you stress a

24  biological tissue beyond its physiological range, its normal

10:45  25  range, that will produce damage to the tissue, and in this case

73

10:45    1    because the muscles have foraminal nerves in them, that will

2    produce the -- The bone in and of itself doesn't have pain.

3    It's the supporting structures of the bone that produce the

4    pain.

10:46    5    Q.    So what is the big test -- the big takeaway for me in

6    regards to your testimony as it relates to the accident?

7    A.    Okay.  That as far as this image is concerned?

8    Q.    Yes.

9    A.    That it's a combination of the wear and tear changes in

10:46   10    her spine have caused her spine to become straight, so that's

11    part of the loss of disk space height and the changes in the

12    joints, in the facet joints.  That's part one, that there was

13    preexisting degenerative changes in her spine with

14    straightening, and loss of disk space height, and wear and tear

10:46   15    on some of the facet joints as well as likely muscle spasm

16    produced by the crash itself as a result of her forward and

17    backward motion.

18    Q.    Thank you.  From the second slide, or the different

19    perspective, Dr. Maiman, you had pointed out to us some boney

10:47   20    changes that you had explained to us.  If you could go over

21    that for me?

22    A.    Excuse me.  I'm going to grab my model.  My $31 Amazon

23    model.  I'm embarrassed.

24          So when we look at the anatomy of the cervical spine, we

10:47   25    see that there are holes at every level of the spine.  These

74

10:47  1  are the facet joints.  There are holes at every level of the
2  spine where nerves come out.  These holes are called foramina.
3  Foramen, which is Latin for hole.
4      And if there are changes in the joints where more commonly
10:47  5  some old disk bulging that turns to calcium right here, that
6  will narrow the hole for the nerve to come out.  In this case
7  we're looking at what is called an oblique view of the spine,
8  it's like this.  It's not a true lateral, it's like this.  To
9  emphasize the openings for the nerves.
10:48 10      So when we go C-1, C-2, C-3, and C-4, at C-5, 6 we see
11  right here, and right here a bone spur, little bone spurs which
12  are old bulging disks.  Again, this is old stuff that is
13  narrowing the space for the nerve to come out.
14  Q.    And what, again, I'm going to ask the same question as I'm
10:48 15  thinking about this accident and the injury, what's the big
16  takeaway from this part of your --
17  A.    It's irrelevant.
18  Q.    Thank you, Dr. Maiman.
19  A.    I just can't stop, you know.
10:48 20  Q.    That's my job to figure out what is relevant to my
21  decision making and what's not, so I wanted to get the
22  testimony clear.
23      Dr. Maiman, the second area of clarification that I need
24  help with is as to your testimony that Dr. Dagam's surgery was
10:49 25  not appropriate.  My question to you, and I believe you

75

10:49  1  testified regarding this, but I just want to nail it down for

2  myself, the way I -- I'm thinking about that portion of your

3  testimony is putting in context of my world, in law when we

4  talk about reasonableness, we talk about it being a range or a

10:49  5  continuum and not just one point.  In other words we could have

6  a room full of judges and we may have different opinions, but

7  so long as we are within the range of reasonableness, a range,

8  a continuum will be reasonable.  Is it your testimony then that

9  Dr. Dagam's decision to perform this surgery on Ms. Gard was

10:50  10  outside of the range of reasonableness, or in your world,

11  appropriateness?

12  A.    So in preparation for this, I actually looked for

13  scientific publications that validated operating for axial

14  pain.  I found roughly 219 saying no.  I think it was 217.  I

10:50  15  found two that said there may be some value in selected

16  populations.  And in those two papers, they qualified their

17  statement by saying that they don't recommend this typically,

18  but if under these certain very specific circumstances it may

19  be helpful.

10:51  20       One of the reasons we've gone to the guidelines is,

21  frankly, and I'm going to be very blunt with you, there's way

22  too much spine surgery being done in this country.  We have the

23  higher -- higher incidents of spine surgery in the

24  United States than anywhere else in the world.  By far.

10:51  25       And it's not for money, it's because Americans like having

10:51  1    surgery.  And I'm not being funny.  So we've developed evidence

2    based standards, in other words is there evidence that this is

3    going to be helpful?  Before a person undertakes something that

4    can kill them or be harmful, where's the evidence to support,

10:51  5    it and that's where these guidelines come from.

6        The people who did the guidelines on cervical fusion, I

7    know many of them and at least one of them was one of my former

8    trainees and one of them is a former colleague, they spent

9    months and months and months reviewing the entire literature,

10:51  10   using the best evidence that there is, and came to a conclusion

11   based on the experience with hundreds of thousands of cases.

12       So the -- the room is very big, but you can get out -- you

13   can get dangerously close to being outside the room, and -- and

14   I'm very uncomfortable with this, obviously as Mr. Knobloch

10:52  15   pointed out, but I would -- if something like this came up in

16   one of our case conferences in the department I'd say, what

17   were you thinking?  Where did you get this from?  And I can

18   assure you that no residency program in the country is teaching

19   residents to do cervical fusions for axial pain.  And I'd be

10:52  20   hard pressed, in fact, I mentioned the insurance company issue

21   too because I find it hard to believe that an insurance company

22   would approve it.  Because it's out of -- it's just out of our

23   stadium.

24   Q.   Thank you.

10:52  25   A.   I guess that's about as clear as I can be.

10:52 1  Q.   Thank you.  Going through the -- my notes here,

2  Dr. Maiman.  The next area I wanted clarification in my mind

3  was the line of testimony and questioning regarding the

4  billing.  Dr. Dagam's billing.  In testifying about billing,

10:53 5  you testified that you -- you neurosurgeons have a fee

6  schedule, fee principle, there's a range; is that correct,

7  Dr. Maiman?

8  A.   Yes.  And interestingly enough, while we were -- while we

9  were on break I got an E-mail from one of my former fellows

10:53 10  who's a resident and fellow who's chairman at Cincinnati who's

11  head of the RUC committee, which is a reimbursement committee.

12  We work in concert with the industry and with -- and with the

13  Government in establishing a fee schedule.

14       So they sent out a survey about a code that they want the

10:53 15  opinion of all the spine surgeons in the United States so we --

16  we have input into this stuff.  Along with the healthcare

17  economists and the Government officials.  These are not

18  arbitrary decisions on how things get paid.  They include not

19  only the technical nature of the procedure, but also the

10:54 20  expected work in evaluating and taking care of the patient

21  and -- and the -- you know, the risks --  I mean, it's a whole

22  number of factors that fit into this.

23       So in this particular E-mail, which I can show you later

24  if you want to see it, say how much postoperative care do you

10:54 25  have to provide for this patient undergoing this surgery?

78

10:54　1　Because that is fit into the billing code.

2　Q.　Dr. Maiman, my question about the fee schedule and fee

3　principle, is this a -- is this a written document?  Is this a

4　handbook that I as a neurosurgeon can go to when I'm setting up

10:54　5　my bills?  Is it a website?  Is this a publication?

6　A.　All of the above.  There are courses in coding, the double

7　ANS -- American Association of Neurological Surgeons has a

8　coding course, the Congress of Neurological Surgeons has a

9　coding course, NASS is having one in two weeks.  There are

10:55　10　courses for coders.  My --  Someone who worked with me for

11　years taught coding at MATC, and there are documents for all

12　this stuff on how things should be coded.

13　　There are fee schedules that are available.  The easiest

14　one to get to, of course, is the CMS one, which is Medicare,

10:55　15　and nobody -- I mean, Medicare pays ridiculously low, and what

16　most insurers have done is they've gone to a percentage of

17　Medicare.  So, for example, last time I checked, United

18　Healthcare was three times Medicare.  That data is all

19　available on-line, and there are courses and publications, yes.

10:55　20　Q.　Thank you.  And you also, I think, you used a word,

21　there's community customs about billing, you testified to that.

22　Is that correct?

23　A.　Well, and part of that is determined by the payors.

24　Because in Milwaukee, the most common -- the most common

10:56　25　non-governmental payor is United Healthcare.  If you want to be

79

10:56   1  a part of their panel, you have to accept their fee schedule.

2  And, frankly, pretty much everybody is going to a common fee

3  schedule, which represents a percentage times Medicare.

4      And so I would -- I would tell you that all of our

10:56   5  schedules are pretty much the same.  There are some things that

6  are written that are outside that, for example, assistant fees.

7  Assistant fees for a surgeon are universally 25 percent for a

8  surgeon, and for a P.A. or an N.P. assisting a surgery, a

9  non-physician, a non-surgeon assistant, it's a little bit

10:56  10  lower.  I don't remember the exact number; it was either 10 or

11  15 percent.

12  Q.   Dr. Dagam testified yesterday that, and this is not a

13  direct quote, but just globally, the way his office does

14  billing is that he has an administrative assistant, a billing

10:57  15  person, who had set up the schedule some 20 years ago, and over

16  time they have adjusted, I guess, for inflation, for market

17  changes and just from knowing generally what other

18  neurosurgeons are charging in the community.  Does that ring

19  correct to you how fees are set in -- for neurosurgeons?

10:57  20  A.   The words fit, the schedule doesn't.  I mean, the numbers

21  that are on that billing form are unbelievably high, and there

22  are things that we don't bill for anymore as I mentioned during

23  my testimony.

24      I don't know --  I can't speak to the expertise of his

10:57  25  billing coordinator, I don't know where she got her data from,

10:57 1  but it's not -- it's not our U. and C., it's not customary.

2  And ultimately I suspect the surgeon tells the billing

3  coordinator what to bill, in that instance in his office.  I

4  can't speak to it because I can't imagine that those numbers

10:58 5  come from any objective data.

6  Q.   Thank you.  You used the words unbelievably high, really

7  high, staggering, quite unreasonable, and so on and so forth.

8  This bill is about 100,000, let's just call it that.  What

9  would be a range of reasonableness in this community for such a

10:58 10  surgery?

11  A.   In this community it would probably be, on the high end it

12  would be 20 -- maybe 25, 28,000 for a surgical fee.  Maybe 30.

13  If you look at reported ranges, and I actually did look this

14  up, the highest I could find for an anterior cervical

10:59 15  diskectomy and fusion of this type was $40,000.

16       Now, again, admittedly fees are a little bit higher in

17  Wisconsin than they are in many other states, but I'm talking

18  about in our range.  I found lows of 15,000, and if I'm not

19  mistaken, and I'm not, United Healthcare right now for a

10:59 20  typical PPO individual is paying between 12 and 14,000, maybe

21  actually 16,000 for this surgery.

22  Q.   Going to switch topics on you now back to the

23  reasonableness of the surgery.  You opined that the surgery was

24  not -- was unwarranted, unnecessary, and you also opined that

10:59 25  the surgery was not successful because Ms. Gard only received,

81

10:59    1    I think, 20 percent -- 20 -- she only got to the 20 percent

2    relief range. Dr. Maiman, do you wish to respond to that?

3    A.   I do. So doctor -- the 20 percent is based on what

4    Dr. Dagam wrote in his note. What I'm hearing today, and I

11:00    5    obviously wasn't here for Miss Gard's testimony, that she may

6    have gotten that 20 percent just from changing jobs. I mean,

7    I -- I am not in a position, it's clear that she did not get

8    much improvement from the surgery at all.

9    Q.   Thank you. I asked about that to set up this specific

11:00   10    question. So it's your testimony that the surgery was not

11    successful, it's your opinion. Is it your opinion that the

12    surgery in any way aggravated Ms. Gard's symptoms? Which is

13    different than the first question that I had asked.

14    A.   I'm under oath, right?

11:01   15    Q.   If you know. If you have an opinion.

16    A.   I always have opinions, Your Honor. Here's the issue with

17    once you've had a fusion. Once you've had a fusion, you put

18    people at risk for having another fusion. So because you've

19    stabilized a segment of the spine, if she develops degenerative

11:01   20    changes, more degenerative changes at C-6, 7, it puts that

21    segment at risk of producing pain. Am I making sense?

22    Q.   Yes.

23    A.   Because by doing a fusion at C-5, 6, you put more stress

24    in C-4, 5 and C-6, 7. And so it could be over decades -- it

11:01   25    may be a long time, it might be decades, but it could

11:01  1  conceivably create wear and tear changes that produce more

2  pain.

3  Q.    Okay.  Thank you.

4  A.    But I don't think her pain syndrome now has anything to do

11:01  5  with the surgery.

6  Q.    Thank you.  And I want to clarify in my mind, I -- you

7  testified that as a result of the accident, Miss Gard suffered

8  cervical muscular strain and facet joint syndrome; is that

9  correct?

11:02  10  A.    Yes.

11  Q.    Okay.  Anything else?

12  A.    No, ma'am.

13  Q.    Those two.  Now, Miss Gard testified yesterday regarding

14  what she's been experiencing since the accident.  She testified

11:02  15  about stiffness, limited range in motion in the neck, she

16  testified about difficulty in getting comfortable to sleep, or

17  waking up from being uncomfortable when sleeping because of the

18  neck.  Are those symptoms that I can reasonably expect to see

19  with cervical muscular strain and facet joint syndrome?

11:03  20  A.    Yes.

21  Q.    Ms. Gard testified that with her neck situation, with the

22  stiffness, that she is now unable to do some activities that

23  she used to do, some physical activities like playing

24  volleyball, softball.  Are those limitations that I can expect

11:03  25  to see with cervical muscular strain and facet joint syndrome?

83

11:03  1  A.    I'm going to qualify that by saying they're not -- those

2  activities are not dangerous to her, but they might aggravate

3  her pain.

4  Q.    Thank you.

11:04  5          THE COURT:   Those are the areas that I needed some

6  clarity on, Dr. Maiman, so thank you very much.

7          THE WITNESS:   Thank you.

8          THE COURT:   Mr. Knobloch, you are jumping at the seat

9  to -- for anything else, very briefly, anything further?  I'll

11:04  10  give the lawyers an opportunity to ask any questions that

11  followed up from my questions.

12                      RECROSS-EXAMINATION

13  BY MR. KNOBLOCH:

14  Q.    Doctor, do you have your report in front of you?  It's

11:04  15  Exhibit 1004.

16          MR. PAWLAK:   Yeah.

17          THE COURT:   Help the doctor, let him know which

18  binder are we talking about.

19          MR. PAWLAK:   It is binder Exhibits 1001 through 1006.

11:04  20  Under tab --

21          THE WITNESS:   I have my report.

22  BY MR. KNOBLOCH:

23  Q.    Is that in front of you, Doctor?

24  A.    Um-hum.

11:05  25  Q.    I want to turn your attention to the first paragraph on

84

11:05   1   page three, which is cut between page two and three, but the

2   part I'm referring to is on page three.  I'm going to read the

3   bottom part of page two on and continue on into page three, and

4   then just simply ask if I read it correctly.

11:05   5       In reviewing Dr. Dagam's report, which admittedly was

6   issued shortly after the surgery, he suggests that Miss Gard

7   was still recovering from her surgery, she is now more than one

8   year postoperative and has demonstrated little, if any,

9   improvement according to the records.  Most series suggest

11:05  10   recovery is maximized within six months, rather, as noted above

11   surgery was of little value.  While I cannot be specific as far

12   as the cost he reports, the literature presents total costs

13   ranging from USD, United States dollars, $35,000 to $70,000 for

14   a single level ACDF.  Did I read that correctly?

11:06  15   A.   Yes, sir.

16   Q.   It appears that the range of reasonable charge for a

17   cervical fusion in your report is about a bit higher than what

18   you testified to today; is that true?

19   A.   I'm here, this says total costs.

11:06  20   Q.   Correct.

21   A.   Including hospitalization in this.

22   Q.   I see.

23   A.   And anesthesia.

24   Q.   I see.  And the assistant charge?

11:06  25   A.   You know what?  Most guys don't use an assistant for an

Case 2:20-cv-00256-NJ    Filed 04/29/22    Page 85 of 89    Document 77

11:06   1   ACDF, although I'm not critical of it.

2   Q.   Does that range include an assistant charge?

3   A.   I -- I can't answer that.  I don't know.

4   Q.   All right.  Your Honor went into it, and you talked about

11:07   5   the billed amount versus the paid amount, and I understand

6   we're getting into the nitty-gritty of the capitalist side of

7   the practice of medicine, but as long as we're talking about

8   it, let's -- let's do it.

9        Any physician that charges a particular amount for a

11:07  10   particular surgery knows that they're not going to get a

11   hundred percent of the dollar on what is billed, correct?

12   A.   Depends on who they're billing in the State of Wisconsin.

13   Q.   For instance, if a surgeon were to charge a hundred

14   dollars for a procedure and Medicare is the payor or Medicaid

11:07  15   is the payor, or United Healthcare is the payor, that physician

16   knows that they're not going to receive a hundred dollars for

17   that service, correct?

18   A.   Exactly right.

19   Q.   So the billed amount is always going to be different than

11:07  20   the paid amount, correct?

21   A.   No, that's not true.

22   Q.   In most circumstances the billed amount is going to be

23   different than the paid amount, true?

24   A.   If there is a third-party payor, there's going to be a

11:08  25   diminution of the payment typically, but in Workman's Comp in

11:08  1   Wisconsin and in liability cases, it's often not the case.

2   Q.   In Workmen's Compensation cases typically a procedure is

3   billed at, say, a hundred dollars and Work Comp paid a hundred

4   dollars, true?

11:08  5   A.   Correct.

6   Q.   Right.  And you're talking third-party liability cases

7   where it may be, say, an auto accident, is that what you're

8   referring to?

9   A.   I'm saying cases like this one, yes.

11:08  10  Q.   Okay.  You don't know in this case what Dr. Dagam has

11  received or what he will receive, true?

12  A.   Well, I know what he has received because it's on this

13  form that was handed to me today, but I've never known before

14  that.

11:08  15  Q.   You don't know what is still outstanding with respect to

16  Dr. Dagam's billing, do you?

17  A.   Only from this piece of paper in this exhibit.

18  Q.   What exhibit are you referring to without talking about

19  the contents, Doctor?

11:09  20  A.   Nine.

21  Q.   And it appears from this, Doctor, that the billed amount

22  is a total of $101,527, and the paid amount at least per this

23  document is roughly $860.78, true?

24  A.   Yes.

11:09  25  Q.   And that is the extent of your knowledge as to what

87

11:09  1    Dr. Dagam and his office has been paid on this 101 some

       2    thousand dollar bill, true?

       3    A.    That is correct.

       4          MR. KNOBLOCH:  That's all I have.

11:10  5          THE COURT:  Thank you.  Mr. Pawlak?

       6          MR. PAWLAK:  Just briefly.

       7                    REDIRECT EXAMINATION

       8    BY MR. PAWLAK:

       9    Q.    The Court asked you a couple questions regarding this

11:10  10   symptomology that Ms. Gard expressed still be suffering from,

       11   and I think the point of the question was whether that could be

       12   attributable to the vehicular accident.  I believe you answered

       13   yes; is that correct?

       14   A.    Yes.

11:10  15   Q.    But even today, if I understand your testimony correctly,

       16   she would benefit from physical therapy and alleviating that

       17   pain?

       18   A.    I think she has a very good probability to get better.

       19   Q.    Very good.

11:10  20         MR. PAWLAK:  That's all I have.  Thank you.

       21         THE COURT:  Thank you, Mr. Pawlak, and thank you

       22   Dr. Maiman.  Please have a good day.

       23         THE WITNESS:  Thank you.  I can leave?

       24         THE COURT: Yes.  Yes.  Yes.

11:10  25         (At 11:10 the transcript excerpt ended.)

88

1                    C E R T I F I C A T E

2

3                    I, THOMAS A. MALKIEWICZ, RPR, RMR,

4    CRR, an Official Court Reporter for the United States

5    District Court for the Eastern District of Wisconsin, do hereby

6    certify that the foregoing is a true and correct transcript

7    of all the proceedings had and testimony taken in

8    the above-entitled matter as the same are contained

9    in my original machine shorthand notes on the said

10   trial or proceeding.

11

12   Dated this 29th day of April, 2022.

13   Milwaukee, Wisconsin.

14

15

16              Thomas A. Malkiewicz, RPR, RMR, CRR
                United States Official Court Reporter
17              517 East Wisconsin Avenue, Room 236
                     Milwaukee, WI 53202
18

19              Thomas_Malkiewicz@wied.uscourts.gov

20

21

22

     ELECTRONICALLY SIGNED BY THOMAS A. MALKIEWICZ
23   Official U.S. Reporter, RPR, RMR, CRR
     _____
24

25