# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**SHEILA A. GARD,**

    **Plaintiff,**

    **v.**                                   **Case No. 20-CV-256**

**UNITED STATES OF AMERICA, et al.,**

    **Defendants.**

---

## DECISION AND ORDER FOLLOWING COURT TRIAL

---

    Sheila A. Gard sues the United States under the Federal Tort Claims Act ("FTCA") alleging that she suffered injuries as a result of a car accident caused by the negligent operation of a postal vehicle driven by a United States Postal Service employee. The government stipulated that it breached its duty of care owed to Gard (Docket # 35) and I conducted a court trial as to causation and damages. Pursuant to Federal Rule of Civil Procedure 52(a), I now enter the following written findings of fact and conclusions of law.

## FINDINGS OF FACT

    On March 3-4, 2022, a trial to the Court was held. Sheila A. Gard, Stephanie Cee, Mikaela Gard, Dr. Shekhar A. Dagam, and Dr. Dennis Maiman testified. I will summarize the testimony of each witness in turn.

*Sheila A. Gard*

    Sheila A. Gard testified at trial that on March 24, 2017, she was driving south on a country road when Mark Czecholinski, driving north in a United States Postal Service truck, turned in front of Gard's vehicle and collided with it. (Transcript of March 3, 2022

Court Trial ("March 3 Tr.") at 15, 17.) The following day, Gard began to feel tightness in the back of her skull, down the sides of her neck, and into her shoulders and shoulder blades. (March 3 Tr. 19–20.) Gard visited an urgent care facility on the Monday immediately following the accident, where x-rays were taken and it was suggested that Gard visit her then-primary care physician, Dr. Amy E. Swift-Johnson. (March 3 Tr. 20, 88.)

Dr. Swift-Johnson referred Gard to physical therapy. (March 3 Tr. 20.) Records from Gard's first session on April 3, 2017 indicated that her potential for rehabilitation was good and that the frequency of her sessions would be two times per week for six weeks. (March 3 Tr. 51–53.) As such, Gard was scheduled to complete physical therapy on May 15, 2017. (March 3 Tr. 54.) She next attended physical therapy on April 6, 2017 and reported a decrease in pain. (March 3 Tr. 54–55.) Gard's next sessions were on April 27, 2017 (March 3 Tr. 56) and May 8, 2017 (March 3 Tr. 58), respectively. The treatment record from the May 8, 2017 session indicates that Gard's job limited her ability to change positions frequently. (March 3 Tr. 60.) At the time, Gard worked as a private investigator and was required to sit in her car for extended periods of time. (March 3 Tr. 46.) At the May 8, 2017 session, Gard expressed that she planned to prioritize physical therapy and was attempting to find another job. (March 3 Tr. 60.)

Gard's next physical therapy sessions were as follows: May 31, 2017 (March 3 Tr. 62), June 21, 2017 (March 3 Tr. 65), July 11, 2017 (March 3 Tr. 67), July 25, 2017 (March 3 Tr. 68), and August 28, 2017 (March 3 Tr. 69). At her tenth session on September 11, 2017, her treating provider indicated that while Gard's work schedule made attending physical therapy on a consistent basis difficult, Gard nonetheless responded well to treatment. (March 3 Tr. 73.) Gard contacted the physical therapy office on October 12, 2017. (March 3

2

Tr. 74.) She stated that her work schedule was very busy, that she was looking for a new job because her current one did not help her neck, and that she would potentially contact the office later. (*Id.*)

Gard next attended physical therapy on October 26, 2017. (March 3 Tr. 75.) While Gard believes that at the time of this session she no longer worked as a private investigator (March 3 Tr. 76), the October 26, 2017 treatment note indicates that her compliance with physical therapy visits and a home exercise program was limited due to her work schedule. (March 3 Tr. 77). The note also indicates that Gard would continue to benefit from skilled therapy. (*Id.*) Gard's next physical therapy session was on November 15, 2017. (March 3 Tr. 78.) Although Gard had changed jobs, she did not recall why she still did not attend physical therapy regularly. (March 3 Tr. 79.) Gard next attended physical therapy on February 15, 2018 (March 3 Tr. 81) and February 22, 2018 (March 3 Tr. 85). Her last physical therapy session was on March 13, 2018. (March 3 Tr. 86.) Gard's physical therapy plan was extended three times, and she ultimately attended 15 physical therapy sessions over the course of 11 months. (March 3 Tr. 85, 87.)

Gard does not believe that the physical therapy sessions helped her neck pain. (March 3 Tr. 20–21.) She expressed that while physical therapy was "[r]elieving at the moment," it did not provide lasting relief. (March 3 Tr. 48.) She stated that she did not attend physical therapy as scheduled because she would have to schedule off work and lose pay as a result. (March 3 Tr. 56.) Gard also stated that her job as a private investigator aggravated her pain because she had to sit for great periods of time. (March 3 Tr. 57.) She stated that she did explore the possibility of attending physical therapy in the evening, but these appointments were always taken. (March 3 Tr. 61.)

3

Gard testified that she also underwent dry needling as a treatment option and explained that while it "felt good while it was going on," after several visits, it too did not bring relief. (March 3 Tr. 21.) She stated that she used a traction mechanism at home daily for almost two months and did home exercise therapy consistently. (March 3 Tr. 21–22, 100.) Gard explained that the traction mechanism felt good while she used it but her soreness would return the next day. (March 3 Tr. 22.) Gard also treated with pain management specialist Dr. Robert Ong. (March 3 Tr. 102; Docket # 45-1.) Dr. Ong gave Gard medial branch block injections. (March 3 Tr. 22.) She testified that the injections provided only initial relief. (*Id.*) In addition to the injections, Dr. Ong also performed radiofrequency ablations on Gard that provided only temporary relief. (March 3 Tr. 23.)

Dr. Ong eventually referred Gard to a neurosurgeon, Dr. Shekar A. Dagam. (*Id.*) Gard testified that after several visits with Dr. Dagam regarding her concurrent treatment with Dr. Ong and its inefficacy, Dr. Dagam told Gard that surgery was her final option. (March 3 Tr. 24.) Gard testified that Dr. Dagam told her that surgery would be beneficial and help her symptoms. (March 3 Tr. 24–25.) While she did not want to have surgery, Gard said that she took Dr. Dagam's recommendation because the other relief measures she tried did not work. (March 3 Tr. 25.) Based on Dr. Dagam's explanation Gard recalled feeling "very secure" that the surgery would help her. (March 3 Tr. 96.) She testified that she also spoke to friends and family before making her decision regarding surgery. (*Id.*) She also testified that Dr. Dagam showed her imaging of where she was having problems and she believed in him. (March 3 Tr. 97.) Gard's goal with surgery was to be 90 percent of where she was before the accident. (March 3 Tr. 94.) However, Gard believes that the surgery did not improve her symptoms. (March 3 Tr. 27.) She testified that after the surgery, Dr. Dagam

4

suggested she attend physical therapy, but she did not want to keep trying something that was not helping her. (March 3 Tr. 97.)

Gard testified to the various symptoms and long-lasting effects of the accident. Gard stated that she has a scar on the front of her neck as a result of the surgery. (March 3 Tr. 39.) She stated that every night when she goes to bed, she takes Tylenol PM to sleep and must constantly reposition herself because her neck gets uncomfortable. (March 3 Tr. 27.) She further stated that after driving or sitting still for about three or four hours, "everything just begins to tighten up." (*Id.*) Additionally, Gard stated that her range of motion is more limited now and when she turns her head, she experiences tightness and stiffness and can hear a "crunching" sound in her neck. (March 3 Tr. 28.) Gard stated that she gets headaches approximately four to five times per week (March 3 Tr. 29), takes ibuprofen and Tylenol to manage her symptoms, and stretches "all the time" (March 3 Tr. 31).

Gard also testified as to the accident's effect on her ability to engage in physical activities. Prior to the accident, Gard testified that she engaged in activities such as softball, volleyball, and bowhunting. (March 3 Tr. 16.) However, Gard believes that she can no longer bowhunt because it involves too much sitting. (March 3 Tr. 29–30.) She further believes that while she can probably still play volleyball and softball, she would be "very sore" the next day. (*Id.*) Furthermore, Gard stated that she used to go for walks often but is now limited to walking her dog up and down the block because walking too much causes stiffness. (March 3 Tr. 30.)

Gard testified that the accident has also impacted her finances and job prospects. Gard obtained a bachelor's degree in criminal justice at age 42. (March 3 Tr. at 15–16.) At the time of trial, Gard worked as an independently contracted process server. (March 3 Tr.

16.) She stated that she worked as a private investigator from December 2016 to October 2017, including at the time of the accident. (March 3 Tr. 46.) Gard said she quit this job and resumed process serving, which she had done previously, because she could not sit in her car for long periods of time as the private investigator job required. (March 3 Tr. 34–35.)

After the accident, Gard applied for a job as an accident investigator with the law firm Gendlin, Liverman and Rymer. (March 3 Tr. 32.) Gard was offered the position, which she believed to be salaried and include a company vehicle, three weeks' vacation, and a 401(k). (*Id.*) However, subsequent to this offer, the law firm told Gard that the firm's auto insurance provider would not insure Gard, whose driving record included two accidents that appeared not to be her fault. (March 3 Tr. 33.) Gard stated that she did not offer to pay for insurance herself because she could not afford it. (March 3 Tr. 98–99.) She further stated that she offered to drive her own car but was told that it was not possible to do so. (March 3 Tr. 99.)

Gard believed that her salary at the law firm would have been approximately $70,000 per year. (March 3 Tr. 34.) She testified that in 2016, her income was approximately $30,000 to $40,000. (*Id.*) She further testified that she made approximately $50,000 and $40,000 in 2018 and 2019, respectively. (March 3 Tr. 36.) Gard stated that her income in 2020 was lower due to the COVID-19 pandemic, and she made about $21,000. (*Id.*) Finally, Gard stated that she made approximately $37,000 in 2021. (*Id.*) She testified that as a result of the accident, she has borrowed money from friends and family and her credit has been negatively impacted because she cannot keep up with her medical bills. (March 3 Tr. 37–38.)

Gard stated that over the past year, her symptoms have been the same and none of the symptoms existed prior to the accident. (March 3 Tr. 40–41.) She stated that knowing her symptoms are permanent makes her feel angry, frustrated, and scared. (March 3 Tr. 38.) Gard summarized the impact of the accident on her life as follows:

> It's impacted my health, it's impacted, like I said, the activities, what I used to do can no longer do. It bothers me that I have a criminal justice degree that I still owe student loans on that I can no longer really use to its full benefit anymore. Financially it's broken me for five years. Having to ask people for help is a hard thing for me . . . . I always depended on just myself, and now I feel like I haven't been able to do that. I am afraid of what the future's going to bring as I'm getting older, because the changes that I've already experienced only in the last five years have been pretty substantial. And I know the pain is just going to keep coming, so I'm just afraid of the future to be honest with you. I wonder what I'm going to do financially.

(March 3 Tr. 40.)

*Stephanie Cee*

The testimony of Stephanie Cee was presented at trial through a videotaped February 23, 2022 deposition. (March 3 Tr. 105.) Cee testified that she met Gard over 10 years ago when Gard worked at a restaurant in Pewaukee, Wisconsin and described Gard as jovial and welcoming during their first encounter. (Deposition of Stephanie Cee "Cee Dep." at 3, Docket # 37-12.) Cee testified that they eventually became good friends and that she knew Gard to be extremely active and worked two part-time jobs before the accident. (*Id.*) Cee testified that she saw Gard months after the accident and observed limitations in Gard such as slower movement, discomfort, and headaches. (*Id.* at 4.) Cee also saw Gard a few weeks after her surgery and observed that Gard's condition was the same. (*Id.*) Cee testified that she now sees Gard weekly. (*Id.*) She testified that they no longer go on walks and if they are out to dinner or just sitting around, Gard gets up and stretches. (*Id.*) Cee also

testified that she has loaned Gard money after the accident to help Gard support herself. (*Id.*)

*Mikaela Gard*

Gard's daughter, Mikaela Gard, also testified at trial. She stated that before the accident, her mother was very active and enjoyed activities such as softball, volleyball, and bowhunting. (March 3 Tr. 108.) She testified that her mother held jobs as a school bus driver and a bartender before the accident. (*Id.*) In her observation, her mother's mobility has not improved since the surgery. (March 3 Tr. 110.) She stated that since the accident, it is more difficult for mother to do even basic activities and she can tell that her mother is in pain. (*Id.*)

*Dr. Shekar A. Dagam*

Dr. Shekar A. Dagam offered testimony through a videotaped February 23, 2022 deposition. Dr. Dagam is a board-certified neurosurgeon and has practiced for over 20 years. (Deposition of Shekhar Dagam "Dagam Dep." at 3, Docket # 37-11.) Dr. Dagam completed his undergraduate education at the University of California-Berkeley and completed medical school at George Washington University. (*Id.*) Dr. Dagam additionally completed neurosurgery training at the Mayo Clinic and an intra-residency fellowship at the University of Pittsburgh Department of Neurosurgery. (*Id.*) Dr. Dagam testified that his current practice is equally split between surgery and clinical work and that he performs about six to eight surgeries per week. (*Id.*)

Gard began treating with Dr. Dagam on July 12, 2018. (*Id.* at 4.) Dr. Dagam opined that Gard's pain was not a degenerative problem but was caused by acute damage from the March 24, 2017 accident. (*Id.* at 28.) Dr. Dagam explained that at the time of his first visit

8

with Gard, he wanted to maximize Gard's pain management treatment. (*Id.*) Specifically, Dr. Dagam wanted Gard to continue facet injections and radiofrequency ablations with Dr. Ong. (*Id.* at 5.) Gard visited Dr. Dagam again on August 22, 2018 and the two discussed the possibility of future surgery. (*Id.* at 5–6.) At this point, Dr. Dagam stated, he did not feel that Gard needed surgery and since the surgery would solely be for pain, the timing would be based on what Gard felt comfortable with. (*Id.*) Thus, Dr. Dagam recommended that Gard continue treatment with Dr. Ong. (*Id.*)

Gard again visited Dr. Dagam on December 5, 2018 and the two once more discussed surgery. (*Id.* at 7.) On February 27, 2019, Gard relayed to Dr. Dagam that she was still having neck pain and was uncomfortable performing daily activities. (*Id.*) Dr. Dagam testified that he made his official recommendation that Gard have an interior cervical discectomy and fusion surgery on October 30, 2019 and obtained a repeat MRI beforehand. (*Id.* at 8.) Dr. Dagam testified that the surgery performed on December 24, 2019 consisted of identifying the damaged disc in Gard's spine, removing the disc, and filling the leftover space with a mixture of cadaver bone or Gard's actual bone. (*Id.* at 9.) He further testified that risks associated with the surgery included infection, failure to alleviate pain, worsening of pain, fracture, blood clots, and the general risks of anesthesia. (*Id.* at 29–30.) He opined that the surgery was worth the risk. (*Id.* at 32.)

Dr. Dagam testified that pain was the main indicator for surgery. (*Id.* at 16.) He also testified that while he was familiar with the North American Spine Society, he did not consult its checklist regarding appropriate criteria for cervical fusion surgery. (*Id.* at 19.) He stated that "if you don't know what you're doing, then go to a checklist." (*Id.*) He also stated that a lot of what he does incorporates common sense and the standard of care, which

9

comes from talking to other neurosurgeons, meetings, textbooks, and cumulative experience. (*Id.*)

Dr. Dagam acknowledged that per an August 6, 2020 treatment note, Gard reported a 20 percent improvement in her cervical symptoms since the operation and continued to have moderate right-sided neck stiffness and achiness. (*Id.* at 32–33.) He stated that he "like[s] to see 50 percent improvement," but this number could include improvement from participating in physical therapy as well. (*Id.* at 34.) As such, Dr. Dagam explained, he recommended after the surgery that Gard participate in physical therapy to help improve her overall outcome. (*Id.* at 35.)

Dr. Dagam also testified regarding billing, both as to his general practices and the charges for Gard's surgery. He testified that his fees were first set over 20 years ago by his billing manager, who checked national fee numbers to determine his fees. (*Id.* at 12.) Thereafter, he stated, the billing manager gradually increased his fees each year based on national trends, what insurance companies allowed, and inflation. (*Id.*) He further testified that his fees were based on his 20 years of experience and the complexity of the work he performs, as spine cases generally produce higher fees than other surgical cases. (*Id.* at 13.) Dr. Dagam stated that he was unaware of how his fees for spine surgeries compared to other fees in the Milwaukee area. (*Id.*) He also stated that he was aware that some doctors charge a multiple of what Medicare will pay for a procedure and that billed amounts for procedures were very different than paid amounts. (*Id.*)

Dr. Dagam's fees for Gard's surgery totaled over $101,000. (*Id.* at 14.) He opined that his fees for the surgery were reasonable. (*Id.* at 11.) Dr. Dagam's physician assistant, Beau Boedecker, also billed for the surgery. (*Id.*) Dr. Dagam explained that because

neurosurgeons are in short supply, physician assistants perform work during surgery that is no less skilled than what a second neurosurgeon would do. (*Id.* at 22.) He stated that Boedecker's fees possibly reflected Boedecker's skill and experience. (*Id.* at 16.)

*Dr. Dennis Maiman*

The government offered the testimony of neurosurgeon Dr. Dennis Maiman. (Transcript of March 4, 2022 Trial "March 4 Tr." at 4.) Dr. Maiman obtained a bachelor's degree from the University of Wisconsin-Madison and completed both medical school and residency in neurosurgery at the Medical College of Wisconsin. (March 4 Tr. 2–3.) He also obtained a Ph.D. in biomedical engineering and biomechanics from Marquette University and an MBA from the University of Wisconsin-Parkside. (March 4 Tr. 3.) Dr. Maiman has been a faculty member at the Medical College of Wisconsin his entire career and has approximately 45 years of experience. (March 4 Tr. 3–4.)

Dr. Maiman opined that Gard suffered myofascial syndrome, or a cervical muscular strain, and facet joint syndrome in the March 24, 2017 accident. (March 4 Tr. 48.) He further opined that Gard also suffered from preexisting degenerative changes in her spine. (March 4 Tr. 73.) Dr. Maiman testified that, based on his review of records predating the accident, Gard did not have any neck problems prior to the accident. (March 4 Tr. 39–40.)

Dr. Maiman believed that it was sound advice for Gard to attend physical therapy after the accident. (March 4 Tr. 19.) He testified that there was "very good evidence" in the scientific literature that "an aggressive nonoperative treatment program, including physical therapy, often including chiropractic treatment, will lead to significant improvement in pain." (*Id.*) Dr. Maiman opined that Gard would have "benefitted significantly from a more involved nonoperative treatment program" and if he had been on her treating team, he

11

would have strongly recommended that she participate in physical therapy. (March 4 Tr. 20–21.) With respect to Gard's treatment with Dr. Ong, Dr. Maiman stated that the facet injections Dr. Ong gave her provided "substantial temporary improvement, which is what you expect." (*Id.*) He further opined that facet injections were a "good adjunct, in other words it's not going to solve the problem, but it can be a valuable contribution in making things better." (*Id.*)

Dr. Maiman testified that he has performed "thousands" of cervical fusion surgeries and described the procedure as "one of the most common operations in neurosurgery." (March 4 Tr. 8–9.) Dr. Maiman opined that the surgery performed by Dr. Dagam was "fine" from a technical perspective but involved "a lot of overkill." (March 4 Tr. 30.) Dr. Maiman testified that he could not conceive of performing cervical fusion surgery for, as in Gard's instance, isolated neck pain with no instability and no neurological deficit. (March 4 Tr. 31.) He added that the North American Spine Society is a well-respected organization with evidence-based guidelines as to when cervical fusion surgery is appropriate. (March 4 Tr. 23.) He testified that the North American Spine Society recommends against cervical fusion surgery for Gard's condition and that upon his review of scientific publications, the vast majority did not validate performing the surgery for axial pain. (March 4 Tr. 24–25, 75.)

Dr. Maiman opined that Dr. Dagam and his physician assistant's fees for Gard's surgery were "quite unreasonable." (March 4 Tr. 36.) Dr. Maiman opined that the amount billed for Gard's surgery was "really high." (March 4 Tr. 32.) He estimated that in the Milwaukee area, the cost for the surgery would reasonably range from approximately $30,000 to $40,000 on the high end and $15,000 on the low end. (March 4 Tr. 80.) He

12

referred to Dr. Dagam and Beau Boedecker's fees for various aspects of the surgery as "unbelievably high" and "staggering." (March 4 Tr. 33.) He also stated that he had "never heard of" a stealth device "being used in the anterior cervical spine before" and the charge for its use was more than he had ever charged. (March 4 Tr. 34.) Dr. Maiman additionally stated that he had not charged for the use of a microscope "in years" because a microscope is a routine tool of surgery and that it was not his normal practice to bill for use of a fluoroscope. (March 4 Tr. 34–35.)

Dr. Maiman also offered an opinion regarding general billing practices in neurosurgery. He testified that the fees of most spine surgeons were comparable. (March 4 Tr. 45.) He stated that various factors go into billing, including fee schedules; relative value units determined based on the difficulty of the surgery, the expertise required, the risks involved, and other care provided; and a quasi-agreement within neurosurgical organizations to "kind of be in a range." (March 4 Tr. 40.) He explained that in his practice, the fee schedule is based on the number of relative value units required for the procedure, as well as what others charge for the same procedures in the area. (March 4 Tr. 45–46.) However, Dr. Maiman acknowledged that nothing prohibited Dr. Dagam from charging what he did for Gard's surgery. (March 4 Tr. 42.)

Dr. Maiman opined that even if Gard underwent all of the physical therapy suggested to her by her primary doctor and the physical therapists, she would still have facet joint pain. (March 4 Tr. 49.) However, he testified that he was comfortable stating, to a reasonable degree of medical probability, that Gard would have "gotten better enough such that [her pain] would cease to be an issue in her life." (March 4 Tr. 50.)

Based on the testimony presented at trial, the findings of fact are as follows:

1. Gard sustained a cervical muscular strain and facet joint syndrome in the March 24, 2017 accident.

2. Gard did not complete her course of physical therapy as instructed.

3. Even if Gard had completed physical therapy as instructed, she would continue to have some discomfort and pain as a result of the March 24, 2017 accident.

4. In seeking treatment with Dr. Dagam, Gard exercised ordinary care.

5. The cervical fusion surgery performed by Dr. Dagam did not relieve Gard's symptoms.

## LEGAL STANDARD

Under the FTCA, the government is liable for torts committed by its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The FCTA waives the government's sovereign immunity only insofar as the defendant, were it not the government, would be liable to the plaintiff under the law of the state in which the conduct that is alleged to be tortious occurred. *Matheny v. United States*, 469 F.3d 1093, 1093 (7th Cir. 2006). Cases brought under the FTCA may only be brought in federal court. 28 U.S.C. § 1346(b)(1). Procedural law is governed by federal law. However, the substantive law of the state in which the alleged tort occurred applies. *See Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001) (citing 28 U.S.C. § 1346(b)); 28 U.S.C. § 2674.

Wisconsin substantive law governs in this case. In Wisconsin, the four elements of a common law negligence claim are: "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting

14

from the [breach]." *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 302, 717 N.W.2d 17, 27 (quoting *Gritzner v. Michael R.*, 2000 WI 68, 235 Wis. 2d 781, ¶ 19, 611 N.W.2d 906).

## CONCLUSIONS OF LAW

In this case, the government has stipulated that it owed Gard a duty of care and that it breached its duty. However, the parties disagree on causation and damages. Gard seeks damages as follows: $230,922.51 for past medical bills, including approximately $100,000 for spinal surgery; past and future lost wages; and damages in the range of $500,000 to $750,000 for past pain and suffering and damages in the range of $1 million to $1.5 million for future pain and suffering.

The government argues that it should only be liable for Gard's medical bills related to urgent care, physical therapy, and pain management (totaling $80,878.92) and for Dr. Dagam's bill up to December 20, 2019 (totaling $3,394.00) because Gard failed to establish a causal link between the March 24, 2017 accident and the cervical fusion surgery performed by Dr. Dagam. Additionally, the government argues that Gard has not shown credible evidence justifying lost wages. Finally, the government argues that Gard should be awarded $25,000 for pain and suffering because Gard failed to mitigate her damages.

*Past Medical Expenses*

A significant part of Gard's past medical expenses is the cost associated with her cervical fusion surgery. The government argues that it should not pay for the surgery for several reasons. First, the government argues that Gard has failed to establish a causal link between the injuries that she sustained in the accident and the cervical fusion surgery. (Docket # 72 at 4–5.) Second, the government argues that even if the court finds a causal

15

link between the injuries from the accident and the surgery, it still should not pay for the surgery because the surgery was the result of Gard's failure to mitigate her damages by failing to complete her recommended physical therapy and by continuing to work a job that required sitting for long periods of time, which Gard alleges exacerbated her neck pain. (*Id.*)

Gard argues that this case is controlled by *Hanson v. Am. Fam. Mut. Ins. Co.*, 294 Wis. 2d 149, 716 N.W.2d 866 (2006). I agree. In *Hanson*, plaintiff's car was hit in the back by a truck driven by defendant. *Id.* at 153. The following day, Hanson developed lower back, neck, and rib pain. *Id.* She saw her primary doctor and began physical therapy. *Id.* After a few months, the lower back and rib pain resolved, but the neck pain remained. *Id.* As a result, Hanson was referred to a neurosurgeon who determined that cervical disks were causing the pain in Hanson's neck and recommended surgery. *Id.* At trial, the defense expert witness, a neurosurgeon, testified that Hanson's surgery was medically unnecessary, opined that Hanson's surgeon was incompetent, and raised the possibility that the surgery was malpractice. *Id.* at 154. The jury found that Hanson did injure her neck in the accident, but only awarded medical expenses up to the point of her surgery. *Id.* at 155. Hanson appealed.

The court of appeals found that Hanson was entitled to all of her medical expenses related to her original injury, provided that she exercised good faith and due care in selecting her treating physician. *Id.* at 156. The Wisconsin Supreme Court affirmed and held that because the jury concluded that Hanson was injured in the accident, she was entitled to all her past medical expenses, regardless of whether Hanson's treating physician performed an unnecessary surgery, so long as Hanson used ordinary care in selecting her doctor. *Id.* at 163.

16

Applying *Hanson* to the facts of this case, the questions are: (1) whether Gard's surgery arose from an initial injury that itself was caused by the accident and (2) whether Gard used ordinary care in selecting her physician. As to the first question, it is undisputed that Gard had no history of neck pain complaints prior to the accident. Additionally, it is not disputed that Gard suffered a neck injury in the accident. Further, it is also undisputed that Dr. Dagam recommended the cervical fusion surgery to Gard to address her unresolved neck pain. On these facts, Gard has sufficiently established a causal link between the initial neck injury from the accident and the cervical fusion surgery.

Gard has also established that she used ordinary care in selecting Dr. Dagam. Again, it was Gard's pain management doctor, Dr. Ong, who referred her to Dr. Dagam. Gard did not randomly select a neurosurgeon from the proverbial telephone book. Moreover, there is no evidence in the record that suggests that Gard should not have relied on Dr. Dagam's recommendation that she undergo the surgery. Accordingly, because it is undisputed that Gard suffered the neck pain injury from the accident and because she used ordinary care in selecting Dr. Dagam, she is entitled to all of her past medical expenses, including the cost of the surgery.

Next, the government argues that even if the court finds a causal link between the injuries from the accident and the surgery, it still should not pay for the surgery because the surgery was the result of Gard's failure to mitigitate her damages. In *Lobermeier v. Gen. Tel. Co. of Wisconsin*, the Wisconsin Supreme Court summarized the law on mitigation of damages in tort actions as follows:

> An injured party is obligated to exercise that care usually exercised by a person of ordinary intelligence and prudence, under the same or similar circumstances; to seek medical or surgical treatment; and to submit to and

17

undergo recommended surgical or medical treatment, within a reasonable time, which is not hazardous and is reasonably within his means, to minimize his damages. The injured party is not required to submit to surgery or medical treatment but is only required to submit to those treatments to which the "reasonable person" would have submitted. Although the injured party is not required to undergo recommended treatment, a tortfeasor is not expected to pay for disability or pain if medical treatment could reasonably correct the ailment. The proper period for which damages are allowed is only for the length of time reasonably required to effect a cure.

119 Wis. 2d 129, 149, 349 N.W.2d 466, 476 (1984); *see also* Wis JI—Civil 1730 (2012).

The government is correct that the evidence shows that Gard did not diligently attend and timely complete her recommended physical therapy plan. Her initial plan of care consisted of six weeks of therapy sessions. However, due to Gard missing appointments, the plan was amended three times and ultimately terminated. Additionally, the physical therapy records also show that Gard complained that her job as an investigator, which required a lot of sitting in place for long periods of time, aggravated her neck pain.

Nevertheless, I find that neither the failure to comply with the physical therapy sessions nor the failure to leave her job alleviate the government from the responsibility to pay for the surgery. First, it is highly speculative to conclude, as the government argues, that had Gard complied fully with physical therapy or changed her job she would not have had to resort to an invasive neck surgery. Gard testified that when she attended physical therapy she only got temporary relief from the pain. Additionally, Dr. Maiman testified that although physical therapy would have likely helped and can still help Gard, the nature of her neck injury is such that it was never going to be eliminated or cured. Thus, the problem with the surgery is not a result of noncompliance with physical therapy or sitting too long. Rather, the problem with the surgery, as Dr. Maiman convincingly testified, is that the surgery is not medically indicated for the type of injury that Gard suffered. But as discussed

18

above, because the surgery resulted from Gard seeking treatment from the initial injury and Gard took ordinary care in selecting and following the recommendation of the surgeon, the government must pay for the surgery.

For these reasons, Gard is awarded a total of $230,922.51 (Docket # 37-4) for past medical expenses.

*Lost Wages*

Gard seeks damages for both past lost wages and for future lost wages. The government argues that Gard has not submitted sufficient credible evidence to justify either past or future lost wages. Relevant to past lost wages and future lost wages, Gard offered testimony regarding her income both prior and subsequent to the accident. Gard testified that in 2016, her income was approximately $30,000 to $40,000. (March 3 Tr. 34.) Although Gard testified that she worked as private investigator from December 2016 to October 2017, Gard did not state what her income was in 2017. However, she testified that she made approximately $50,000 and $40,000 in 2018 and 2019, respectively. (March 3 Tr. 36.) Gard stated that her income in 2020 was lower due to the COVID-19 pandemic, and she made about $21,000. (*Id.*) Additionally, Gard testified that she made approximately $37,000 in 2021. (*Id.*) Gard further testified that as result of not being able to be insured due in part to the accident, she missed the opportunity to work for a law firm where she would have earned approximately $70,000 per year. (March 3 Tr. 34.) She testified that as a result of the accident, she has borrowed money from friends and family and her credit has been negatively impacted because she cannot keep up with her medical bills. (March 3 Tr. 37–38.)

While Gard need not show her damages with exact or mathematical precision, guesswork or speculation is also not enough to meet the burden of proof on damages. Wis JI—Civil 1700 (2016). Regarding lost wages, the record shows that while Gard continued to experience pain and discomfort after the accident, she also continued to work, and at least in 2018 earned more than she did before the accident. It is also difficult to allocate the blame for the loss of the position with the law firm based solely on the accident. The firm cited two accidents for the difficulty in insuring her. (March 3 Tr. 33; Docket # 37-17.) Accordingly, even crediting Gard's testimony that she had to borrow money and that the medical bills have negatively impacted her credit, she has not provided sufficient evidence on which to grant damages for past lost wages.

As to future wage loss, other than a life expectancy and mortality table and her testimony that she has not been able to take advantage of her college degree, Gard offers no evidence on which to tether any estimate of her future lost wages. Again, while some pain and discomfort will be part of Gard's life, Dr. Maiman testified that with some phyisical therapy and chiropractic care, Gard can return to a quality of life, which includes work. (March 4 Tr. 44.) Specifically, Dr. Maiman testified that Gard has a " good chance of being better enough that [pain] ceases to be an issue in her life." (March 4 Tr. 44.) Accordingly, without more evidence of the accident's impact on her ability to work, I cannot award Gard damages for future lost wages.

*Pain and Suffering*

Finally, Gard seeks damages for pain and suffering. Gard argues that the injury has negatively impacted her life and will continue to negatively impact her life. She seeks damages in the range of $500,000 to $750,000 for past pain and suffering and damages in

the range of $1 million to $1.5 million for future pain and suffering. The government counters that Gard should be awarded $25,000 in damages for pain and suffering and that Gard failed to mitigate her damages.

Pain and suffering is the hardest damages calculation to perform. First, pain and suffering is inherently subjective. Further, there is no exact standard for determining damages for pain and suffering. For this reason, heeding the dictum of the Seventh Circuit in *Jutzi–Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001), I invited the parties to submit data on comparable cases.

Gard, focusing on jury verdicts generally involving neck injuries and cervical fusions, cited two Wisconsin jury verdicts: *Lindner, et al. v. O'Donnell, et al.*, 2006 WL 4739286 (Wis. Cir.) and *Allen v. General Cas. Co.* (1993 WL 795433 (Wis. Cir.)). (Docket # 75 at 2.) In *Lindner*, plaintiff sustained injuries to his neck, back, and shoulders in a car accident caused by defendant and underwent a cervical fusion. (*Id.*) The pain and suffering damages award was $325,000 ($175,000 past and $150,000 future). (*Id.*) In *Allen*, plaintiff sustained injury when his vehicle was struck by defendant, which necessitated cervical anterior discectomy and fusion. (*Id.*) Allen was awarded $350,000 in pain and suffering damages. (*Id.*) Gard asserts that accounting for inflation, these awards would be closer to $500,000-$750,000 in 2022 dollars. (*Id.*) Gard also submitted a special verdict form from *Scott H. Arnsdorf, et al. v. Westfield Insurance Company*, a case tried by Attorney Eric M. Knobloch as lead trial counsel in 2018. (Docket # 75 at 2.) In that case, Gard states, plaintiff was rear-ended and suffered a neck injury that required a cervical fusion surgery, and the jury awarded $200,000 in past pain and suffering and $150,000 in future pain and suffering. (*Id.*) Finally, Gard submitted several jury verdicts from jurisdictions outside of Wisconsin. (*Id.* at 3.)

21

The government submitted a collection of nationwide cases that are factually analogous to this case, specifically cases that involve neck injuries and/or neck fusion surgery where liability was not contested. (Docket # 78 at 1.) The government presented two verdict summaries from Wisconsin: *Cager v. Metro. Prop. & Cas. Ins. Co.*; *Yanny* 2016 WL 8116086 (Wis. Cir.) and *Escobedo v. Radjenovich*, 2010 WL 6366744 (Wis. Cir.). (Docket # 78 at 1–2.) In *Cager*, plaintiff claimed he suffered a permanent neck injury from an automobile collision and defendants admitted liability but disputed damages. (*Id.* at 1.) The jury awarded $30,000 for pain and suffering. (*Id.* at 2.) In *Escobedo*, plaintiff was injured during a motor vehicle collison and alleged injuries including an anterior cervical decompression and fusion at the C5-6 level, annular tear at C4-5, lost earnings, loss of consortium, permanent partial disability and loss of enjoyment of life. (*Id.*) The parties reached a settlement of $214,489.90, with $43,266.25 going to plaintiff. (*Id.*)

In the end, Gard argues that the "great unknown" is whether surgical interventions provided the plaintiffs in the comparable cases relief. (Docket # 75 at 4.) Gard further argues that if the surgeries did provide relief, one can presume that the jury took into consideration limited ongoing or future problems when awarding damages for future pain and suffering. (*Id.*) By contrast, Gard argues that she received zero relief from the cervical fusion and that she is left with permanent neck problems that continue to interfere with her activities of daily living. Gard asserts that this offers support in favor of a future pain and suffering award in the range of $1,500,000. (*Id.*)

After considering the parties' submissions, I conclude as follows. The evidence shows that Gard has been suffering from neck pain which she undisputably did not have prior to the accident. It is also undisputed that Gard had to endure invasive cervical surgery

22

as a result of the neck pain. Even though the surgery was not indicated for the type of neck injury she suffered, it was undeniably performed in the course of seeking treatment for her neck pain and her doctor recommended the surgery. And while Dr. Maiman's prognosis is that Gard will do better even at this stage with physical therapy and chiropratic care, she will never be "cured" of the neck pain. In other words, Gard will be left with a pain which she did not have prior to the accident. This evidence supports an award for pain and suffering.

Additionally, the accident's impact on Gard's daily activities also supports an award for pain and suffering. Gard, her daughter Mikaela Gard, and her friend Stephanie Cee each testified that the pain has impacted her activities. Gard has difficulty sleeping. She tightens up after driving or sitting too long. Her range of motion is limited and she suffers headaches four to five times per week. Gard also testified that can no longer enjoy activities such as bowhunting, volleyball, softball, or walking.

Given the persistent nature of Gard's injury and its impact on her quality of life, I find that an award of $350,000 for past and future pain and suffering is appropriate here. In arriving at this award, I took into account that although Gard's injury has resulted in persistent pain, it is not a catastrophic injury. I also took into account that although the injury was not Gard's fault or invited by Gard, her pain and suffering may be mitigated by physical therapy and chiropractic care.

## CONCLUSION

The government's negligence on March 24, 2017 caused injury to Gard and she suffered actual damages as a result. In sum, for the reasons discussed above, I award

Case 2:20-cv-00256-NJ   Filed 06/24/22   Page 23 of 24   Document 79

damages as follows: $230,922.51 for past medical expenses and $350,000.00 for pain and suffering.

**ORDER**

    **NOW, THEREFORE, IT IS HEREBY ORDERED** that the Clerk of Court shall enter judgment in favor of the plaintiff and against the defendant in the amount of $580,922.51, consisting of $230,922.51 for past medical expenses and $350,000.00 for pain and suffering.

    **IT IS FURTHER ORDERED** that this action be and hereby is dismissed.

    Dated at Milwaukee, Wisconsin this 24th day of June, 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge